## THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

CHASE BARFIELD, *et al.*,　　　　　)
　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　Case No. 11-cv-04321-NKL
　　　　　　　　　　　　　　　　)
SHO-ME POWER ELECTRIC　　　　　)
COOPERATIVE, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　)
　　　　　　　　　　　　　　　　)

## ORDER

Pending before the Court is Plaintiffs' Motion for Class Certification. [Doc. #146]. For the reasons set forth below, the Motion is GRANTED.

I.　　**Background**

This class action is brought on behalf of several thousand Missouri landowners for claims arising out of Defendants' use of electric transmission line easements on the class members' properties. Defendants are Sho-Me Power Electric Cooperative and its wholly-owned technology subsidiary, Sho-Me Technologies, LLC, and KAMO Electric Cooperative, Inc. and its wholly-owned telecommunications subsidiary, K-PowerNet, LLC.

Defendant Sho-Me has an electric transmission easement over the properties owned by named Plaintiffs Michael and Gina Biffles and Dwight Robertson. Defendant KAMO has an electric transmission easement over property owned by named Plaintiff

1

Chase Barfield. Plaintiffs allege that, in order to support a separate telecommunications business, Defendants created excess fiber optic cable capacity on their easements and then licensed that capacity for external, commercial telecommunications purposes. In so doing, Plaintiffs assert that Defendants have exceeded the scope of their easements over Plaintiffs' land and deprived them of a valuable property right, the right to benefit from the use of their land for fider optic telecommunications purposes. [Doc. #147 – Suggestions in Support of Class Certification].

Plaintiffs have moved for class certification of the following class:

> All persons who own or owned land in Missouri underlying Defendants' electric-transmission lines and on or in which a Defendant has licensed the fiber optic cable for commercial-telecommunication uses or has used the fiber optic cable for commercial-telecommunication uses.

Defendants oppose class certification primarily on the grounds that individual issues predominate over common issues, damages cannot be measured on a uniform, class-wide basis, and the class is unmanageable.

## II.    Discussion

### A.    Class Certification Standard

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, pursuant to Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Plaintiffs assert that the

proposed class qualifies under both Rule 23(b)(2) and Rule 23(b)(3). Plaintiffs have the burden of showing that the class should be certified and that the requirements of Rule 23 are met. *Luiken*, 705 F.3d at 372. This burden is met only if, "after a rigorous analysis," the Court is convinced that the Rule 23 requirements are satisfied. *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)). This rigorous analysis frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim," as "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 131 S. Ct. at 2551-52 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Luiken*, 705 F.3d at 372 ("The preliminary inquiry of the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case."). District courts are accorded broad discretion to decide whether class certification is appropriate. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012) (citing *Rattray v. Woodbury Cnty, Iowa*, 614 F.3d 831, 835 (8th Cir. 2010)).

## B. Rule 23(a)

### 1. Numerosity

The first requirement of 23(a) is that the class be sufficiently numerous such that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). In assessing whether the numerosity requirement has been met, courts examine such factors as the number of persons in a proposed class, the nature of the action, the size of the individual claims, and the inconvenience of trying individual claims. *Paxton v. Union Nat'l Bank,*

688 F.2d 552, 561 (8th Cir. 1982). Here, there are several thousand class members. Joinder of these persons would be impracticable, and so the numerosity requirement is met.

### 2. *Commonality*

Rule 23(a) also requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that their claims "depend upon a common contention" that "is capable of classwide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. They must demonstrate that a class wide proceeding will "generate common answers apt to drive the resolution of the litigation." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011) (quoting *Wal-Mart*, 131 S. Ct. at 2551), *cert. denied*, 132 S. Ct. 1807 (2012), *and cert. denied*, 132 S. Ct. 1861 (2012); *see also Luiken*, 705 F.3d at 376.

There are several questions of fact or law common to Plaintiffs' proposed class. One key question is whether Defendants have violated Missouri law, which provides that electric cooperatives may not engage in any business other than supplying electric energy and promoting and extending electricity use in rural areas. Mo. Rev. Stat. § 394.030. Resolution of this question will resolve issues central to the case "in one stroke" even as to those easements which permit telecommunications use. A second common question is whether the installation and use of a fiber optic cable which transmits light pulses carrying commercial communications traffic is a violation of easements limited to electrical transmission. Resolution of this issue could also resolve the lawsuit "in one

stroke." These two issues alone are sufficient to satisfy the commonality requirement, because for purposes of Rule 23(a), there need only be "questions of fact or law common to the class."[1]

### 3. Typicality

The typicality requirement is met when the claims or defenses of the representative party are typical of those of the class. Fed. R. Civ. P. 23(a)(3). The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). In determining typicality, courts consider whether "the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, the Named Plaintiffs' claims arise out of Defendants' course of conduct in using fiber optic cable on Plaintiffs' land to operate a commercial telecommunications business. The same legal theories involving the scope of the easements and the interpretation of Missouri law limiting the business endeavors of electric cooperatives applies across the class.

Defendant KAMO alleges that Barfield's claims are not typical of the class and he is thus not an adequate representative because his easement may not have been properly recorded. While the copy of Barfield's easement held by KAMO states that the easement was recorded in Book 105 at the Hickory County Recorder's Office, Book 105 contains a

---

[1] Although Defendants contend the variation in easement language impacts the commonality requirement, that issue is appropriately dealt with under the "predominance" and "superiority" analysis of Rule 23(b)(3), discussed below.

blank page.  Plaintiffs have assumed Defendants' records will establish that the easement held by KAMO will apply to Barfield's property despite its unavailability in the public record.  [Doc. #141, p. 5 n.4 – Suggestions in Support].  KAMO claims that Barfield must make a binding admission that his property is subject to the written easement produced by KAMO before his claims can be considered typical.  If, as Plaintiff's state, they are willing to concede the validity of the written easement in KAMO's possession, then Barfield's claims are typical.  Even if Barfield is shown to be no longer a typical representative, Plaintiffs may move to substitute class representatives, and therefore this dispute is not a basis for refusing class certification.  *See Kremens v. Bartley*, 431 U.S. 119, 135, 97 S. Ct. 1709, 1718 (1977).

