**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| CHASE BARFIELD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-cv-04321-NKL |
| | ) | |
| SHO-ME POWER ELECTRIC | ) | |
| COOPERATIVE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This class action is brought on behalf of several thousand Missouri landowners for claims arising out of Defendants' use of electric transmission line easements for commercial telecommunications instead of the generation and sale of electricity.

It is undisputed that Sho-Me Power Electric Cooperative and KAMO Electric Cooperative (Electric Cooperative Defendants) created Sho-Me Technologies and K-Powernet, respectively, to operate commercial telecommunication companies. The Electric Cooperative Defendants did this because Missouri law does not permit electric cooperatives to operate commercial telecommunication companies. The Electric Cooperative Defendants then leased to Sho-Me Tech and K-Powernet excess space on fiber optic cables that had been laid on the Electric Cooperative's respective electric transmission easements. Sho-Me Tech and K-Powernet then used their space to transmit commercial telecommunications, returning the profits from their enterprise to their electric cooperative parent.

The Plaintiffs argue that this use of the Defendants' easements for the generation of commercial telecommunications, instead of electricity, exceeds the scope of the easements which were granted to the Defendants and this deprived the Plaintiffs and the class of a valuable property right – the right to benefit from the use of their land as an information highway.[1]   In short, the dispute is about whether Missouri law requires third parties to compensate land owners when they operate this information highway under the landowners' real property for a purpose not permitted by a valid easement.  Plaintiffs bring this suit claiming trespass and unjust enrichment.  To resolve the dispute, the Court must consider how changing technologies should be harmonized with historic real property principles.   [2]

Pending before the Court are: (1) the KAMO Defendants' Motion for Summary Judgment Against Plaintiff Chase Barfield [Doc. 229]; (2) the Sho-Me Defendants' Renewed and Restated Motion for Summary Judgment Against the Biffle and Robertson Plaintiffs [Doc. 239]; (3) Plaintiffs' Motion for Summary Judgment on the Issue of Defendants' Liability [Doc. 245]; (4) the KAMO Defendants' Motion for Summary Judgment on the Issue of Liability [Doc. 293]; (5) the Sho-Me Defendants' Motion for Summary Judgment Against All Members of the Class Who Have Unadjudicated Claims Against the Sho-Me Defendants [Doc. 296]; (6) the Sho-Me Defendants' Motion for Summary Judgment Against the KAMO Class Members [Doc. 297]; (7) the Sho-Me

---

[1] Fiber optic cables are often referred to as information highways because electrons are transported along the length of the enclosed cable to communicate information by a binary process.
[2] Plaintiffs do not dispute that Sho-Me Power and KAMO Electric could construct fiber optic cable lines for internal communication purposes related to their electric transmission .

Defendants' Motion for Partial Summary Judgment Based on the Statute of Limitations [Doc. 298]; and (8) the Sho-Me Defendants' Motion for Summary Judgment Based on Class Members' Consent [Doc. 299].

## I. Undisputed Facts

### A. Named Plaintiffs and Class Members

Dwight Robertson owns property in Miller County, Missouri. His properties are subject to easements in favor of Sho-Me Power Corporation. These easements, titled "Transmission Line Easements," state that Sho-Me Power Corporation and its successors and assigns are granted the right to enter the property and to

> construct, reconstruct, patrol, replace, repair, operate, and maintain on the above described lands and in and upon all streets, roads or highways abutting said lands, *an electric transmission line and all appurtenances thereto*; to cut and trim trees, bush and shrubbery located within fifty feet of the center line of said line or that may interfere with or threaten to endanger the operation and maintenance of said line; to clear all structures, improvements and fire hazards located within fifty feet of the center line of said line…; and to have the right of ingress and egress to, from and over the above described lands, *for doing anything necessary or useful for the enjoyment of the easement herein granted … [and] the right at anytime after said electric transmission line has been constructed to add additional poles, wires, anchors, guys, crossarms and other appurtenances; the right to change a single pole line to a double pole line (H frame construction) and the right to increase or decrease the voltage of the line, all as [Sho-Me Power Corporation] may deem necessary or advisable.* (emphasis added).

Michael and Gina Biffle own land in Oregon County, Missouri. The property is subject to a "Transmission Line Easement" in favor of Howell Oregon Electric Cooperative, which was subsequently assigned to Sho-Me Power. The easement contains similar language to the Robertson easement and states that the grantee has the right to enter the property and to

construct, reconstruct, patrol, replace, repair, operate and maintain on the above described lands and in and upon all streets, roads and highways abutting such lands, *an electric transmission line and all appurtenances thereto*, to cut and trim trees, bush and shrubbery located within fifty feet of the center line or that may interfere with or threaten to endanger the operation and maintenance of said line; to clear all structures, improvements and fire hazards located within fifty feet of the center line of said line . . . and to have the right of ingress and egress to, from and over the above described lands with the option given Cooperative to construct all gates, if any, Cooperative deems necessary for such purpose; *for doing anything necessary or useful for the enjoyment of the easement herein granted.* (emphasis added).

Chase Barfield owns land in Hickory County, Missouri. The property is subject to an easement in favor of Defendant KAMO Electric Cooperative. The easement, titled "Transmission Line Easement," states that KAMO Electric and its lessees, licensees, successors and assigns are granted "the perpetual easement and right to enter" the property to

erect, operate, survey, maintain, repair, rebuild and patrol on or over said lands and in and upon all streets, roads, or highways abutting said lands, *one or more electric power transmission lines and appurtenant signal lines, telephone and telegraph wires, poles, towers, wires, cables, anchors, guy wires, and appliances necessary in connection therewith, and to license, permit, or otherwise agree to the joint use or occupancy of the line or system by any other person, association or corporation for electrification or telephone purposes* together with the right of ingress and egress to, from, and over said lands for doing anything necessary or useful to the enjoyment of the easement herein granted. (emphasis added).

Plaintiffs have grouped the more than 6,000 easements at issue in this case into three broad categories, each of which are further divided into subparts based on differences in the language in the easements. The easement language in the various categories is described in more detail below where necessary to resolve the pending motions. *See infra* Part IV.A.2.

## B. The Sho-Me Defendants

Sho-Me Power Corporation was incorporated in 1947 as a public utility under the General and Business Corporation Law of Missouri, Chapter 351 RSMo. In 1993, the Missouri Public Service Commission granted Sho-Me Power Corporation's application to convert to a rural electric cooperative governed by the Rural Electric Cooperative Act, Chapter 394 RSMo. Its name was then changed to Sho-Me Power Electric Cooperative.

For many years, Sho-Me Power used either microwave radios or power line carriers to communicate with its unmanned power substations. In 1995, the Federal Communications Commission ordered the sale of the radio frequencies previously assigned to utility microwave radios so that the frequencies could be sold to cellular telephone providers. Sho-Me Power then converted to fiber optic cables for its electric transmission system, constructing a sixty-fiber, 550-mile communications system through the easements it had on Plaintiffs' land.[3]

The fiber optic communication system was developed to have far more capacity than Sho-Me Power needed to meet its current, internal communication needs. Sho-Me Power sought to use this excess capacity for the operation of a commercial telecommunications network. However, as a rural electric cooperative governed by Chapter 394 RSMo., Sho-Me Power can only supply electric energy; it is not authorized to provide commercial telecommunications services. Consequently, Sho-Me Power

---

[3] Fiber optic cable is capable of transmitting light signals. The invisible light signal inside the fiber optic cables is either on or off and continually changes state on the glass strands that are being used or "lit." The signals are repetitive on or off light impulses that represent "1" or "0," which is the binary code that enables communication via computers or telephones. The light signal must exist on at least a portion of the fiber optics within the cables to serve Sho-Me Power's (and KAMO Electric's) internal electric transmission system.

formed Sho-Me Technologies, LLC as a wholly owned subsidiary. Sho-Me Tech serves as the telecommunications provider and uses Sho-Me Power's electric transmission fiber optic capacity to market Sho-Me Tech's telecommunication services.

Shortly after the implementation of the Telecommunications Act of 1996, Sho-Me Power assigned to Sho-Me Tech the right to use or sell any excess capacity on Sho-Me Power's fiber optic network. The same fiber optic cable is used for Sho-Me Power's internal electric communication needs and marketed by Sho-Me Tech for commercial telecommunications. The Sho-Me Defendants have entered into some 5,000 contracts with various entities for commercial-telecommunications services on the fiber optic network.

As of December 31, 2012, the Sho-Me Defendants had installed approximately 1,094 miles of fiber optic cable across more than 4,300 parcels of private property burdened by easements acquired by Sho-Me Power. Sho-Me Tech owns no independent easement rights; it only uses Sho-Me Power's easements.

### C. The KAMO Defendants

KAMO Electric Cooperative, Inc. is a rural electric cooperative formed in April 1941 under Oklahoma law.[4] In May 1941, it was granted the right to do business in Missouri as a foreign corporation. Like Sho-Me Power, KAMO Electric operates as a rural electric cooperative under Chapter 394 RSMo. KAMO Electric's path to fiber optics is similar to Sho-Me Power's. For decades, KAMO Electric communicated with its

---

[4] The Oklahoma statute governing the powers of rural electric cooperatives is virtually identical to the Missouri statute. *Compare* Mo. Rev. Stat. § 394.080, *with* Okla. Stat. tit. 18, § 437.2.

unmanned substations using microwave radio channels. After the Federal Communications Commission's decision in 1995 to reassign the microwave spectrum for cellular telephone service providers, KAMO Electric installed fiber optic cable for its internal communication needs. It also formed K-PowerNet as a wholly owned subsidiary. In a License and Use Agreement dated February 14, 2003, KAMO Electric assigned to K-PowerNet the right to use or sell any excess capacity on KAMO Electric's fiber optic network. Beginning in 2000 and continuing to the present, K-PowerNet has marketed and sold commercial telecommunications services on KAMO Electric's fiber optic network. KAMO Electric has installed over 1,000 miles of fiber optic cable on class members' land, which is being used for KAMO Electric's internal, electric transmission business and being used by K-Powernet (by license from KAMO Electric) for commercial telecommunications services to third parties.