### 4. *Adequacy*

The final requirement of Rule 23(a) is that the class representative and class counsel will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is met where "1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge."  *Carpe v. Aquila, Inc.,* 224 F.R.D. 454, 458 (W.D. Mo. 2004) (internal quotes omitted); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20, 117 S. Ct. 2231, 2251 n.20 (1997).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625, 117 S. Ct. at 2250.  Defendant Sho-Me argues that the adequacy requirement is not met

because some class members may have benefited from broadband. Sho-Me argues that Plaintiffs' request for injunctive relief requires Sho-Me to cease providing fiber optic communication services, and so conflicts with the benefit incurred by any class members who use the fiber optics telecommunications service Defendants provide. Sho-Me argues that this conflict applies to most class members, as "every time a class member uses a cell phone in South Central rural Missouri, he or she is likely using Sho-Me's fiber optic system to some extent." [Doc. #199 – Sho-Me's Suggestions in Opposition]. However, the fact that some class members may benefit from Defendants' provision of fiber optic telecommunications services does not somehow obviate the alleged illegality of Defendants' actions. Additionally, Plaintiffs' Complaint does not seek to enjoin Sho-Me from providing fiber optic communications services altogether. Rather, Plaintiffs allege that Defendants intend to expand their fiber optic commercial communications in the future, and so it is reasonable to read Plaintiffs' claim as a request to enjoin Defendants from further use and expansion of the fiber optic cable for commercial telecommunications purposes absent payment to Plaintiffs for use of their land for that purpose. An injunction on future illegal acts does not necessarily mean class members will no longer receive cell phone service, just that Defendants will not be able to misuse their easements in providing such service.

Sho-Me also argues that there is a conflict between current and former owners. This argument is premised on the assumption that damages must be measured on the "before-and-after" fair market value test rather than the "corridor valuation" theory promoted by Plaintiffs, which is discussed in greater detail below. Sho-Me argues that a

damages calculation would have to take into account whether buyers of the property received less than fair market value because of the diminution in property value as a result of the easement. This would involve determining the amount of diminution for each property and whether each buyer paid full price, which would make the buyer's and seller's claims "inherently antagonistic" because only a buyer who paid full price would suffer damages. [Doc. #199, p. 40 – Sho-Me's Opposition]. However, "potential conflicts over the distribution of damages – which would arise only if the plaintiffs succeed in showing liability on a class-wide basis – will not bar a finding of adequacy at the class certification stage." 1 Newberg on Class Actions § 3:58 (5th ed. 2013).

More importantly, the Court has determined in a separate Order [Doc. #246] that Plaintiffs' proposed theory of damages is viable. This theory, which apportions damages based on the total value of the fiber optic corridor divided by the length of corridor running through each class member's land, does not require individual before-and-after fair market valuation. Additionally, Plaintiffs propose that damages be calculated on a yearly or monthly "rent," rather than a one-time fee. This eliminates the conflict between past and present owners of the property because each class member receives damages based on the amount of time they were in possession of the property, rather than based on the amount they paid to acquire the property. The corridor theory is the only damage theory submitted by Plaintiffs, so the theoretical problem raised by Defendants is not at issue on this record.

For these reasons, there is no conflict of interest between the named representatives and the class members. As for the other factors relevant to the adequacy

requirement, the class representatives have common interests with proposed class members because they claim Defendants exceeded the scope of all class members' easements by using their property for commercial telecommunications purposes. The class representatives and their counsel have also vigorously prosecuted the case throughout the litigation, as indicated by the fact that this litigation was initiated a year and a half ago and since then numerous motions on substantive issues have been filed. Therefore, the adequacy requirement is satisfied.

### C.    Rule 23(b)(2)

In addition to the requirements of 23(a), a proposed class must also satisfy at least one of the requirements of Rule 23(b). *Wal-Mart*, 131 S. Ct. at 2548. Plaintiffs assert that the proposed class satisfies the requirements of Rule 23(b)(2) and/or 23(b)(3).

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart*, 131 S. Ct. at 2557 (quoting Fed. R. Civ. P. 23(b)(2)). Certification under Rule 23(b)(2) is meant for cases challenging "the propriety of the behavior" of the defendant, not for actions primarily asserting monetary damages. 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1775 (3d ed. 1998); *see also In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).

In *Wal-Mart*, the Supreme Court "expressed serious doubt about whether claims for monetary relief may be certified" under Rule 23(b)(2) at all, and held that if accompanying claims for money damages were permitted, they must be merely

"incidental" to the request for declaratory or injunctive relief. *Wal-Mart*, 131 S. Ct. at 2557. In determining whether accompanying monetary damage claims are incidental, the focus is on whether damages must be determined on an "individualized" basis, *Wal-Mart*, 131 S. Ct. at 2559, or whether "liability to the class turned on a single question that uniformly applied to all class members" such that "the computation of the damages due each followed mechanically." *Avritt*, 615 F.3d at 1036 (citing *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 764 (7th Cir. 2003)). The Supreme Court held that a claim for back pay accompanying a request for declaratory and injunctive relief against Wal-Mart's employment practices was not "incidental," and so Rule 23(b)(2) certification was improper. *Wal-Mart*, 131 S. Ct. at 2559.[2]

Although the precise definition of "incidental" in the Eighth Circuit has not been fleshed out, the Southern District of Iowa has held that money damages are "incidental" if the plaintiffs can "show that they would have filed similar litigation seeking purely injunctive relief 'even in the absence of a claim for damages.'" *In re Teflon Products Liab. Litig.*, 254 F.R.D. 354, 369 (S.D. Iowa 2008) (citing *In re St. Jude*, 425 F.3d at 1122). The court emphasized that "class certification under Rule 23(b)(2) is intended for those groups hoping to achieve broad-based injunctive relief, rather than cases in which a lawyer 'located a plaintiff and brought a class action in the hope of a fee.'" *Id.* (citing *In re St. Jude*, 425 F.3d at 1122). The Western District of Arkansas recently determined

---

[2] The reason for the focus on "individual" versus "mechanical" damages awards is that Rule 23(b)(2) does not mandate that notice and the ability to opt-out be given to potential class members, as Rule 23(b)(3) does. *Walmart*, 131 S. Ct. at 2558. The Court in *Wal-Mart* underscored "the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone – a choice Rule 23(b)(2) does not ensure that they have." *Id.* at 2559 (emphasis in original).

that certification under Rule 23(b)(2) was proper in a suit to enjoin the defendant insurance company from continuing to engage in "a systematic practice of sending an illegal notice of cancellation" and collecting rewrite fees, where the plaintiffs also alleged an accompanying claim for damages in the "nominal and incidental" amount of either $20 or $25, depending on which fee they had been charged. *Walls v. Sagamore Ins. Co.*, 274 F.R.D. 243, 256-57 (W.D. Ark. 2011) (citing Wright et al., supra, § 1775).