II.     **Sho-Me's Motion for Partial Summary Judgment based on the statute of limitations, [Doc. 298]**

Plaintiffs filed their original lawsuit against the Sho-Me Defendants in state court on January 21, 2010. Plaintiffs filed the current lawsuit, which included the addition of the KAMO Defendants, on November 29, 2011, and dismissed the state court lawsuit on the same day. Based on Missouri's five-year statute of limitations on trespass claims, § 516.120 RSMo., the Sho-Me Defendants seek partial summary judgment against Plaintiffs for any recovery sought for the period prior to January 21, 2005 (five years before Plaintiffs filed their state court petition against the Sho-Me Defendants). [Doc. 298]. After Sho-Me filed their motion, Plaintiffs filed a consent motion to amend their

complaint by interlineation, limiting their claims to those that commenced not later than five years prior to the filing of this action against the KAMO Defendants and the previous state court action against the Sho-Me Defendants. [Doc. 321]. Because Plaintiffs are not seeking damages outside the statute of limitations period, Sho-Me's Motion for Summary Judgment based on the statute of limitations, [Doc. 298], is GRANTED as to any claim outside the applicable statute of limitations.

The Sho-Me Defendants also propose modifying the class definition because suit was filed against the Defenadnts on different dates, January 21, 2005 as to the Sho-Me Defendants and November 29, 2006 as to the KAMO Defendants. [Doc. 337, at p. 1]. However, there is no confusion over the certified class's scope because recovery is limited by Plaintiffs' Complaint, which, as amended, specifically limits the recovery time period. Further, Sho-Me's defendant-specific definitions fail to take into account that some class members have claims against both sets of Defendants, where, for instance, one electric cooperative defendant leased fiber optic capacity to the subsidiary of the other electric cooperative defendant and vice-versa. *See infra* Part III. The class will therefore remain defined as

> All persons who own or owned land in Missouri underlying Defendants' electric-transmission lines that is burdened by an easement with either Defendant or their subsidiaries, which easement does not contain an arbitration clause, and on or in which a Defendant has licensed the fiber optic cable for commercial telecommunication uses or has used the fiber optic cable for commercial-telecommunication uses.

III.    **Sho-Me's Motion for Summary Judgment against class members whose land is under KAMO transmission lines, [Doc. 297]**

The Court has previously determined that Defendants were not conducting their commercial telecommunications business as a joint venture. [Doc. 187, at p. 13]. Because no joint venture existed, the Court granted the KAMO Defendants' motion for summary judgment as to claims by Robertson and the Biffles because they only owned land burdened by Sho-Me transmission lines. Likewise, the Court granted the Sho-Me Defendants' motion for summary judgment as to claims by Barfield because Barfield only owned land burdened by KAMO transmission lines. *Id.* The Sho-Me Defendants now seek summary judgment against all class members whose land is burdened only by a KAMO transmission line. With three exceptions, Plaintiffs do not object to the Sho-Me Defendants' motion. [Doc. 317, at p. 52].

The first exception is a 20-mile stretch of KAMO transmission lines where fiber-optic cable was installed by Sho-Me Tech instead of KAMO pursuant to a license agreement. The Sho-Me Defendants do not dispute that former and current owners of this land should be excluded from their motion and have excluded them from the motion. [Doc. 297, at p. 2-3]. Class members whose land is burdened by this 20-mile stretch of KAMO transmission lines may still have a claim against the Sho-Me Defendants if the easements burdening their land do no permit use for commercial telecommunications purposes.

The second exception is a 2.5 mile stretch of KAMO right-of-way where Sho-Me Tech uses KAMO's fiber optic cables. The Sho-Me Defendants acknowledge that Sho-Me Tech uses this stretch of cable, but argue that "KAMO owns the cable, not [Sho-Me] Tech" and Sho-Me "Tech is in the process of abandoning this very short segment of

KAMO fiber." [Doc. 297, at p. 3 n. 1]. Sho-Me Tech's use of this stretch of cable resulted from a verbal agreement between Sho-Me and KAMO where Sho-Me's crew would install a 2.5 mile stretch of cable on KAMO's transmission lines in return for Sho-Me Tech's right to use some of the fiber strands inside KAMO's cables at no further cost. [Doc. 331, at p. 2-3]. Sho-Me argues that this agreement amounted to the purchase of dark fiber from KAMO, which cannot be trespass under Plaintiffs' theory of liability because Plaintiffs' theory of recovery is that Defendants trespassed by violating the terms of their easements and by permitting their subsidiaries to sell excess capacity on their fiber optic cables. Sho-Me argues that Sho-Me Tech cannot be liable under this theory of trespass because it was not a party to or bound by the easement. Instead, Sho-Me contends Sho-Me Tech can only be liable if Plaintiffs' theory was that trespass occurred when Sho-Me Tech transmitted invisible light pulses through the cables. *Id.* at 4.

The third exception is an agreement between Sho-Me and KAMO under which Sho-Me Tech acquired strands of dark fiber on approximately 200 miles of KAMO's fiber optic cables and resold that dark fiber to the University of Missouri so it could connect its campuses. [Doc. 317, at p. 53; Doc. 331, at p. 4-5 n. 3]. Sho-Me Tech acknowledges that it "acquired at least two strands of dark fiber from" several access providers, including 200 miles of KAMO dark fiber, but contends that since it resold the dark fiber to the University of Missouri, it neither owns nor uses the cable. Sho-Me argues that nothing in Plaintiffs' complaint or in the class certification order suggests a non-owner or non-user can be liable to Plaintiffs.

Regardless of whether KAMO or Sho-Me owns the cable, Sho-Me Tech still uses, used, or resold the cable for commercial telecommunications purposes and gained the right to do so from KAMO Electric. Plaintiffs' theory of liability is that the Electric Cooperative Defendants licensed rights they did not have to their subsidiaries and as a result, their subsidiaries' use of plaintiffs' land for commercial telecommunications purposes is unauthorized and therefore, trespass. "[T]he owner of an easement may permit some use of its right of way . . . [but] it may not create a right in excess of the title held by it, nor her [sic] a right which as against the owner of the servient estate is an additional burden or servitude upon the fee simple title." *Eureka Real Estate & Inv. Co. v. S. Real Estate & Fin. Co.*, 200 S.W.2d 328, 332 (Mo. 1947); *Ogg v. Mediacom, LLC*, 142 S.W.3d 801, 808 (Mo. Ct. App. 2004) (remarking that a licensing agreement between an easement holder and a licensee could, at most, lawfully confer on the licensee only the rights held by the easement holder). Further, Sho-Me Tech's plan to withdraw from the 2.5 mile stretch of land does not shield it from liability for use dating back to January 21, 2005. Therefore, the Sho-Me Defendants' motion for summary judgment against all class members whose land is burdened only by a KAMO transmission line, [Doc. 297], is GRANTED except for class members who own land in the three stretches of land described above. Sho-Me Tech may still be liable for trespass and unjust enrichment if the easements burdening those stretches of land do not permit use or lease for commercial telecommunications purposes.

IV.    **The Parties' Cross-Motions for Summary Judgment on Defendants' liability, [Docs. 229, 239, 245, 293, 296], and Sho-Me's Motion for Summary Judgment based on class consent, [Doc. 299]**

The Parties have filed cross-motions for summary judgment on the issue of Defendants' liability for trespass and unjust enrichment. The Sho-Me Defendants have also filed a motion for summary judgment against the class based on their alleged consent to any trespass by the Defendants.

## A. Trespass

### 1. Easement-related trespass under Missouri law

Plaintiffs claim Sho-Me Power and KAMO Electric exceeded the scope of the easements granted to them when they leased fiber optic capacity to Sho-Me Tech and K-PowerNet to be used for commercial telecommunications. Plaintiffs further claim Sho-Me Tech and K-PowerNet trespassed by selling fiber optic capacity because though they were licensed to do so by their parent companies, their parent companies were not authorized to license the easements for commercial telecommunications purposes in the first place.

Under Missouri law, trespass occurs either by unauthorized entry on land or by exceeding the scope of any license to enter upon the land. *Illig v. Union Elec. Co.*, 652 F.3d 971, 977 (8th Cir. 2011) (citing *Ogg*, 142 S.W.3d 801, 809 (Mo. Ct. App. 2004). "[I]f the user of an easement exceeds his or her usage rights in either manner or extent, the user becomes a trespasser to the extent of the unauthorized use." *Ogg*, 142 S.W.3d at 809 (involving prescriptive easements); *Reinbott v. Tidwell*, 191 S.W.3d 102, 109 (Mo. Ct. App. 2006) (same); *Branson West, Inc. v. City of Branson*, 980 S.W.2d 604, 606 (Mo.

Ct. App. 1998) (involving an express easement).[5]  The Missouri Court of Appeals has

recognized the balance between an easement holder's right to use an easement to the

fullest extent possible and the rights of the owner of the servient estate:

> Though to the extent of the easement the rights of the easement owner are
> paramount to those of the landowner, the rights of the easement owner and of the
> landowner are not absolute, irrelative, and uncontrolled; but are so limited, each
> by the other, that there may be a due and reasonable enjoyment of both the
> easement and the servient tenement.  The owner of an easement is said to have all
> rights incident or necessary to its proper enjoyment, but nothing more.

*Branson West*, 980 S.W.2d at 606 (quoting 25 Am.Jur.2d *Easements and Licenses* §81

(1996)).  "An easement is not the complete ownership of land with the right to use it for

all lawful purposes perpetually and throughout its entire extent, but, instead, is a right that

extends only to one or more particular uses." *Maasen v. Shaw*, 133 S.W.3d 514, 518-19

(Mo. Ct. App. 2004).