From the above cases, it appears that monetary damages are "incidental" if the primary purpose of the action is to achieve declaratory or injunctive relief, rather than monetary damages for the class members, and if the monetary damages that are requested are nominal. If, on the other hand, the primary thrust of the case is about righting the defendant's wrong to the plaintiff via a cash payment, then Rule 23(b)(2) does not provide the proper vehicle for certification.

Although Plaintiffs seek declaratory and injunctive relief relating to this practice, the thrust of Plaintiffs' claims are for monetary compensation. Plaintiffs seek declaratory relief that Defendants have no legal right to use their easements to construct a fiber optic commercial telecommunications network and injunctive relief to prevent the continued use of the easements for that purpose. If Defendants are found to be liable, their actions will constitute a "trespass" which will entitle Plaintiffs to damages. Declaratory relief will merely be a formal way for the Court to announce that a trespass has occurred. Similarly, injunctive relief will preclude Defendants from continuing to use their fiber optic commercial telecommunications network unless and until they pay Plaintiffs for the value of using their land for this purpose. As such, although claims for declaratory and

injunctive relief are asserted here, the primary focus of the litigation is on obtaining monetary damages for class members. Therefore, the claim for monetary relief cannot be said to be "incidental," and Rule 23(b)(2) certification is improper.

### D. Rule 23(b)(3)

#### 1. *Predominance*

To certify the class, then, Plaintiffs must prove that they meet the requirements of Rule 23(b)(3). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation." *In re Zurn Pex Plumbing Products Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Amchem*, 521 U.S. at 623, 117 S. Ct. at 2249) *cert. dismissed*, 133 S. Ct. 1752 (2013). To satisfy the predominance standard, the plaintiffs must show that the method of calculating damages measures "only those damages attributable to that theory" of injury asserted by the plaintiffs, and that the "damages are susceptible of measurement across the entire class." *Comcast*, 133 S. Ct. at 1433. The Supreme Court indicated that Rule 23(b)(3)'s predominance requirement is not met if individual damage calculations "overwhelm questions common to the class." *Id.*

Defendants argue that the predominance requirement has not been met because of individual issues regarding property ownership; the difficulty of assessing damages; differences in types of easements; and the potential for affirmative defenses.

12

### a.    Property Ownership

Defendants cite to a number of cases that they claim support the denial of class certification in fiber optics cable cases.  [Doc. #199 – Sho-Me Defendant's Suggestions in Opposition, p. 20 n.21].  However, the majority of these cases involve railroad rights-of-way, which necessarily implicate more complex issues than those involved in easements between private landowners and Defendants.

Private railroads obtained rights to use land through a variety of methods, including federal and state grants; traditional real estate transactions with private individuals; and court condemnations.  *See* Jill K. Pearson, *Balancing Private Property Rights with Public Interests: Compensating Landowners for the Use of Railroad Corridors for Fiber-Optic Technology*, 84 Minn. L. Rev. 1769, 1772-73 (2000).  The property rights granted to the railroad companies varied enormously depending on the particular circumstances of each conveyance.  *Id.*; *see also Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 214 (E.D. Va. 2003) (distinguishing cases involving alleged trespass by railroads from non-railroad fiber optics cases).  For instance, rather than granting the railroad a simple easement in which the landowner retained the rest of their real property rights, railroads were sometimes granted fee title to the land under the right-of-way as well.  Pearson, *supra*, at 1773.  For this reason, when landowners have contested a railroad's licensing of the use of the right-of-way to telecommunications companies, courts have had to investigate whether the individual class members retained any property rights over the land at issue at all.  These inquiries involve investigations of class members' fee titles as well as the instruments conveying land to the railroads, which

13

could be in the form of federal or state grants, private conveyances, land condemnation proceedings, or even American Indian treaties in some cases. *Id.*

Most courts have determined that the individual issues presented by these railroad cases defeat the typicality and/or predominance requirements of 23(b)(3) class certification. *See, e.g.*, *Nicodemus v. Union Pac. Corp.*, 204 F.R.D. 479, 488-89 (D. Wyo. 2001) (certification denied on the grounds it was too difficult to ascertain class members, the representative's claims were not typical, and predominance was not met, where the case involved thousands of parcels of land across the country and the extent of the defendant railroad's rights depended on the individual deeds of class members, individual federal land grants to the railroad, and individual class members' consent); *McDaniel v. Qwest Commc'ns Corp.*, 2006 WL 1476110 at *8-9 (N.D. Ill. May 23, 2006) (denying certification in part because the rights-of-way consisted of myriad parcels in ten states, and the railroad owned some of these rights-of-way in fee simple while others were easements created by deeds of conveyance from the federal and state governments or private parties); *Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir. 2001) (denying certification because "[t]he case involves different conveyances by and to different parties made at different times over a period of more than a century... in 48 different states (plus the District of Columbia) which have different laws regarding the scope of easements... whose application involves intricate legal and factual issues; *Kirkman v. N. Carolina R. Co.*, 220 F.R.D. 49, 52-53 (M.D.N.C. 2004) (denying certification because of the individualized issues such as "the nature of the Defendants' property interest in each of the disputed rights-of-way, the property interest of each potential class member in the