"An easement granted in general terms without any limitations as to its use, is one

of unlimited *reasonable* use."  *Branson West*, 980 S.W.2d at 606 (emphasis in original).

The appropriate standard then is whether the operation of a commercial

telecommunications network is reasonable and necessary to Sho-Me Power's and KAMO

Electric's authorized use of their easements.  *See id.* at 607 (citing *Pogue v. KAMO

Electric Cooperative, Inc.*, 795 S.W.2d 566 (Mo. App. S.D. 1990)).  Whether an

additional use is reasonable and necessary depends on "whether the additional use

represents only a change in the degree of use, or whether it represents a change in the

---

[5] Defendants argue *Ogg* is not relevant to the instant case because the easements in *Ogg* were prescriptive easements and the easements in this case are express, written easements.  However, the same "exceeding in manner or extent" standard was also applied in *Branson West, Inc. v. City of Branson*, 980 S.W.2d 604, 606 (Mo. Ct. App. 1998), a case cited by *Ogg* which involved express easements.  Thus, there is nothing that limits *Ogg*'s definition of trespass to prescriptive easements.

quality of the use.  If the change is in the quality of use, it is not permissible, because it would create a substantial new burden on the servient estate." *Maasen*, 133 S.W.3d at 519 (Mo. Ct. App. 2004).

Defendants insist no trespass has occurred and cite to the Eighth Circuit's decision in *MCI WorldCom Inc. v. Int'l Paper Co.*, 442 F.3d 633 (8th Cir. 2006).  The Eighth Circuit held that under Arkansas law, transmission of light signals across fiber optic strands for a particular purpose cannot constitute a trespass because Arkansas law requires a trespass to involve interference with a plaintiff's possession.  However, as the Court has already stated in its Order denying Defendants' Motion to Dismiss, case law such as *Ogg* and *Cape Girardeau*, combined with § 523.283.1 RSMo., show that Missouri law is different in this respect from Arkansas law and that Missouri courts recognize claims based on violations of the manner and extent of usage rights provided by an easement regardless of whether or not those violations include actual physical injury. [Doc. 81, at 19].  These significant differences in Missouri and Arkansas trespass case law make *International Paper* inapplicable to this case, and the Court declines to further revisit this issue.[6]

If the easement is used in a different manner or to an extent that the easement does not contemplate and the different use is not reasonable or necessary to the enjoyment of the easement, then the use exceeds the authorization granted by the easement and constitutes trespass.  This determination requires an analysis of the easement language

---

[6] For the Court's analysis of *Ogg*, *Cape Girardeau*, *International Paper*, and § 523.283.1 RSMo., see the Court's previous order denying Defendants' Motion to Dismiss, found at docket entry 81, pages 15-20.

categories as discussed in more detail below. The Court must also determine whether leasing excess fiber for a commercial telecommunications network is reasonable and necessary or instead, exceeds the authorized use. However, before turning to those issues, the Court will address the Defendants' argument that no trespass has occurred because Plaintiffs have no legal right to control the electromagnetic spectrum.

Defendants argue Plaintiffs cannot succeed on a trespass claim because they do not have a legal right to exclusive possession of the electromagnetic spectrum. [Docs. 293, 295, & 304]. Defendants contend that since Plaintiffs do not challenge installation of the fiber optic cable, they are challenging use of those cables, which "consists of transmissions of invisible, infrared light pulses" that are part of the electromagnetic spectrum. [Doc. 304, at 15-16]. Defendants cite to *Alltel Commc'ns, LLC v. Oglala Sioux Tribe*, 2011 WL 796409, at *6 (D.S.D. 2011), for the proposition that "the electromagnetic spectrum, like the air, is owned by no one."

*Alltel* is distinguishable from this case. In *Alltel*, the Oglala Sioux Tribe claimed "it, and it alone, [was] the owner of the electromagnetic spectrum . . . which exists over the Pine Ridge Indian Reservation." *Id.* at *1. The Tribe sought declaratory and injunctive relief, asking the court to prohibit Alltel from selling or assigning any licensing of the spectrum by the Federal Communications Commission (FCC) to any other party. The tribe claimed that as part of the Fort Laramie Treaty, it was granted "absolute and undisturbed use and occupation" of the land. *Id.* In concluding that the Tribe did not own the electromagnetic spectrum over its land, the South Dakota district court determined use of the electromagnetic spectrum was free and that the spectrum itself, like "air or

light above land," belonged to no one. *Id.* at *3. The court remarked that the United States did not own the spectrum but, through the FCC, could "license the *use* of radio transmissions." *Id.* at *5 (emphasis in original).

Plaintiffs are not claiming ownership of or the exclusive right to the electromagnetic spectrum. Rather, they are challenging whether Defendants can use fiber optic cables physically installed in their land to transmit those wavelengths. Although use of the spectrum may be free, use of the conduit in Plaintiffs' land is not. Outside that conduit, movement of light would not achieve Defendants' telecommunication purpose. To hold that use of the fiber cables can be limited only by the FCC would lead to the conclusion that the FCC could license use of Defendants' cables for free – a result Defendants would surely dispute.

### 2. Easement Categories

The interpretation of an easement, like any contract, is a question of law. *Erwin v. City of Palmyra*, 119 S.W.3d 582, 584 (Mo. Ct. App. 2003). When interpreting an easement, the primary rule is to ascertain the intention of the grantor from the four corners of the instrument, giving effect, if possible, to every part of it. *McAlister v. Pritchard*, 230 S.W. 66, 67 (Mo. 1921). "Any doubt concerning as easement's scope should be resolved in favor of the servient owner's free and untrammeled use of the land." *Massen v. Shaw*, 133 S.W.3d 514, 519 (Mo. Ct. App. 2004).

Plaintiffs have categorized the nearly 6,500 express easements and condemnation orders in this case into categories and subcategories based on their granting language. The Court hereby incorporates Plaintiffs' categorization and description of the purpose

language of the easements, [Doc. 317-4, at pp. 9-17][7], into this Order. To summarize, the

easements are categorized as follows:

| Category | General Description | Number of Easements |
|---|---|---|
| 1A | Easements for electric transmission line only or for electric transmission line with unspecified appurtenances | Total: 2,302<br>KAMO: 330<br>Sho-Me: 1,972 |
| 1B | Easements for electric transmission lines and appurtenances which include specific references to communications equipment | Total: 721<br>KAMO: 68<br>Sho-Me: 653 |
| 1C | Court orders condemning easements limited to electric transmission lines and generic appurtenances or specifying related communications equipment | Total: 71<br>KAMO: 49<br>Sho-Me: 22 |
| 1D | Easements for electric transmission lines that purport to permit a license to another for communications purposes | Total: 3,021<br>KAMO: 3,021<br>Sho-Me: 0 |
| 1E | Hybrids: easements with individual deletions of some but not all references to communications; easements with individual additions that limit the scope; or easements with a title inconsistent with rest of the easement | Total: 51<br>KAMO: 49<br>Sho-Me: 2 |
| 2A | Easements for electric transmission lines that include an independent communications purpose | Total: 310<br>KAMO: 167<br>Sho-Me: 143 |
| 2B | Court orders condemning easements "for electrical power utility and communication purposes . . . including communication equipment as well a communication systems that may be required for, but not limited to the commercial transmission of communications" | Total: 2<br>KAMO: 2<br>Sho-Me: 1 |
| 3 | Standalone communications easements where grantee is Electric-Cooperative Defendant (not Telecommunications-Subsidiary Defendant) or where it is unclear whether a prior electric-transmission easement | Total: 13<br>KAMO: 5<br>Sho-Me: 8 |

---

[7] Doc. 317-4 also contains sample easements for each category.

| | burdened the same property | |
|---|---|---|

### 3. Easements that do not authorize use or lease for commercial telecommunications purposes

The express easements classified within Categories 1A and 1B and the court ordered condemnation easements classified within Category 1C do not expressly authorize use and lease of fiber optic cable for commercial telecommunications purposes.

There are several variations of language in the Category 1A easements, but the variations do not materially affect the issues relevant to the dispute. For example, the Biffles' and Robertson's easements are Category 1A easements. These easements grant the holder the right to construct, maintain, and operate "an electric transmission and distribution line or system," or "an electric transmission line and all appurtenances thereto," or "lines for transmission of electric energy, and all appurtenances," or "an electric transmission and/or distribution line or system . . . [and] such additional transmission and/or distribution facilities as may, from time to time, be necessary or desirable." [Doc. 317-4, at p. 9-10]. Some also permit the holder to do "anything necessary or useful to the enjoyment of the easement herein granted." But none of the Category 1A easements includes language that confers rights on the easement holder to engage in commercial telecommunications services. They do not mention communications, telephones, or fiber optic cables.

Therefore, all Category 1A easements include rights limited to installation and maintenance of electric transmission lines and "appurtenances thereto." Under Missouri

law, an appurtenance has been defined as "a thing used with, and related to or dependent upon, another thing more worthy, and agreeing in its nature and quality with the thing whereunto it is appendant or appurtenant," *Snoddy v. Bolen*, 24 S.W.142, 144 (Mo. 1893), or "an appendage; that which belongs to something else." *Jackman v. St. Louis & H.R. Co.*, 263 S.W. 230, 231 (Mo. 1924). Thus, inclusion of "appurtenance" in the language of Category 1A easements does not permit the easement holder to construct and use fiber optic cables for any purpose. Rather, the cables may only be used as an "accessory" or "appendage" to the electric transmission lines the easement holders are authorized to construct and operate. Likewise, inclusion of the phrase "anything necessary or useful to the enjoyment of the easement herein granted" does not give the easement holder carte blanche use of the easement. Use is limited to what is necessary and useful for operation of the electric transmission lines.