right-of-way at the time of the alleged trespass, and the possibility of statute of limitations defenses for some class members"); *Johnson v. Kans. City S.*, 224 F.R.D. 382, 389 (S.D. Miss. 2004) *aff'd sub nom.* 208 F. App'x 292 (5th Cir. 2006) (denying class certification because there were "an abundance of individualized issues involved in determining the nature of the interest owned by the railroad in each parcel of land comprising the railroad corridor in question and ascertaining who owns any interest in the corridor not owned by the railroad in fee"); *Nudell v. Burlington N. & Santa Fe Ry. Co.*, 2002 WL 1543725 at *2 (D.N.D. July 11, 2002) (denying class certification because of the individualized inquiries necessary to determine who owned the land; the railway's interest in each parcel; and potential defenses of consent or acquiescence, as well as the interpretation of multiple state laws); *Hallaba v. Worldcom Network Servs. Inc.*, 196 F.R.D. 630, 640 (N.D. Okla. 2000) (denying class certification because of the individualized inquiries involving land ownership, the applicable federal or state laws, and the scope of the potential easements); *Regan v. Qwest Commc'ns Int'l, Inc.*, 2010 WL 3941471 at *7(E.D. Cal. Oct. 5, 2010) (denying certification because the rights of way were conveyed by "at a minimum... five federal land grant statutes, five condemnation statutes, and thousands of private conveyances"); *Ostler v. Level 3 Commc'ns, Inc.*, 2002 WL 31040337 at *8-9 (S.D. Ind. Aug. 27, 2002) (denying certification on grounds of unmanageability and lack of predominance because the case involved "grants of property rights under a host of different explicit conveyances, prescriptions, and even treaties, all governed by different statutes and common law principles, with 'intricate' issues of application to a particular property.").

These cases are distinguishable from the instant case for the following reasons: they depend on preliminary questions of the real property rights retained by individual class members; they involve multiple types of right-of-way instruments, such as statutes, federal land grants, private conveyances, or even treaties; and/or they involve the laws of multiple states. None of these problems arise in the instant case, which involves class members in one state, who conveyed land to Defendants primarily through private easements,[3] the language of which is fairly uniform, and which plaintiffs have already categorized into seven workable categories.[4] For these reasons, the cases cited by Defendants above do not have persuasive authority in this case.

### b.    Damages

Defendants also contend that damages must be assessed on a case-by-case basis, and so individual issues necessarily overwhelm common issues. However, as explained in the Court's Order denying Defendants' motion to strike Plaintiffs' expert witness [Doc. #246], damages may be assessed on a holistic, class-wide level based on the "corridor valuation" method. In this method, the value of the use of each class member's land for commercial fiber optic telecommunications purposes is a function of the value of the entire fiber optic network, or "corridor," divided by the number of linear feet of fiber optic cable on Plaintiffs' property. As discussed in the prior Order, this method of corridor valuation is endorsed by Plaintiffs' expert, Dr. Kilpatrick, and is one of several

---

[3] With the exceptions of a small number of court orders condemning the land for easement purposes, which use the same purpose language as the easement grants. *See infra* Part D(1)(c).
[4] *See infra* Part D(1)(c).

methods of land valuation available, as indicated by mass appraisal scholars, practitioners, and the relevant literature.  [Doc. #246].

Defendants cite to two cases in particular to argue that Dr. Kilpatrick's theory should not be considered by the Court for purposes of class certification.  They first rely on *Corley v. Entergy Corp*, which rejected the corridor valuation method on the grounds that "*[i]t strains credibility to suggest that the property damages for the alleged trespass across the entire state can be measured by one measure*… Instead, each land owner is entitled to damages based on the specific characteristics of his or her land and the extent of Defendants' trespass on his or her land."  220 F.R.D. 478, 486 (E.D. Texas 2004) (internal quotes omitted) (emphasis in original).  The Fifth Circuit affirmed, stating it was "intuitive" that damages must be individualized because of the "peculiar circumstances" of each parcel of land.  *Corley v. Orangefield Ind. Sch. Dist.*, 152 Fed. App'x 350, 354 (5th Cir. 2005).  However, Plaintiffs' theory shows that the "highest and best use" of each parcel of land is its aggregation into a fiber optics telecommunications corridor.  The value of this use depends on the creation of the entire corridor; without the existence of the corridor, the right to use the land for commercial fiber optics communications purposes is useless.  For this reason, the Court disagrees that it is "intuitive" that damages must be measured based on the individual value of each parcel of land.  The market evidence in fact suggests otherwise.

Defendants also cite to *Ogg v. Mediacom, LLC*, in which the Missouri circuit court decertified the class of landowners because "[w]hile trespass damages to the 'telecommunications corridor' may well be amenable to pure mathematical calculation

17

equally applicable to all class members, the Court finds and believes that other factors, unique to each member, would naturally come into play as well," such as additional compensatory or punitive damages. No. 7CV101002809, at 22 (7th Mo. Jud. Cir. Apr. 22, 2011). The court emphasized that in addition to damages for the legal trespass, the class representatives had also claimed actual damages for such things as knocking over their mailbox, as well as punitive damages arising out of the specific facts of their case (the defendants had at first agreed to pay them $1,000 to install fiber optic cable over the existing easement, but later rescinded, necessarily raising individual questions). *Id.* at 8-9. In contrast, here Plaintiffs are not claiming any physical damages, merely damages for the alleged misuse of the easements. *See Fisher*, 217 F.R.D. at 216 ("Here, there is no allegation that the Defendants have exceeded the physical scope of the easements, only the legal scope."). Additionally, although Plaintiffs are requesting punitive damages, this claim hinges on Defendants' knowing violation of the easements, rather than any specific incidents arising out of the installation of the cable. Defendants' knowledge is determinable on a class-wide basis and does not require evidence of Defendants' interaction with individual class members. Therefore, the Court concludes that as to damages, class-wide issues clearly predominate over individual inquiries.

### c. Types of Easements

The class members' easements number more than 6,900 and contain some variation in language. Plaintiffs have provided appendices grouping the easements into

seven categories based on the "purpose language" of their granting clauses.[5]  According to Plaintiffs, approximately 3,500 of the 6,900 easements reviewed contain language restricting the purpose to transmitting electricity and related activities, while 3,333 of the easements are dual-purpose easements permitting use for electric-transmission and communications purposes.  [Doc. #147-1 - Appendix].