Sho-Me Power argues that the commercial telecommunications business is useful to the enjoyment of its easement because the profit from Sho-Me Tech's commercial sales offsets the cost of electrical service that members receive. Applying Sho-Me's logic, Sho-Me Power could do anything on Plaintiffs' land so long as it made a profit doing so. Such an interpretation is not reasonable and is inconsistent with the fundamental rule that the easement holder's rights are limited. If merely making a profit from the land use was enough, then the easement holder's rights would be virtually limitless, even if totally contrary to the purpose for which the easement was given.

Because commercial telecommunications use is outside the scope of the rights granted by the Category 1A easements, Defendants' use of those easements for

commercial telecommunications purposes is unauthorized and constitutes a trespass under Missouri law. The Biffles, Robertson, and those class members included in the 1A easement category have therefore shown as a matter of law that their easement holder has exceeded the scope of the easement.

The result for Category 1B and Category 1C easements is the same. Category 1B easements are also typically titled "Transmission Line Easement." Although these easements grant the right to install and use some communications equipment, they permit such equipment only insofar as it is "appurtenant" to, "necessary in connection," or "related" with the transmission of electricity. [Doc. 317-4, at p. 11-12]. Equipment such as signal lines, wires, etc., in the easements are limited by the preceding word "appurtenant," and by the phrase "necessary in connection therewith" that follows the list. Inclusion of "communication and other wires" is limited by the preceding "necessary" and by the phrase "in connection therewith" that follows the list. Common forms of the easements in Category 1B include the right to

> erect, operate, maintain, repair, rebuild, and patrol … one or more electric transmission lines and appurtenant signal lines, telephone wires, poles, towers, wires, cables, and appliances necessary in connection therewith, together with the right of ingress and egress to, from, and over said lands for doing anything necessary or useful to the enjoyment of the easement herein granted

or the right to

> construct, operate and maintain a pole or tower line for transmission and distribution of electricity, including necessary communication and other wires, towers, poles, guy and brace poles, anchors, ground connections, attachments, fixtures, equipment and accessories desirable in connection therewith . . .

or to

construct . . . operate, and maintain electric transmission lines of one or more circuits, communication lines, fiber optic lines, . . . wires . . . and other appurtenances thereto, including transformers.

Similar to the "anything necessary and useful" language in the Category 1A easements, the phrase "the right of ingress and egress to, from, and over said lands for doing anything necessary or useful to the enjoyment of the easement herein granted" does not give the easement holder unlimited discretion. Rather, the holder of Category 1B easements has rights necessary to the operation and maintenance of electric transmission lines and nothing more. *See McDonald v. Miss. Power Co.*, 732 So.2d 893, 897 (Miss. 1999) (holding that easement language permitting the construction of "electric lines and all telegraph and telephone lines, towers, poles, wires, and appliances and equipment necessary or convenient in connection therewith" permitted use in connection with providing electrical services but did not permit lease of cable space to third parties for uses other than providing electricity, even if the lease "would not constitute an additional servitude on the property"). Use of the Category 1B easements for commercial telecommunication purposes is a change in the quality of use and not merely in the quantity of use. Use of the easement for internal communication purposes in connection with supplying electric energy is entirely different than using the easements for a commercial telecommunications business that, if ceased tomorrow, would not affect Sho-Me Power's or KAMO Electric's ability to provide electric energy.

Category 1C includes condemned easements in favor of either Sho-Me Power or KAMO Electric. The condemnation orders in this category contain "purpose" language similar to that found in the Category 1A easements, such as the right "to construct . . .

operate and maintain a certain electric transmission line . . . and such other appurtenances, as may be necessary, convenient or proper for the purpose of supplying electric energy . . . ." For the same reasons that Category 1A easements do not permit use for commercial telecommunications purposes, the Category 1C easements do not either. While the installation of Defendants' fiber optic cables for internal communications purposes was necessary in connection with the continued and evolving needs of their electric transmission systems, the sale externally of the excess capacity of the cables for unrelated, third-party communications was never necessary for the continued operation of their electric transmission systems.

Defendants rely on *Henley v. Continental Cablevision of St. Louis County, Inc.*, 692 S.W.2d 825 (Mo. Ct. App. 1985), for the argument that using fiber optic cable for their electric transmission systems and for commercial telecommunications purposes is a permissible additional use of fiber optic cable. In *Henley*, a phone company and electric company held easements across a subdivision granting them the right to construct and maintain electric, telephone, and telegraphic wires. *Id.* at 827. Both companies granted licenses to a cable company, which placed equipment on the existing easements for the purpose of providing cable television. *Id*. The plaintiffs sought to enjoin the cable company's use of the easements. *Id*. The Missouri court found in favor of the cable company, stating

> The owner of an easement may license or authorize third persons to use its right of way for purposes not inconsistent with the principal use granted. The . . . easements . . . provided the right of ingress and egress . . . to add to the number of and relocate all wires, cables, conduits, manholes, adding thereto from time to time . . . [and to construct and maintain] all poles, cables, wires, conduits, . . . and

all other fixtures and appurtenances deemed necessary at anytime. . . . It can hardly be said that the addition of a single coaxial cable to the existing poles for the purpose of transmitting television images and sound by electric impulse increases the burden on the servient tenement beyond the scope of the intended and authorized use.

*Id*. at 828. The Court further remarked

The expressed intention of [the grantors] was to obtain for the homeowners in the subdivision the benefits of electric power and telephonic communications. Scientific and technological progress over the ensuing years have added an unforeseen dimension to such contemplated benefits, the transmission by electric impulse of visual and audio communication over coaxial cable. It is an inescapable conclusion that the intention of the [original grantors] was the acquisition and continued maintenance of available means of bringing electrical power and communication into the homes of the subdivision."

*Id.* at 829.

Where the easements in Categories 1A-C differ from the easements in *Henley* is that the Category 1A-C easements do not permit use for communications purposes outside of what is necessary for the transmission of electric energy. The Court in *Henley* found that cable television was the transmission of visual and audio *communication*, which is consistent with the grantors' original intention of permitting use of the easements for telephone purposes – another form of communication. *See, e.g., Salvaty v. Falcon Cable Television*, 212 Cal.Rptr. 31, 34-35 (Cal. Ct. App. 1985) ("Although the cable television industry did not exist at the time the easement was granted, it is part of the natural evolution of communications technology. Installation of the equipment was consistent with the primary goal of the easement, to provide for wire transmission of power and communication."). But unlike in *Henley*, the Category 1A-C easements do not convey the right to use the property for the purpose of transmitting communications, and

using the easements for commercial telecommunications purposes is not merely a more technologically advanced method of delivering electricity. Category 1A and 1C easements make no mention of communications or telephones. While the Category 1B easements do mention telephone or communication lines, they are specifically limited to what is necessary for the operation of the permitted electric transmission lines; a comparison of 1B easements to 1D easements demonstrates the important difference.[8] Accordingly, Defendants' reference to *Henley* does not support their argument that the Category 1A-C easements permit use for commercial telecommunications purposes.

Easements within Categories 1A-C therefore do not authorize use and lease of fiber optic cable for commercial telecommunications. Nonetheless, Defendants argue that use of the easements for commercial telecommunications purposes is not trespass because Plaintiffs consented to use of their land for a commercial telecommunications network. Therefore, the Court turns to the issue of consent.

### a. The Biffles' Consent

In their Motion for Summary Judgment against the Biffles, the Sho-Me Defendants argue that even if the Biffle easement does not authorize use of the fiber optic cables for commercial telecommunications purposes, Mr. Biffle nonetheless consented to that use. [Doc. 239]. The Sho-Me Defendants argue that because Mr. Biffle approached Sho-Me's crew as they were installing fiber optic cable and because Mr. Biffle thought the installation was "peculiar" but did not oppose installation of the cable, Mr. Biffle consented to use of the fiber optic cable for commercial telecommunication uses or

---

[8] *See* discussion *infra* Part IV.A.2.ii.

otherwise did not care for what purposes the cable was used. However, the record demonstrates Sho-Me's crew only revealed they were installing fiber optic cable, not how the cable would be used. The record does not support a finding that Mr. Biffle understood that the cables would be used both for internal communications purposes – use permitted by the easement across his land – and external, commercial communication purposes. Therefore, he could not have consented to what he did not know.

The Sho-Me Defendants rely on two cases – *Muir v. Ruder*, 945 S.W. 2d 33 (Mo. Ct. App. 1997), and *Sinopole v. Morris*, 743 S.W.2d 81 (Mo. Ct. App. 1989) – for the proposition that by watching Sho-Me's crew install the fiber optic cables, Mr. Biffle impliedly consented to installation of the cable by failing to take action to stop it. However, these cases are distinguishable for two reasons. First, Mr. Biffle does not challenge installation of the fiber optic cables so long as they are used for Sho-Me Power's internal communication needs. Second, both *Muir* and *Sinopole* involved landowners watching the defendant physically alter their land by removing trees and farming. Unlike the landowners in *Muir* and *Sinopole*, who could observe the nature of the trespass, Mr. Biffle had no way of knowing – through either his own observations or his conversations with Sho-Me's crew – that the cable would be used for commercial telecommunication purposes, rather than for internal communications purposes related to supplying electric energy. Therefore, *Muir* and *Sinopole* are distinguishable.

As a matter of law, the Biffles' easements do not authorize use of the fiber optic cables burdening their land for commercial telecommunications purposes, and Mr. Biffle did not consent to use of his land for that purpose. Therefore, Sho-Me Power, as the

holder of the easements, could not license rights to use the cables for commercial telecommunications purposes to Sho-Me Tech. Accordingly, Sho-Me Tech's use of the fiber optic cable across the Biffles' land for commercial telecommunications purposes exceeds the authorized scope of the easement and is therefore, trespass.