Defendants contend  that these variations in categories of easements, as well as other variations such as minor differences in the language used within each, create individual issues that overwhelm any common issue of fact or law, and therefore the predominance requirement of Rule 23(b)(3) cannot be satisfied.  In support of their argument, Defendants rely on several cases that found that individual issues predominated when the dispute involved multiple easements.   However, those cases involved substantial variations in the language of the easements, and even some claims that no easements had ever been conveyed.  *See Genenbacher v. CenturyTel Fiber Co.*

---

[5] Plaintiffs have broken down the 6,900 electric easements into the following 7 categories:

> **Category 1A**: easements containing language limiting use to transmitting electricity and related activities (total: 2,727 easements);
> **Category 1B**: easements for electric transmission and appurtenances that also include specific reference to communications equipment (735 easements);
> **Category 1C**: easements by condemnation limited to electric transmission and general appurtenances or specific communications equipment (49 easements);
> **Category 2A**: easements for electric transmission lines that include an independent communications purpose or purport to permit Defendant to license easement to another for communications purposes (3,333 easements);
> **Category 2B**: easements with individual deletions of some but not all references to communications, or individual edits limiting scope, or titles inconsistent with rest of the easement (46 easements);
> **Category 2C**: easements by condemnation permitting electric power utility and communications purposes (2 easements);
> **Category 3**: easements for communications purposes where grantee is Defendant itself rather than Defendant's telecommunications subsidiary, or where it is unclear whether a prior electric-transmission easement existed (13 easements).

[Doc. #147-1 – Appendix].

*II*, 244 F.R.D. 485, 489 (C.D. Ill. 2007) ("The Genenbachers' claims are premised on the allegation that LightCore has no easement or other right or permission to maintain or operate the Network on each parcel. To resolve issues of liability, the Court will need to determine whether LightCore had an easement or other right with respect to each parcel."); *Ogg,* No. 7CV101002809, at 22 (finding lack of predominance where class contained both written and prescriptive easements, and where the easements were held by other parties than defendants).

Here Plaintiffs have compiled detailed appendices categorizing types of easement language.[6] Some courts considering similar issue have held that where the plaintiffs produce a detailed appendix categorizing the types of easements at issue which shows that the differences are not stark, individual issues do not predominate. For instance, in *Moore v. United States*, after Plaintiffs had "furnish[ed] a representative sampling of the conveyances at issue" that "indicate[d] that the number of variants is limited," the Court of Federal Claims determined that it was unlikely that differences in the "precise formulation" of the different conveyances would "spawn any significant amount of piecemeal review." 41 Fed. Cl. 394, 398-99 (1998). Similarly, the Eastern District of Virginia stated that there would be "no question that class certification would be inappropriate if it were necessary to review each of the thousands of relevant easements grants individually," but that this concern had been obviated by Plaintiffs, who submitted two appendices separating the easement grants into nine categories based on purpose

---

[6] To the extent that Plaintiffs' initial class definition did not limit class members to those whose land is burdened by an easement with Defendants or their subsidiaries, that omission is corrected in the class definition approved below.

language. *Fisher*, 217 F.R.D. at 205. After reviewing the appendices, the *Fisher* court determined that any variations that existed were not likely to have a material impact on the central questions in the case involving whether the scope of the easements extended to use for a commercial fiber optic network. *Id*. at 208. Rather, the court concluded, "determining the relevant property interest will require analysis of only a limited array of easement language and the vast majority of the conveyances at issue contain substantially similar language." *Id*. at 217. *See also McDaniel*, 2006 WL 1476110, at *14 (citing *Fisher* for the proposition that Plaintiffs might have shown that individual issues did not predominate by illustrating that the class members' claims "arise from a common conveyance or form deed."); *Kirkman*, 220 F.R.D. at 52-53 (denying certification in part because the plaintiff "has provided no evidence that his deed is similar to the deeds held by other potential class members, or that there is a limited range of possible deed language."); *Regan,* 2010 WL 3941471, at *7 (denying certification in part because plaintiffs had offered "no evidence that there is a limited range of granting language or that there will be a limited number of potential deed 'groups.'").

Having reviewed the Plaintiffs' appendices, the Court concludes that the different language in the Plaintiffs' easements does not appear to be material. For example, the easements in Category 1A contain language granting the right to construct or maintain "an electric transmission and distribution line or system," "an electric transmission line and all appurtenances thereto," "a line or line of poles, wires and fixtures, for the purpose of transmitting electric or other power," "lines for transmission of electric energy, and all appurtenances and appliances necessary in connection therewith," etc. [Doc. #147-1 –

Plaintiffs' Appendix]. All these easements grant the Defendants the right to transmit electricity on the easements; there is no right to use the easement for telecommunications purposes. The difference in how this is expressed is not material to the Court's interpretation. Had Defendants found material differences, *i.e.* differences that would affect the outcome of the case, the Court would have expected them to be brought to the Court's attention. The same is true as to Category 2A easements, which contain 3,333 easements for electric transmission lines that include an independent communications purpose or purport to permit Defendants to license easement to another for communication purposes.[7] Plaintiffs' other categories also contain sufficiently similar language that the scope of the easement in question should not be difficult to ascertain. For instance, Category 1B includes 735 easements for electric transmission and appurtenances that also include specific reference to communications equipment[8]; Category 1C includes 49 court orders condemning easements that contain language

---

[7] The easements in Category 2A contain language granting the right to erect, operate, and maintain "one or more electric power transmission lines and appurtenant signal lines… and to license… the joint use or occupancy of the line or system by any other person, association or corporation for electrification or telephone purposes," "an electric transmission line... and to license, permit or otherwise agree to the joint use or occupancy of or lines by any other person, association or corporation for electrification or telephone purposes," to "make use thereof for electrical power utility and communication purposes… [and] to license, permit or otherwise agree to the use or occupancy of the line or lines and the exercise of any rights of Cooperative contained herein by another party for electrification or communication purposes," etc. [Doc. #147-1 – Plaintiffs' Appendix].