### b. Class Members' Consent [Doc. 299]

The Sho-Me Defendants argue that even if Plaintiffs – including Robertson – have claims against Sho-Me, summary judgment is still appropriate against "every class member who had knowledge that [Sho-Me] Tech was marketing and selling excess fiber optic capacity, and never objected" because those class members thereby consented to the trespass. [Doc. 299, at p. 1]. The Sho-Me Defendants argue they began an "extensive publicity campaign" to publicize that Sho-Me Tech was marketing and selling excess fiber optic capacity on Sho-Me Power's transmission system and that "there are undoubtedly class members who were aware [Sho-Me] Tech was marketing and selling excess fiber optic capacity." *Id.* at p. 6.

When a landowner is aware that another is using and maintaining his property and never objects to the other's conduct, the landowner's consent to such use is implied, and the consent continues until revoked. *Grossman v. St. John*, 323 S.W.3d 831, 834 (Mo. Ct. App. 2010). Implied consent requires both awareness of use and failure to object to that use. With the exception of one document – an Order from the Missouri Public Service Commission – Sho-Me submitted the same publicity documents[9] to the Court in

---

[9] Examples of this publicity include articles in *Rural Missouri*, a publication circulated to 500,000 members of rural electric cooperatives; a letter by Crawford Electric Cooperative to its 30,000 members

its opposition to class certification. *See* [Doc. 299, at p. 3 – Motion for Summary Judgment based on Class Consent, citing [Docs. 199-10 through 199-17, exhibits submitted in opposition to class certification]]. The Court considered this evidence in its class certification determination and concluded that the Sho-Me Defendants had "not presented sufficient evidence that individual class members knew of and acquiesced to the use of the fiber optic cable on their property for commercial telecommunications uses." [Doc. 254, at p. 26]. The Court determined that whether notice existed may be determined on a class-wide basis, the standard being whether "'a reasonably prudent person [would be] on notice of a potentially actionable injury.'" *Id.* (quoting *Bus. Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. 1999).

The evidence submitted by Sho-Me is insufficient to demonstrate that a reasonably prudent person would be aware that the fiber optic cable burdening his or her land was being used for an impermissible purpose. Even assuming that various magazine and newspaper articles and member reports were widespread enough to create an inference that Plaintiffs had access to the articles and actually read them, the content within the articles themselves would not lead a reasonably prudent person to believe trespass was occurring on his or her land. For instance, a February 2000 magazine article states, "There will be more installation of fiber optic cable on our system, allowing additional automated control of substation switching equipment . . . . The fiber installation will also

that "the board learned that fiber optic access contracts continue to increase income for Sho-Me Power Cooperative, our power supplier;" various reports during annual member meetings; articles in the *Dixon Pilot*, circulated to citizens of Dixon, Missouri, explaining that Gascosage was working with Sho-Me Power to install fiber optic cable and excess fiber could be made available for Dixon's schools and citizens; and newsletters to members of other electric cooperatives whose power is supplied by Sho-Me Power.

allow opportunities for additional services to be taken to members." [Doc. 199-10, at p. 2].  In a speech to cooperative members, it was stated that Sho-Me Power would complete a fiber route that will provide fiber optic connections in various service areas. *Id.* Other examples state that "High-speed fiber optic technology now connects a large portion of our service territory . . . ." or that "fiber optic access contracts continue to increase income for Sho-Me Power Cooperative . . . ." [Doc. 199-12, at p. 2].  This evidence does not mention Sho-Me Power's easements in connection with the fiber optic projects and only a few of the examples mention specific commercial telecommunication sales.

While the Order from the Missouri Public Service Commission outlines Sho-Me Power's and Sho-Me Tech's relationship and operation more clearly than Sho-Me's other evidence, the Order does not state or explain that the fiber optic cables were installed on Sho-Me Power's electric transmission easements.  However, even if it did, the likelihood of a reasonably prudent person regularly reading orders published by the Missouri Public Service Commission is even less than the likelihood that a reasonably prudent person would deduce from a newsletter that the Sho-Me Defendants were using their land in an unauthorized way.

The Sho-Me Defendants primarily rely on *Grossman v. St. John*, 323 S.W.3d 831, 834 (Mo. Ct. App. 2010), for the proposition that implied consent occurs when a property owner does not object to unauthorized use and that the consent continues until revoked. *Grossman* is distinguishable from this case. In *Grossman*, the property owner watched his neighbors clear debris from his land, lay sod, construct concrete benches and lights, and

plant bushes. The landowner testified that he did not say anything to his neighbors because "it wasn't bothering" him. *Id.* The Missouri Court of Appeals held that the landowner impliedly consented to his neighbor's use when he did not object. The plaintiff in *Grossman* knew unauthorized use occurred; Plaintiffs in this case did not. Plaintiffs' consent to the installation of fiber optic cable for internal communications purposes is not consent to its use for commercial telecommunications purposes. *See* Restatement (Second) of Torts § 892A cmt. c to sub. 2 ("In order to be effective, the consent must be to the particular conduct of the actor, or to substantially the same conduct."). Without notice that their land was being used in an unauthorized way, Plaintiffs could not impliedly consent by failing to object. Sho-Me's Motion for Summary Judgment Based on Class Consent, [Doc. 299], is therefore DENIED.

Because the Category 1A-C easements across Robertson's and the applicable class members' land do not authorize use for commercial telecommunications purposes, the Electric Cooperative Defendants, as holders of the easements, could not license rights to their subsidiaries that the Electric Cooperative Defendants did not have. Accordingly, the subsidiary Defendants' use of the cable across Robertson's and the Category 1A-C class members' land for commercial telecommunications purposes exceeds the authorized scope of the easement and is therefore, trespass.

### 4. Easements authorizing use or lease for telephone or commercial telecommunications purposes

The express easements classified within Categories 1D, 2A, and 3 and the court ordered condemnation easements classified within Category 2B expressly authorize the

holder of the easements to install and use fiber optic cable for internal or commercial telecommunications purposes and to license that right to third parties.

All of the easements in Category 1D are KAMO Electric easements. The Barfield easement is an example of a Category 1D easement. The two most common KAMO Electric easements in this category are titled either "Transmission Line Right-of-Way Easement" or "Transmission Line Easement" and provide the right to

> erect, operate, survey, maintain, repair, rebuild and patrol . . . one or more electric transmission lines and appurtenant signal lines, telephone and telegraph wires, poles, towers, wires, cables, anchors, guy wires, and appliances necessary in connection therewith, and to license, permit, or otherwise agree to the joint use or occupancy of the line or system by any other person, association or corporation for electrification or telephone purposes;

or to

> construct, reconstruct, repair, operate and maintain an electric transmission line upon, over and across [the lands of Grantor.] . . . And also the perpetual right, privilege and authority . . . to license, permit or otherwise agree to the joint use or occupancy of the line or lines by any other person, association or corporation for electrification or telephone purposes.

[Doc. 317-4, at p. 13]. The Category 1D easements are very similar to the Category 1B easements with one significant difference. While both 1B and 1D easements contain communication language qualified by limiting language such as "appurtenant" and "necessary in connection therewith," the 1D easements contain additional language permitting the holder to license joint use of the constructed lines for electrification *or* telephone/communication purposes. Further, the language permitting the easement holder to license use for telephone purposes to "any other person, association or corporation" suggests that "telephone purposes" does not have to be related to the holder's internal

electric transmission business since "any other person" or corporation would not be concerned with the holder's internal communication system. Use of the Category 1D easements for commercial telecommunications purposes is a reasonable use that is not qualitatively different than "telephone/communications" purposes, given the lack of any limiting language.

Category 2A easements permit the grantee to use Plaintiffs' land for both power and communication purposes. Common examples of Category 2A easements include

> [T]he perpetual easement and right of way … to enter upon said Easement and make use thereof for electrical power and communication purposes, including, but not limited to, the perpetual right to place, replace, construct, reconstruct, install, erect, relocate, modify, change operating voltage, patrol, repair, operate and maintain thereon ... an electrical transmission system and a fiber optic or other communication system, including but not limited to, communication lines, electric transmission or electric distribution lines of one or more circuits, poles, structures, wire, guy wires, anchors, cables, fiber optic line, lines or systems and all other appurtenances ... for internal, commercial or other purposes and for the transmission and distribution of electrical energy and communication data or information of any type whatsoever, to and across the Easement.

and

> [A] perpetual easement and right of way . . . with the right, privilege and authority to enter upon said Easement and make use thereof for electrical power utility and communication purposes including, but not limited to, the perpetual right to construct, reconstruct, install, replace, repair, patrol, operate and maintain an electrical transmission system of 161 kV or less and all appurtenances thereto, including communications equipment, as well as, communications systems that may be required for, but not limited to, the commercial transmission of communications . . . ."

[Doc. 317-4, at p. 14-15]. Unlike the easements in Categories 1B and 1C, the language of the easements in Category 2A do not restrict the holder to use "necessary," "appurtenant," or "related" to electric transmissions. The easements that do not expressly

say "commercial" nonetheless contemplate broad authority for the construction and operation of a communications system without restriction as to what kind of communication system it is. A holder of an easement granted in general terms without any limitation has unlimited, reasonable use of that easement. Use of these easements for commercial telecommunications is a reasonable use.

Similarly, Category 3 easements contain no restriction on the uses for the communication systems over Plaintiffs' land. Unlike the rest of the easements in the case, these easements do not grant rights to operate and maintain electric-transmission lines or other electric equipment. Rather, they are easements that purport to convey only communications rights. Category 3 easements allow one of the following: (1) construction of "underground communication systems . . . consisting of cables and wires"; (2) making use of the easement "for communication purposes including . . . install[ing] . . . a communication line and equipment"; (3) "under ground [sic] fiber optic cables" and the licensing of the same for "telephone or telecommunication purposes"; (4) an "underground facilities system consisting of such communication and other broadband service cables . . . as may be required"; and (5) use of the easement for "fiber optic communication purposes." *Id.* at 16.