[8] Category 1B easements include the following types of language: the right to erect and maintain "one or more electric transmission lines and appurtenant signal lines, telephone wires, poles, towers, wires, cables, and appliances necessary in connection therewith"; "electric transmission facilities and all appurtenances thereto" as well as "the right at anytime after initial construction to add additional poles, wires, fiber optic cables... and other appurtenances"; "electric transmission lines of one or more circuits, communication lines, fiber optic lines...and other appurtenances thereto"; "for electrical power utility and related communications purposes" including the right to operate and maintain "an electric transmission line... and all appurtenances thereto including related communications equipment." [Doc. #147-1 – Appendix].

Case 2:11-cv-04321-NKL   Document 254   Filed 07/25/13   Page 22 of 35

substantially similar to that in 1A or 1B[9]; Category 2B includes 46 easements with individual additions or deletions limiting the scope of the easement, that align the language with that of either Category 1A or 1B[10]; Category 2C contains two court orders condemning easements that permit commercial communications use[11]; and Category 3 includes 13 easements that expressly allow for communication purposes.[12]  Any small variation in the language of the easements is not material to the Courts' interpretation.

Furthermore, "predominance" does not require that no individual issues exist, but rather ensures that a class action proceeding is appropriate by requiring core issues of liability to be addressed "in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.  It does not mean

---

[9] Category 1C court orders contain the following language: "for the construction, maintenance and operating an electric transmission and distribution line or system and buried telephone cable... to transmit and distribute electric energy..."; "to operate and maintain a certain electric transmission line... and such other appurtenances, as may be necessary, convenient or proper for the purpose of supplying electric energy and promoting and extending the use thereof in rural areas..."

[10] Half the Category 2B easements contain language identical to one iteration of Category 2A (granting use of the easements for electric and communications purposes), with the exception that permission to construct telephone and/or telegraph wires has been deleted, or the easement contains a handwritten or typed addition noting the easement "is for electric transmission line only."  Other language in the remaining easements includes the right to use the easement "for electrical power utility and communications purposes" and to "alter or reconstruct said electric transmission line and communication line" as well as to license rights to another party "for electrification or communication purposes."  The category also includes an easement titled "Easement for Electric & Communications Lines" that only grants the right to construct and maintain "lines for the transmission and distribution of electric energy and all appurtenances and appliances necessary in connection therewith."

[11] Category 2C court orders condemning easements contain this language: "for electrical power utility and communication purposes, including the perpetual right to construct... and maintain an electrical transmission system... and all appurtenances thereto, including communication equipment as well as communication systems that may be required for, but not limited to the commercial transmission of communications."

[12] Category 3 easement language includes the right to maintain and operate "such underground communication systems as the Grantees may from time to time require..."; "to make use thereof for communication purposes including... the perpetual right to... operate a communication line and equipment"; to maintain and operate "one or more under ground fiber optic cables" and "to license, permit or otherwise agree to the joint use or occupancy of the fiber optic cables or conduits by any other person, association or corporation for telephone or telecommunications purposes"; to construct and operate "underground facilities system consisting of such communication and other broadband service cables..."; "to make use thereof for fiber optic communication purposes, including... maintain an underground fiber optic communication line..."; and "fiber optic cable and all appurtenances thereto."

that every question presented in the litigation must be capable of resolution in one fell swoop. Upon rigorous review, the Court determines that Plaintiffs' seven categories of easements allow the Court to address the common questions presented in an efficient and holistic manner, and that variations in language are not so substantial as to cause individual questions of easement construction to predominate.

These similarities distinguish the instant case from *Wal-Mart*, in which the plaintiffs tried "to sue ... literally millions of employment decisions at once" without any "glue" tying the decisions together. 131 S. Ct. at 2552. Here there are only seven categories of easements, two of which contain the vast majority of the easements, and within each class the "purpose" language is substantially the same. As such, although there are 6,900 easements, the Court will only need to engage in seven inquiries regarding the proper interpretation of the easement language. Examination of these seven categories of easements "will produce a common answer to the crucial question[s]" of whether Defendants exceeded the scope of the easements and whether, even if they did not, Defendants have the right to use their easements for commercial communications purposes under Missouri law. *Id.* Although there will be variations in the language of the easements in terms of question one – for instance, some easements do not mention communications use, some permit communications use but do not mention commercial use, and some permit communications use and potentially commercial use – the variations are not so substantial that the Court's analysis would devolve into myriad individual analysis. Rather, the answers to the common questions will resolve central issues involving Defendants' liability "in one stroke." For this reason, the seven

24

categories of easements with slight variations of language within each category do not defeat predominance.

However, there is one group of easements that should not be included in the class. Defendant Sho-Me has identified 728 easements which contain clauses requiring arbitration for damage claims. Plaintiffs have not addressed this argument. Given the strict rules concerning arbitration and the lack of response by Plaintiffs, the Court determines that the easements containing arbitration clauses will not be included in class treatment since the arbitration language will present issues material to the resolution of those class members' claims and the arbitration question is likely to predominate over issues common to the class.

### d.    Affirmative Defenses

Defendants claim that they will present affirmative defenses that will require individualized, fact-intensive litigation and thus will defeat predominance. Defendants argue that Missouri's five-year statute of limitations applies, and that they installed the majority of their fiber optic cable at least nine years ago. They claim that the class members discovered or could have discovered the presence of the cable on their property shortly after installation, and so their claims are time-barred. They also argue that some class members may have acquiesced to the trespass. This, Defendants argue, creates the need for individual investigation of issues of notice and consent.

However, this argument misstates the nature of Plaintiffs' claim. Plaintiffs do not argue that the installation of the fiber optic cable was itself a trespass; rather, the alleged trespass is the use of the fiber optic cable for commercial telecommunications purposes

Case 2:11-cv-04321-NKL   Document 254   Filed 07/25/13   Page 25 of 35

outside the scope of the easement.  As such, this trespass is arguably a continuing wrong, such that "a right of action exists for the damages suffered within the statutory period immediately preceding suit."  *Davis v. Laclede Gas Co.*, 603 S.W.2d 554, 556 (Mo. 1980).  Additionally, Defendants have not presented sufficient evidence that individual class members knew of and acquiesced to the use of the fiber optic cable on their property for commercial telecommunications uses.  *Compare Melton ex rel. Dutton v. Carolina Power & Light Co*, 283 F.R.D.280, 296 (D.S.C. 2012) (defendants offered detailed examples of notice they gave class members that they were using their fiber optic cable for telecommunications purposes).  As the Eighth Circuit has made clear, "the relevance of such [affirmative] defenses must be subjected to the same rigorous inquiry as plaintiffs' claims."  *Zurn Pex*, 644 F.3d at 619.  Defendants have not borne this burden.  To the extent that Defendants will argue that class members were on notice of the commercial fiber optics use outside the relevant statute of limitations, this issue will not defeat class certification, because in Missouri notice is an objective reasonable person standard.  *See Bus. Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. 1999) (damages become "capable of ascertainment" when "a reasonably prudent person [would be] on notice of a potentially actionable injury").  As such, whether notice existed may be determined on a class-wide basis.  For these reasons, Defendants' claimed affirmative defenses do not create individual issues that will overwhelm the common issues in this case.