Category 2B contains easements obtained through condemnation proceedings. These easements are "for electrical power utility and communication purposes," and permit the construction and operation of "communication equipment as well as communication systems that may be required for, but not limited to the commercial transmission of communications." Category 2B easements are similar to Category 2A

easements and for the same reasons discussed above, permit use for commercial telecommunications purposes.

### a. Whether the easements are illegal

Plaintiffs argue that regardless of whether the easement language expressly permits use for commercial telecommunications purposes, Sho-Me Power and KAMO Electric, as rural electric cooperatives governed by Chapter 394 of the Missouri Revised Statutes, are limited to acquiring, using, and leasing easements "for the purpose of delivering electricity to the communities they were created to serve and nothing more." [Doc. 245-1, at p. 21]. Plaintiffs argue that if the easements cannot be read in a manner consistent with the limited powers granted by Chapter 394, then any provisions that purport to grant interests in conflict with Chapter 394 are illegal and cannot be enforced.

A rural electric cooperative "may be organized under [Chapter 394] for the purpose of supplying electric energy and promoting and extending the use thereof in rural areas." Mo. Rev. Stat. § 394.030. Section § 394.080 RSMo. outlines a rural electric cooperative's powers.[10] Plaintiffs argue that because electric cooperatives are limited to actions related to supplying electric energy, any easement language granting KAMO and Sho-Me the right to use Plaintiffs' land for commercial telecommunications purposes or to lease its rights to others for commercial telecommunications purposes is illegal and therefore, void.[11]

---

[10] The powers relevant to this case may be found in Mo. Rev. Stat. §§ 394.080(4), (7), (8), and (14).

[11] There is a difference between an illegal contract and an act by Sho-Me Power or KAMO Electric that is ultra vires. Plaintiffs do not have standing to challenge whether Sho-Me Power's or KAMO Electrics's use or lease of the easements are ultra vires. *State ex rel. State Hwy. Comm'n v. Chicago B. & Q. R. Co.*, 539 S.W.2d 760, 763-64 (Mo. Ct. App. 1976).

Under Missouri law,

> [a] distinction is made between the act of a corporation which is merely without authority and one which is illegal.  In the one case it is a question of authority; in the other, of legality.  A corporate act becomes illegal when committed in violation of an express statute on a specific subject, or when it is malum in se, or malum prohibitum, or when it is against public policy.

*Marshall v. Knights of the Maccabees of the World*, 270 S.W. 418, 419 (Mo. Ct. App. 1925).  An agreement is illegal if it "is predicated on the violation of the laws and regulations, which have as their purpose the protection of the safety and health of the public."  *Déjà Vu of Missouri, Inc. v. Talayna's Laclede's Landing, Inc.*, 34 S.W.3d 245, 249 (Mo. Ct. App. 2000); *see also Rice v. James*, 844 S.W.2d 64, 69 (Mo. Ct. App.1992); *King v. Moorehead*, 495 S.W.2d 65, 77 (Mo. Ct. App. 1973) ("The general rule is that any act forbidden by a legislative enactment, if passed for the protection of the public and which provides for a penalty, cannot be the foundation of a valid contract.").  "Because [courts] value the freedom to contract so highly, [courts] will not find that a contract contravenes a statute unless the language of the implicated statute is clear and unambiguous that the legislature intended that the courts not be available for either party to enforce a bargain made in violation thereof."  *State Farm Mut. Auto. Ins. Co. v. D'Angelo*, 875 N.E.2d 789, 798 (Ind. Ct. App. 2007).

The language of Chapter 394 neither clearly nor unambiguously shows that the legislature intended to make the Defendants' easements illegal.  Chapter 394 does not expressly prohibit Sho-Me Power or KAMO Electric from acquiring easements for a purpose not authorized by statute.  See *Déjà Vu*, 34 S.W.3d at 249 (contract to sell nightclub and to transfer liquor license was illegal in light of Missouri law and St. Louis

ordinance prohibiting transfer of liquor license to another); *Clouse v. Myers*, 753 S.W.2d 316, 319 (Mo. Ct. App. 1988) (similar); *Rice*, 844 S.W.2d at 69 (Mo. Ct. App. 1992) (contract between unlicensed contractor who paid a licensed contractor to obtain a permit for unlicensed contractor was illegal where sole purpose of agreement was to circumvent city's requirement that only licensed contractors could obtain a permit and in light of city ordinance specifically prohibiting the agreement); *Moorehead*, 495 S.W.2d at 78 (Mo. Ct. App. 1973) (an agreement between a landlord and tenant was illegal where the landlord knew at the time the lease was signed that substantial housing code violations existed and a city ordinance "expressly prohibit[ed] an owner from permitting occupancy of a dwelling unit which is unfit for human habitation because of violations of the housing code"); *Ullman v. St. Louis Fair Ass'n*, 66 S.W. 949 (Mo. 1902) (contract giving plaintiff exclusive betting and bookmarking privileges on its race track was illegal in light of Missouri statute prohibiting gambling). Rather, Chapter 394 describes the purpose for which electric cooperatives are formed, how they are formed, and what actions they may take once they are formed. Even assuming Plaintiffs are correct in arguing that Sho-Me and KAMO do not have the authority under Chapter 394 to lease their easements for use in a commercial telecommunications network, Plaintiffs' argument is a challenge to Sho-Me and KAMO's *authority* to contract for and lease easement rights and not to the *legality* of the contract itself. "Ultra vires and illegality are not synonymous. A given contract may have both defects, or one without the other, or neither." *Donovan v. Kansas City*, 175 S.W.2d 874, 879 (Mo. 1944).

Plaintiffs primarily rely on the Supreme Court of Missouri's decision in *Farmers' Elec. Co-op., Inc. v. Missouri Dept. of Corrections*, 977 S.W.2d 266 (Mo. 1998), for the proposition that "a contract that purports to confer rights which exceed an electric cooperative's statutory powers is illegal." [Doc. 245-1, at p. 29]. In *Farmers*, an electric cooperative signed a contract with a correctional facility to serve as the sole provider of electric energy to that facility, which was located outside the city limits. While the twenty-year contract was still in place, the correctional facility was annexed into the city limits. A new facility was built in addition to the existing structures and the city provided the electric energy to that facility rather than the electric cooperative. The cooperative sued the facility alleging breach of contract and the facility filed a counterclaim requesting that the court find the original contract between the parties illegal and void pursuant to §§ 386.800.2 and 394.315.1(2) RSMo. *Farmers*, 977 S.W.2d at 268. The cooperative argued that pursuant to § 394.080, it had the authority to provide service to structures it was serving before the land was annexed into the city limits. However, the Supreme Court of Missouri cited to § 394.315.1(2), which contained "plain language" that "a rural cooperative may not serve 'new structures' on a particular tract of land merely because it was serving an existing structure on that tract of land." *Id.* at 270. The Missouri Supreme Court, quoting *Union Elec. Co. v. Platte-Clay Elec. Co-op, Inc.*, 814 S.W.2d 643, 647 (Mo. Ct. App. 1991), remarked that "[t]he meaning of the language of section 394.315.1 is plain and clear. The statute prohibits a rural electric cooperative . . . from providing electrical energy to new structures on a particular tract of land [which has

ceased to be in a rural area] even though it was serving an existing structure on that tract . . . ." *Farmers*, 977 S.W.2d at 270 (ellipses and brackets in original).

There is no "plain and clear" language prohibiting Sho-Me and KAMO from having a commercial telephone easement. While they have no authority to operate a telephone company, directly or indirectly (an ultra vires act), there is no statute that directly states that that activity is prohibited (an illegal act). In contrast, the statute in *Farmers* expressly stated that new structures could not be serviced by a rural electric cooperative merely because the cooperative was previously providing electricity to that property. It is a modest distinction but provides a clear line between illegal and ultra vires acts.

Even so, courts have still refused to enforce agreements that are otherwise contrary to the declared public policy of the state. Nonetheless, "courts will not go out of their way to discover an illegality in a contract, and they proceed with great caution when determining whether the contract must be voided due to public policy issues." *Frishman v. Maginn*, 912 N.E.2d 468, 478 (Mass. App. Ct. 2009). The Supreme Court of Indiana lists five factors to be considered in determining whether a contract not prohibited by statute or clearly tending to injure the public, but nevertheless alleged to contravene public policy, should be enforced: "(i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute*;* (iii) the likelihood that refusal to enforce the bargain or term will further that policy*;* (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties' relative bargaining power and freedom to contract. *Fresh Cut, Inc. v. Fazli*, 650

N.E.2d 1126, 1130 (Ind. 1995) (internal citations omitted).[12]  These considerations are meant to aid a court in determining whether enforcing a contract will harm the public or otherwise contravene a state's public policy. The easements at issue in this case are not the type of contracts where enforcement harms the public.  At most, enforcing the easements may create unfair competition for commercial telecommunications providers seeking to compete against the subsidiary Defendants or other electric companies which did not have powers of condemnation, but the State of Missouri's interest in promoting fair competition is protected by the State's authority to challenge the electric cooperative Defendants' acts as ultra vires.