For the above reasons, Rule 23(b)(3)'s predominance requirement is met.

## 2. *Superiority*

The final requirement of Rule 23(b)(3) is that the class action form be superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). In determining whether a class action is the superior vehicle for litigation, courts consider, *inter alia*, the difficulties likely to be encountered in the management of the action. *Amchem*, 521 U.S. at 616, 117 S. Ct. at 2246. Defendants contend that ascertaining the class members and managing the class would be an overly complicated, time-consuming process, and so a class action is not a superior method for adjudication. Some courts have considered "ascertainability" to be an implicit requirement of Rule 23(a), while "manageability" is a consideration under 23(b)(3). *See, e.g., Dumas v. Albers Med., Inc.*, 2005 WL 2172030 at *7 (W.D. Mo. Sept. 7, 2005); 1 William B. Rubenstein & Alba Conte, <u>Newberg on Class Actions</u> § 3:1, § 4:72 (5th ed. 2011). The Court will address both together, as "[w]hether addressed under the heading of 'ascertainability' or 'manageability,' the fact remains that in order for a class to be certified, the proposed class must be both ascertainable in theory and readily identifiable (thus, administratively manageable) in fact." *Dumas,* 2005 WL 2172030 at *7; Rubenstein & Conte, <u>supra</u>, § 3:10 ("few circuit courts have identified membership as an implicit requirement, and even those district courts that nominally recognize the requirement… often fail to apply it as a requirement distinct from ascertainability."). The Court determines that the class is both sufficiently ascertainable for purposes of notice, and sufficiently manageable for purposes of claims administration.

### a.    Ascertainability

There are two points in the litigation when identifying class members is necessary – notice, which under Rule 23(b)(3) is required so that class members may opt-out if they

27

choose, and claims administration, which distributes damages among the members should Defendants be found liable. *See* Rubenstein & Conte, supra, § 3:1. The court must be able to readily ascertain class members in order to permit members to opt-out and to determine who is or is not bound by the judgment. The process of identification must be sufficient to satisfy due process but also efficient enough to prevent the court from being bogged down in individual inquires. *See* 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:2 (9th ed. 2012); Rubenstein & Conte, supra, § 8:4.

Plaintiffs state that membership in the class is determined by what land is at issue and who the owners of the land are or were during the period of commercial telecommunications use.[13] Plaintiffs' proposed notice program will include direct mail notice to a database of individuals who receive tax bills for the land parcels in question; a published notice for members not in the database; an 800-number that potential members can call for more information; and a website with information on the class action. [Doc. #211 – Plaintiff's Reply].

For purposes of notice for a 23(b)(3) class, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). As the District Court of Massachusetts has explained, "[s]omething less than actual notice to all class members is tolerated in order to strike a balance between the due process concerns and the need for a mechanism, *i.e.*, the class action, to

---

[13] The land underlying Sho-Me's fiber optic corridor has already been determined, [Doc. #199-5 – Affidavit of Paula Doolitte], and it should not be difficult to conduct a similar analysis to determine the land underlying KAMO's corridor.

efficiently litigate certain cases involving numerous parties." *In re Massachusetts Diet Drug Litig.*, 338 F. Supp. 2d 198, 209 (D. Mass. 2004); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S. Ct. 2965, 2974 (1985) ("notice must be the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (internal quotes omitted).

Defendants rely on *Melton ex rel. Dutton v. Carolina Power & Light Co.* for the proposition that in fiber optics cable cases such as this, "a title search would be the only way to comport with the notice requirements for a Rule 23(b)(3) class." 283 F.R.D. at 299. The *Melton* court cited *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S. Ct. 2140 (1974) in support of this proposition. However, *Eisen* only held that "individual notice must be provided to those class members who are identifiable through reasonable effort." *Id.* at 175, 94 S. Ct. at 2151. It is for the Court to determine what constitutes a "reasonable effort" after reviewing the available information and possible means of identifying class members. *Evans & Green, LLP v. That's Great News, LLC*, 2012 WL 4888471 at *4 (W.D. Mo. Oct. 15, 2012) ("the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process.") (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975)); 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 8:2 (4th ed. 2002). "What constitutes the best notice practicable under the circumstances depends on several factors, including the size of the class, whether the class members can be easily

identified, and the probability that notice will reach the intended persons." McLaughlin, supra, § 5:80.[14]

Defendants point to this Court's previous Order denying their Motion to Dismiss [Doc. #81] as evidence that the Court has embraced the reasoning of *Melton*. However, the Court's previous Order dealt with the issue of subject matter jurisdiction; the issue there was whether the Court could assume that class members were Missouri citizens if their tax billing addresses were in Missouri, whereas in the instant case the issue is what constitutes "reasonable effort" to effect the "best practicable notice" of the class action. In its previous holding, the Court did not determine that the tax billing addresses are not the addresses of the class members, merely that tax billing addresses could not be used to presume citizenship. Defendants have not argued that the tax billing addresses are not the relevant addresses of current property owners or their legal representatives; they argue that tax billing addresses do not allow the court to provide notice to all potential class members, such as past class members, class members who claim an interest by adverse possession, or heirs or devisees. However, under Rule 23(c)(2)(B), the Court is only required to provide the best practicable notice to those members identifiable by reasonable effort – not achieve actual notice on every potential class member. Tax billing addresses are a sufficient means of achieving notice on individual members because the persons who receive the tax bill are either owners

---

[14] Defendants' contention that the notice requirement for a class action settlement is less stringent is not accurate. Regardless of whether a Rule 23(b)(3) class action is being settled or proceeding through litigation, the "best practicable" notice requirements of Rule 23(c)(2)(B) must be satisfied. *See Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D. Pa. 2006).

themselves or the legal representatives of the owners, and so the probability that notice will reach the intended persons is high.