Further, Chapter 394 is not the type of law or regulation which has as its purpose the protection of the safety and health of the public.  *See King v. Moorehead*, 495 S.W.2d 65, 77 (Mo. Ct. App. 1973) (identifying housing code as a regulation which promotes "order, safety, health, morals, and general welfare"); *Déjà Vu of Missouri, Inc. v. Talayna's Laclede's Landing, Inc.*, 34 S.W.3d 245, 250 (Mo. Ct. App. 2000) ("These liquor laws and regulations have as their purpose the protection of the safety and health of the public."); *Rice v. James*, 844 S.W.2d 64, 69 (Mo. Ct. App.1992) (ordinance allowing only licensed contractors to obtain permit "obviously has as its purpose the protection of the safety and health of the public").  The Supreme Court of Missouri's decision in *McCaleb v. Shantz*, 318 S.W.2d 199 (Mo. 1958), is instructive.  In *McCaleb*, a will devised an interest in land to a Missouri corporation.  Residuary devisees of the

---

[12] For similar standards, see *Frishman v. Maginn*, 912N.E.2d 468 (Mass. App. Ct. 2009), and *Baugh v. Novak*, 340 S.W.3d 372 (Tenn. 2011).

will claimed the devises to the corporation were void because they were in violation of Article VI, section 5 of the Missouri Constitution (now repealed) which authorizes corporations to hold real estate necessary and proper for carrying on legitimate corporate business. *Id.* at 200, 202. The Supreme Court of Missouri declined to find the devises void, remarking:

> We are of the opinion therefore that the provision of Article XI, Section 5, Missouri Constitution 1945, authorizing corporations to hold the real estate necessary and proper for carrying on the legitimate corporate business, is not expressly prohibitory in the sense that it makes void a conveyance or devise of real estate which might be unnecessary, but that such provision is regulatory only and a devise or conveyance of 'unnecessary' real estate passes title thereto to the corporation.

*Id.* at 202. The Supreme Court of Missouri further remarked that while the plaintiffs could bring a lawsuit for the purpose of determining whether the devises were void,

> . . . the questions of whether the corporation's title was voidable [and] whether the real estate was or was not in fact necessary for the accomplishment of the legitimate corporate business . . . are all matters determinable only in a proper action by the State of Missouri against the corporation in question.

*Id.* at 202-03.[13]

Though it is questionable whether Sho-Me Power and KAMO Electric have the authority under Chapter 394 RSMo. to secure easements with language allowing use of the Plaintiffs land for external, commercial telecommunications purposes or to license their wholly-owned subsidiaries to use and sell excess fiber optic capacity for commercial purposes, the easements themselves are not illegal.

---

[13] Like the plaintiffs in *McCaleb*, Plaintiffs argue Sho-Me and KAMO are limited by Article XI, section 5 of the Missouri Constitution (now repealed). For the same reasons described in the Chapter 394 analysis, *supra*, and pursuant to *McCaleb*, the Court finds that Article XI, section 5 is regulatory in nature and does not void acquisition of title to real estate. Sho-Me and KAMO's authority to acquire the easements at issue can be challenged by the State of Missouri, but not by Plaintiffs.

Because trespass occurs only when an easement holder exceeds the scope of its usage rights, no trespass has occurred where the easements expressly allow Sho-Me Power or KAMO Electric to use and lease Plaintiffs' land for commercial telecommunications purposes. It follows, then, that Sho-Me Tech's and K-PowerNet's lease of the excess fiber optic capacity for commercial purposes is also not a trespass where the right to use the easements is derived from the license agreements with their parent companies. *See Eureka Real Estate & Inv. Co. v. S. Real Estate & Fin. Co.*, 200 S.W.2d 328, 332 (1947).

### b. Whether the Easements are Apportionable

Plaintiffs argue that even if the easements permit use for commercial telecommunications purposes and are not illegal, Sho-Me Power's and KAMO Electric's easements are not exclusive and thus not apportionable to their subsidiaries. In other words, Plaintiffs argue Sho-Me Power and KAMO Electric cannot license any of their easement rights to Sho-Me Tech or K-PowerNet. However, the language of the Category 1D, 2A-B, and 3 easements specifically grants the rights discussed above to the cooperative and "to its lessees, licensees, successors and assigns " or specifically grants the right to license occupancy to another party for communication purposes. *See* [Doc. 317-4, at p. 63 (1D easement); p. 74-74 (2A easements); p. 85 (2B easement); and p. 100 (3 easement)]. The Missouri Court of Appeals has held that where the plain language of an easement includes "successors or assigns," the easement permits assignments. *City of Jackson v. Bettilee Emmendorfer Revocable Trust*, 260 S.W.3d 918, 925 (Mo. Ct. App.

2008). Accordingly, Sho-Me Power and KAMO Electric were permitted to license their rights to their subsidiaries.

### 5. Category 1E Easements

Category 1E easements are classified by Plaintiffs as "hybrid" easements because they contain individual deletions of some but not all references to communications, include individual additions that limit the scope of the holder's use, or contain a title inconsistent with rest of the easement. Plaintiffs contend that "[i]f for any reason the Court does not grant summary judgment in Plaintiffs' favor with respect to the Category 1E easements, then the 51 easements in this category will need to be individually reviewed because they all contain handwritten edits that further limit the rights KAMO has under the easement." [Doc. 245-1, at p. 36]. The KAMO Defendants, [Doc. 304, at p. 50], and the Sho-Me Defendants, [Doc. 335, at p. 21], agree individual analysis is required and summary judgment is not appropriate.

Because the Court has found that Plaintiffs have no standing to challenge the ultra vires acts of the Defendants and because of the individualized language in the Category 1E easements, summary judgment cannot be granted in anyone's favor at this time. The Court will leave for another day whether Category 1E easements can be organized into subcategories making summary judgment possible, or whether decertification is the appropriate remedy.

### B. Unjust Enrichment

Plaintiffs argue in support of their motion for summary judgment and in opposition to Defendants' motions for summary judgment that if Defendants have

committed trespass by exceeding the scope of their easements, then Defendants have unjustly enriched themselves at the Plaintiffs' expense, and eligible Plaintiffs are entitled to equitable restitution. [Doc. 245-1, at p. 39]; [Doc. 317, at p. 48]. "Plaintiffs seek restitution under their unjust enrichment claim in the alternative to receiving damages under their trespass claim." [Doc. 317, at p. 48 n. 50].

Plaintiffs argue Defendants were enriched when they appropriated commercial telecommunications easement rights over Plaintiffs' land, which have a recognized commercial value, and then used those appropriated rights to sell commercial telecommunications services. Defendants argue summary judgment against Plaintiffs' unjust enrichment claim is appropriate because "Missouri law has rejected unjust enrichment as a remedy for a trespass," [Doc. 293, at p. 3; Doc. 304, at p. 51], and there is no implied agreement on the part of a trespasser to pay for the use and occupation of land. [Doc. 295, at p. 44].

Unjust enrichment occurs when a person retains and enjoys a benefit conferred on that person without paying the benefit's reasonable value. *Archway Kitchen & Bath, Inc. v. Lands Dev. Corp.*, 838 S.W.2d 13, 14 (Mo. Ct. App. 1992). The elements of unjust enrichment are (1) the defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it would be unjust to allow the defendant to retain the benefit. *Exec. Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.*, 280 S.W.3d 678, 697 (Mo. Ct. App. 2009).

Because the Category 1D, 2A, 2B, and 3 easements permit use for commercial telecommunications purposes, it is not unjust to allow Defendants to retain the benefits of

those easements.  Further, a plaintiff cannot recover under an unjust enrichment theory when the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery. *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). The issue, then, is whether Plaintiffs may recover under an unjust enrichment theory for Defendants' unauthorized use of the Category 1A-C easements.

First, the Court must determine if under Missouri law, a party may recover under an unjust enrichment theory rather than under a trespass claim. Case law in Missouri is sparse.  However, case law throughout the United States suggests a plaintiff may recover under an unjust enrichment theory if the plaintiff proves the defendant has wrongfully secured a benefit by exceeding the scope of an easement. *See Drawhorn v. Qwest Commc'ns Int'l, Inc.*, 121 F.Supp.2d 554, 563 (E.D. Tex. 2000) (The plaintiffs sued for trespass and unjust enrichment, claiming easements owned by a railroad did not permit a fiber optic telecommunications network to install a fiber optic network.  Deciding only whether the case should be removed to federal court, the Texas court held that "in order to succeed on their claim for unjust enrichment, the plaintiffs must demonstrate that [the defendant] wrongfully secured a benefit by installing its fiber optic cables on the easements it has acquired from the railroad companies," an analysis which would require an inquiry into federal railroad statutes.); *see also In re AT&T Fiber Optic Cable Installation Litig.*, 2001 WL 1397295, at *12 (S.D. Ind. 2001).  For instance, in *Melton v. Carolina Power & Light*, 2012 WL 2401635, at *3 (D.S.C. 2012), the United States District Court for the District of South Carolina, held that "when an easement holder's actions exceed the authority granted by that easement, or center around a point not

43

covered by the express easement, a cause of action for unjust enrichment may be available." In *Melton*, the plaintiff sued a power company alleging that the company exceeded the scope of the easements it had over her property when the company allowed telecommunication companies, for a fee, to use the fiber optic cable installed in its easements for general telecommunications. *Id.* at *1. The plaintiff asserted claims for unjust enrichment, trespass, injunction, and declaratory judgment. The defendant filed a motion for partial summary judgment arguing that the plaintiff's unjust enrichment claim failed as a matter of law because an express contract governed the rights of the parties. The South Carolina district court disagreed:

> This improperly categorizes Plaintiff's argument. Plaintiff's actual argument is that because Defendant's alleged use of the fiber optic cable at issue is not covered at all by the express easements at issue, there is no express contract governing this case. Thus, in addition to damages for trespass, Plaintiff is entitled to recover the amount gained by Defendant at Plaintiff's expense.

*Id.* at *2 (internal citations omitted). Cases finding no liability for unjust enrichment claims paired with trespass claims have denied liability not on the basis that a plaintiff cannot recover under both trespass and unjust enrichment, but because the plaintiff did not provide evidence that the defendant engaged in any inequitable or illegal conduct and therefore did not unjustly retain benefits. *See In re MCI, Inc.*, 2006 WL 538556 (Bankr. S.D.N.Y. 2006), *aff'd sub nom. In re Worldcom, Inc.*, 2010 WL 334980 (S.D.N.Y. 2010); *Ciampi v. Zuczek*, 598 F.Supp. 2d 257, 263 (D.R.I. 2009).