Furthermore, if, as Defendants contend, a title search on each parcel of land would be time-consuming and onerous, it is clearly not the best means practicable of providing notice. *See Fisher*, 217 F.R.D. at 227 ("if Defendants are correct that identifying each individual class member will require a title search and survey and that such cannot possibly be accomplished within a reasonable time, the appropriate remedy in that eventuality will be to provide the most reasonable, alternate form of notice."). Rather, Plaintiffs' proposed means of effecting notice is the best practicable under the circumstances. Although past owners will not receive personal notice like the current owners notified through the tax billing addresses, the additional methods of notice employed by Plaintiffs (the website, 800-number, and publication) are adequate means of reaching unknown members. *See, e.g., Evans*, 2012 WL 4888471 at *4 ("Individual notice should be given to those whose names and addresses are known, and for those who are not known, publication is sufficient."); *Alberton v. Commonwealth Land Title Ins. Co.*, 2010 WL 1049581 at *3 (E.D. Pa. Mar. 17, 2010) (approving a notice plan that included providing individual notice to 2/3 of the estimated class, issuing a press release to hundreds of local media outlets, and establishing a website); *Lamb v. United Sec. Life Co.*, 59 F.R.D. 25, 42 (S.D. Iowa 1972) (notice may be effected by individual mailing to members who can be readily identified and publication for members who are unidentifiable or not locatable) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950)).

### b.     Manageability

Defendants also argue that the class is unmanageable.  However, "dismissal for management reasons is never favored."  *In re Workers' Comp.*, 130 F.R.D. 99, 110 (D. Minn. 1990); *see also* Conte & Newburg, supra, § 9:12 (4th ed. 2013) ("Class suits should rarely be denied or decertified solely because class management problems are complex.").  Manageability "should be considered only in relation to alternative means of adjudication and thus should not be used to deny certification in the fact of novel challenges"; lack of manageability justifies denial of certification "only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class."  *Fisher*, 217 F.R.D. at 227 (internal quotes omitted).

As with their argument regarding ascertainability, Defendants claim the class is unmanageable because articulation of a claim of injury and determination of liability would require proof of title for each class member.  However, Missouri law only requires that the party claiming trespass has a "legal right to possession" that trumps that of the defendants, not perfect title.  *Int'l Bhd. of Elec. Workers v. Monsees*, 335 S.W.3d 105, 108 (Mo. Ct. App. 2011); *Stewart v. Sidio*, 358 S.W.3d 524, 527 (Mo. Ct. App. 2012).  Possession may be shown by actual possession, deed, or constructive possession.  *Jaycox v. E.M. Harris Bldg. Co.*, 754 S.W.2d 931, 934 (Mo. Ct. App. 1988).  Thus, potential class members do not need to prove title in order to articulate or prove a claim of trespass.

Additionally, a class action is clearly the most efficient means of resolving the class members' claims. Unlike other cases where courts have denied certification on manageability grounds, this is not a case where the class spans multiple states and involves multiple issues of state law, *In re Prempro*, 230 F.R.D. 555, 568 (E.D. Ark. 2005); where the class members are nearly impossible to ascertain or notify, *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 266 (D. Minn. 2001); where the proposed class action contains "what are, in reality, a myriad of individualized claims," *Rattray*, 253 F.R.D. at 465; or where the class members can only be identified via "an individualized inquiry into the facts and circumstances" of the case, *Dumas*, 2005 WL 2172030, at *7. On the contrary, here "the potential class consists of readily identifiable private landowners located in a defined geographic area," and Plaintiffs have articulated a variety of methods to effect notice. *Moore*, 41 Fed. Cl. at 398. Although the class is large, Plaintiffs have set forth a process for managing the case. Class members who own land burdened by the winning easements during the relevant time period will file a claim form with a sworn statement identifying the period of their ownership and attaching a deed. If the parcel at issue is owned by multiple individuals, the compensation check will be issued in all the owners' names. In the event that individual issues involving damages or disputes between competing owners arise, this will be addressed in claims administration proceedings as between the competing owners. "Separate mini-trials, a special master, later stratification of the class, or a magistrate may be available to resolve such issues." *Workers' Comp.*, 130 F.R.D. at 110; Conte & Newburg, <u>supra</u>, § 9:59

33

("there are numerous means available for resolving irreducible individual issues, primarily through the use of delegation to magistrates, special masters, and others…").

Additionally, class actions are superior vehicles for addressing wrongs when the members' damages are too small to make individual litigation worthwhile. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617, 117 S. Ct. at 2246 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). Where, absent class certification, "there would be thousands of individual actions each relying on identical conduct by [the defendant] and each asserting small claims," a class action is a superior method for litigation. *Janson v. LegalZoom.com, Inc.*, 271 F.R.D. 506, 512 (W.D. Mo. 2010) (referencing *Paxton*, 688 F.2d at 561). Here, the amount of damages in question for each individual landowner is likely too small to making bringing an individual suit worthwhile. As such, a class action is the superior means of adjudicating this case.

## III.    Conclusion

For the above stated reasons, Plaintiffs' Motion to Certify Class [Doc. #146] is GRANTED. Pursuant to Rule 23(c), the Court certifies the following class:

> All persons who own or owned land in Missouri underlying Defendants' electric-transmission lines that is burdened by an easement with either Defendant or their subsidiaries, which easement does not contain an arbitration clause, and on or in which a Defendant has licensed the fiber optic cable for commercial-

34

telecommunication uses or has used the fiber optic cable for commercial-
telecommunication uses.

The attorneys and law firms representing Plaintiffs are appointed as counsel for the Class.

Fed. R. Civ. P. 23(g).


                                        s/ NANETTE K. LAUGHREY
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  July 25, 2013
Jefferson City, Missouri