A finding that Plaintiffs in this case may recover the amount gained by the Defendants for their trespass under a theory of unjust enrichment is also supported by the

Restatement (Third) of Restitution and Unjust Enrichment.  Section 40, subsection c, states:

> Unjust enrichment from interference with real property may involve a removal of physical assets. More commonly, what the defendant has "taken" from the claimant is an unauthorized use of property from which the claimant had a right to exclude him.

Illustration 2 of section 40, subsection c, is instructive.[14] Illustration 2 is based on *Raven Red Ash Coal Co. v. Ball*, 39 S.E.2d 231 (1946), cited by Plaintiffs.  In *Raven Red Ash*, the defendant owned an easement over the plaintiff's land to construct a railway or tramway in order to transport coal from designated areas. *Id.* at 232-33.  In addition to transporting coal from the designated areas permitted by the easement, the defendant also transported more coal from other areas. *Id.* at 233.  The plaintiff could not prove damage done to his land by transporting the extra coal, so he brought an action to recover for the defendant's "use and occupation" of the land.  The Virginia court declined to follow the then majority rule, which would have limited the plaintiff to nominal damages and an injunction from further unlawful use of the easement. *Id.* at 236.  Instead, the Virginia court reasoned:

---

[14] Illustration 2 of section 40, subsection c states:
> A owns Blackacre; B owns Whiteacre, an adjoining tract. Whiteacre is burdened by an easement, benefiting Blackacre, permitting A to transport coal removed from Blackacre by a tramway crossing Whiteacre. A uses the tramway to transport coal from Greenacre as well as Blackacre. B discovers the facts and obtains an injunction against further surcharge of the Whiteacre easement. A has moved one million tons of coal from Greenacre in violation of B's property rights. The measurable injury to B (or to Whiteacre) as a result of A's trespass is nil. By local custom, a license to transport Greenacre coal over the existing easement would have been available by agreement at a price of one cent per ton. If the court finds that A's trespass was unintentional, A's liability to B in restitution will be fixed at $10,000 (§ 51(2)). The least expensive alternative means of removing coal from Greenacre would have cost A five cents per ton. If the court finds that A's trespass was intentional, A's liability to B in restitution will be fixed in an amount greater than $10,000 but not more than $50,000.

> To hold that a trespasser who benefits himself by cutting and removing trees from another's land is liable on an implied contract, and that another trespasser who benefits himself by the illegal use of another's land is not liable on an implied contract is illogical. The only distinction is that in one case the benefit he received is the diminution of another's property. In the other case, he still receives the benefit but does not thereby diminish the value of the owner's property. In both cases, he has received substantial benefit by his own wrong. As the gist of the action is to prevent the unjust enrichment of a wrongdoer from the illegal use of another's property, such wrongdoer should be held on an implied promise in both cases.

*Id.* at 237-38. The Virginia court held that while the plaintiff could not prove damage to his land, he was entitled to the value of the illegal use of the easement. *Id.* at 239.

Defendants cite to *Young v. Home Tel. Co.*, 201 S.W. 635 (Mo. Ct. App. 1918), in support of their argument that Missouri has rejected unjust enrichment as a remedy for a trespass. In *Young*, a telephone company installed poles on the plaintiffs' land without obtaining the right to do so through eminent domain or other agreement. *Id.* at 636. The plaintiffs sent the telephone company a letter indicating the company did not have permission to have its poles on their land and stated the company would be charged a fee per pole per month going forward if the company kept its poles on their land. The plaintiffs alleged the company agreed to the terms of the letter by remaining silent and were therefore liable for the fee per pole. *Id.* Plaintiffs brought an action for recovery of damages under the theory of trespass and implied contract. The Missouri Court of Appeals determined based on technical pleading rules that plaintiffs had not sufficiently pleaded trespass because the complaint "makes no allegations as to damages except on the basis of a monthly sum fixed and agreed upon." *Id.* The Missouri court further determined plaintiffs could not recover under an implied contract theory for use and

occupation of land because "no agreement, express or implied, to pay rent" existed between the parties and plaintiffs could not create a contract by the defendants' silence.

*Id.* The Missouri court remarked that

> it is clear where one takes and occupies the land of another as a trespass, the law does not imply an agreement on the part of such trespasser to pay for such use and occupation. . . . [S]uch a suit cannot be maintained unless the relation of landlord and tenant, express or implied, exists between the parties. In other words, there must have been a prior mutual agreement existing between the parties or their privies to pay for such use and occupation, else a suit therefore cannot be maintained.

*Id.* at 637. The court distinguished an action in trespass from an action for implied contract:

> It [the action for use and occupation] sounds in contract, and springs from the *mutual assent* of owner and occupant, that the later holds by permission of the former. If the occupant enter and hold without permission or right, he is a trespasser; nor can the owner waive the trespass and make him a tenant *without his consent*.

*Id.* (quoting *Edmonson v. Kite*, 43 Mo. 176 (Mo. 1869)) (emphasis in original).

*Young* is factually distinguishable from this case in an important way. Plaintiffs in *Young* sought compensation for use of the land itself under a theory of implied contract for use and occupancy. The plaintiffs did not seek damages for benefits conferred to the defendants by their allegedly unlawful use of plaintiffs land in conjunction with their telephone company.[15] Plaintiffs in this case are not requesting that the Court find a new,

---

[15] The Plaintiffs in this case brought two additional lawsuits. The Supreme Court of Missouri, denying relief to the Plaintiffs for the same reasons in the case described above, remarked that "[t]he petition is based upon the theory of an implied agreement by the telephone companies to compensate plaintiffs with the resulting right in plaintiffs to have an accounting. But, as the petition fails to allege any enforceable agreement to pay rent or otherwise to make compensation, plaintiffs do not allege facts showing themselves entitled to an accounting." *Young v. Southwestern Bell Tele. Co.*, 3 S.W.2d 381, 384 (Mo. 1928).

implied agreement to pay for the expanded right under the easements to operate a commercial telecommunications network; rather, Plaintiffs request that Defendants disgorge the benefits they received to date. *Young* would be more analogous to this case if Plaintiffs were requesting that the Court find that Defendants use of Plaintiffs' land for telecommunications purposes created an implied agreement by the Defendants to pay for the easement rights to conduct such business.

*Young* stands for the principle that under Missouri law, a party cannot be made a tenant without his consent, even if he occupies land without authorization. *Id.* at 637. But Defendants may at any time cease using the land burdened by Category 1A-C easements for commercial telecommunications purposes if they do not wish to renegotiate the scope of their easements with plaintiffs, and nothing in this Court's Order suggests a new, renegotiated agreement has otherwise been impliedly created.

Having found that Plaintiffs may, under Missouri law, recover damages under a theory of unjust enrichment, the Court must next determine whether Plaintiffs whose land is burdened by Category 1A-C easements are entitled to summary judgment on their unjust enrichment claims. By leasing their easement rights to their wholly-owned subsidiaries, and by selling excess fiber optic capacity for commercial telecommunications purposes, there is no genuine issue of material fact as to whether the Defendants have retained a benefit. The subsidiary Defendants do not dispute that they profit as a result of the sale of excess fiber optic capacity for commercial purposes and the Electric Cooperative Defendants do not dispute that as a result of the commercial telecommunications enterprise and their agreement with the subsidiaries, that their

operation costs are substantially less than if the commercial telecommunications business did not exist. *See* [Doc. 295-1, at p. 14-15, ¶ 10-13] (Sho-Me); [Doc. 304, at p. 11]. There is also no genuine issue of material fact as to whether Defendants' enrichment was at the expense of the Plaintiffs. Defendants used Plaintiffs' land for their commercial telecommunications business and had no authority to do so. It would be unjust for the Defendants to retain this benefit. Accordingly, Plaintiffs whose land is burdened by Category 1A-C easements are entitled to restitution under their unjust enrichment claim in the alternative to recovering damages under their trespass claim.

## V.     Conclusion

Plaintiffs whose land is burdened by Category 1A-C easements, including the Biffles and Robertson, are entitled to summary judgment on their trespass and unjust enrichment claims. Defendants are entitled to summary judgment against the trespass and unjust enrichment claims by Plaintiffs whose land is burdened by Category 1D, 2A-B, and 3 easements. Summary judgment is denied as to Category 1E easements. Therefore,

1.   The KAMO Defendants' Motion for Summary Judgment Against Plaintiff Chase Barfield, [Doc. 229], is GRANTED.

2.   The Sho-Me Defendants' Renewed and Restated Motion for Summary Judgment Against the Biffle and Robertson Plaintiffs, [Doc. 239], is DENIED.

3.   Plaintiffs' Motion for Summary Judgment on the Issue of Defendants' Liability, [Doc. 245], is GRANTED as to claims involving Category 1A-C

easements and DENIED as to claims involving Category 1D-E, 2A-B, and 3 easements.

4. The KAMO Defendants' Motion for Summary Judgment on the Issue of Liability, [Doc. 293], is GRANTED as to claims involving Category 1D, 2A-B, and 3 easements and DENIED as to claims involving Category 1A-C and 1E easements.

5. The Sho-Me Defendants' Motion for Summary Judgment Against All Members of the Class Who Have Unadjudicated Claims Against the Sho-Me Defendants, [Doc. 296], is GRANTED as to claims involving Category 1D, 2A-B, and 3 easements and DENIED as to claims involving Category 1A-C and 1E easements.

6. The Sho-Me Defendants' Motion for Summary Judgment Against the KAMO Class Members, [Doc. 297], is GRANTED in part and DENIED in part.

7. The Sho-Me Defendants' Motion for Partial Summary Judgment Based on the Statute of Limitations, [Doc. 298], is GRANTED.

8. The Sho-Me Defendants' Motion for Summary Judgment Based on Class Members' Consent, [Doc. 299], is DENIED.

9. Summary judgment is DENIED as to Category 1E easements.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 31, 2014
Jefferson City, Missouri