CHASE BARFIELD, et al.,       )
                                   )
       Plaintiffs,          )
                                   )
v.                              )     Case No. 2:11-cv-04321-NKL
                                   )
SHO-ME POWER ELECTRIC     )
COOPERATIVE, et al.,       )
                                   )
       Defendants.      )

## ORDER

Before the Court are Sho-Me's[1] Rule 50(a) Motion for Judgment as a Matter of Law, [Doc. 607], and Sho-Me's Rule 50(b) Renewed Motion for Judgment as a Matter of Law or Motion for New Trial, [Doc. 638]. Sho-Me's Rule 50(a) Motion is denied as moot. Sho-Me's Rule 50(b) Motion and Motion for New Trial are denied.

## I.  Background

This class action was filed on behalf of several thousand Missouri landowners for claims arising out of Sho-Me's use of electric transmission line easements for commercial telecommunications purposes. Named Plaintiffs Dwight Robertson and Michael and Gina Biffle represent a class of Missouri landowners whose properties are subject to electric transmission line easements in favor of or assigned to Sho-Me Power but whose land is being used by Sho-Me Power and Sho-Me Tech for commercial telecommunications purposes. Although this case involves the intertwining of historic property law and new technology, the theories behind this case involve one of the most recognizable principles of American property law: a property owner

---

[1] Sho-Me Power Electric Cooperative (Sho-Me Power) and Sho-Me Technologies, LLC (Sho-Me Tech) are noted separately where necessary and otherwise referred to jointly as "Sho-Me."

owns a "bundle of rights" associated with his or her land, and among that bundle is the power to exclude others and to control the use of the property.

Sho-Me Power Corporation was incorporated in 1947 as a public utility under the General and Business Corporation Law of Missouri, Chapter 351 RSMo. In 1993, the Missouri Public Service Commission granted Sho-Me Power Corporation's application to convert to a rural electric cooperative governed by the Rural Electric Cooperative Act, Chapter 394 RSMo. Its name was then changed to Sho-Me Power Electric Cooperative.

For many years, Sho-Me Power used either microwave radios or power line carriers to communicate with its unmanned power substations. In 1995, the Federal Communications Commission ordered the sale of the radio frequencies previously assigned to utility microwave radios so that the frequencies could be sold to cellular telephone providers. Sho-Me Power then converted to fiber optic cables, purportedly for internal communication purposes. It constructed a sixty-fiber, 550-mile communications system through the easements it had on Plaintiffs' land.

The fiber optic communication system was developed to have far more capacity than Sho-Me Power needed to meet its current, internal communication needs. Sho-Me Power sought to use this excess capacity for the operation of a commercial telecommunications network. However, as a rural electric cooperative governed by Chapter 394 RSMo., Sho-Me Power is not permitted to operate a commercial telecommunications business. *See* Mo. Rev. Stat. § 394.030 ("Cooperative, nonprofit, membership corporations may be organized under this chapter for the purpose of supplying electric energy and promoting and extending the use thereof in rural areas."); *see also* Mo. Rev. Stat. § 394.080 (describing a rural electric cooperative's powers). Consequently, Sho-Me Power formed Sho-Me Technologies, LLC as a wholly owned subsidiary. Shortly after the implementation of the Telecommunications Act of 1996, Sho-Me Power

2

assigned to Sho-Me Tech the right to use or sell any excess capacity on Sho-Me Power's fiber optic network. Sho-Me Tech owns no independent easement rights, and its right to use the easements is derived from Sho-Me Power. The same fiber optic cable that is used by Sho-Me Power for internal communications is used and marketed by Sho-Me Tech for its commercial telecommunications business, and the profits Sho-Me Tech earns from the telecommunications business are returned to its parent, Sho-Me Power.

As of December 31, 2012, the Sho-Me Defendants had installed approximately 1,094 miles of fiber optic cable across more than 4,300 parcels of private property burdened by easements acquired by Sho-Me Power. Sho-Me has entered into some 5,000 contracts with various entities for commercial-telecommunications services on the fiber optic network. The gross margin on these contracts is 91.8 percent and the benefit to Sho-Me Power of this commercial telecommunications business from 1999 to 2013 is approximately $100 million.

Plaintiffs argue Sho-Me's use of Sho-Me Power's easements for the generation of commercial telecommunications, instead of electricity, exceeds the scope of the easements which were granted to Sho-Me Power and that this unauthorized use deprived Plaintiffs and the class of valuable property rights – the right to benefit from the use of their land as an information highway and the right to control what occurs on their properties.[2] In short, the dispute is about whether Missouri law requires third parties to compensate land owners when they operate an information highway under or over the landowners' real property for a purpose not permitted by a valid easement. Plaintiffs filed this lawsuit claiming trespass and unjust enrichment. Resolving this dispute has required the Court to consider how changing technologies should be harmonized with historic real property principles.

---

[2] Plaintiffs do not dispute that Sho-Me Power could construct and use fiber optic cable lines for internal communication purposes related to their electric transmission business.

3

After the Parties extensively briefed cross-motions for summary judgment, the Court ruled that Sho-Me Power and Sho-Me Tech were liable for trespass and unjust enrichment for some, but not all, of the easements identified by Plaintiffs. [Doc. 396]. Of the approximately 1,094 miles of land where Sho-Me's fiber optic cables are installed and used for commercial telecommunications purposes, 796 of those miles across 3,560 parcels are burdened by easements which do not permit use of the land for commercial telecommunications purposes. As for the easements which did authorize commercial telecommunication uses, summary judgment was granted in favor of Sho-Me. Thereafter, Sho-Me filed a Motion for Partial Summary Judgment on the Issue of Damages, [Doc. 400], and the Motion was denied, [Doc. 529]. Plaintiffs proceeded to trial for a jury determination of damages on their unjust enrichment claim. On February 6, 2015, a jury returned a verdict awarding Plaintiffs $79,014,140, representing the fair market rental value of Sho-Me Power's and Sho-Me Tech's unauthorized use of the fiber optic cables burdening Plaintiffs land for commercial telecommunications purposes from January 21, 2005 to February 2, 2015 . [Doc. 619].

## II. Discussion

### A. Rule 50(a) Motion for Judgment as a Matter of Law

During trial, Sho-Me moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). [Doc. 607]. Without ruling on Sho-Me's Motion, the Court submitted the case to the jury. Sho-Me does not contest Plaintiffs' argument that the Rule 50(a) Motion is now moot. Therefore, the Court denies the Rule 50(a) Motion as moot. *See Rose v. Barrett Tp.*, 2014 WL 2039621, *6 (M.D. Pa. 2014) ("Once the Court submits the matter to the jury, the 50(a)

4

motion has effectively been mooted and no further briefing is necessary, unless the movant seeks to renew the Motion in accordance with 50(b).").[3]

## B. Rule 50(b) Renewed Motion for Judgment as a Matter of Law

When deciding a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 854 (8th Cir. 2013) (internal quotations omitted). "[A]ll factual conflicts are resolved, and all reasonable inferences are drawn, in a manner that supports the verdict." *Willis v. State Farm Fire & Cas. Co.*, 219 F.3d 715, 717 (8th Cir. 2000). Judgment as a matter of law "is appropriate when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." *Hortica-Florists' Mut. Ins. Co.*, 729 F.3d at 854. Sho-Me offers twelve separate grounds for why judgment as a matter of law is appropriate, each of which are discussed below.[4]

### 1. Sho-Me Tech's use is too intangible to constitute actionable trespass.

Sho-Me argues judgment as a matter of law is required based on the Eighth Circuit's decision in *International Paper Company v. MCI WorldCom Network Services, Inc.*, 442 F.3d

---

[3] Regardless of whether the Rule 50(a) Motion is moot, the arguments in the Rule 50(a) Motion are nearly identical to the arguments in the Rule 50(b) Motion and so are addressed in detail below.

[4] Although Sho-Me did not include this argument in the "Arguments for Judgment" section of their brief in support of their Renewed Motion for Judgment as a Matter of Law, Sho-Me argued in the introduction of their brief that the verdict amount was "absurd" and "so excessive that only bias and prejudice can be its cause" especially when viewed in light of Sho-Me's net worth. Sho-Me argues the verdict is 15 times Sho-Me Tech's net worth, 116% of Sho-Me Power's net worth attributable to its own operations, 150% of Sho-Me Power's and Sho-Me Tech's combined, cumulative net operating margins over the past 25 years, and more than Sho-Me Tech's cumulative net loss from the inception of its commercial sales of telecommunication services. [Doc. 639, p. 11]. However, the jury was not asked to base its damages calculation on Sho-Me's net worth or the other facts cited here by Sho-Me. They have not even identified such facts in the transcript. Further, Sho-Me has not asked for judgment as a matter of law or a new trial on the basis that the verdict is unsupported by the evidence or that it is against the weight of the evidence. Their argument concerning the size of the verdict is therefore not preserved, and even if it was, the argument fails because Sho-Me has not identified how the evidence presented at trial is insufficient to support the jury's verdict or how it is against the weight of the evidence. Nor have they identified how the size of the verdict resulted from any other grounds that they have raised in this motion.

Case 2:11-cv-04321-NKL   Document 730   Filed 08/21/15   Page 5 of 58

633 (8th Cir. 2006). In *International Paper*, the Eighth Circuit held that under Arkansas law, transmission of light signals across fiber optic strands for a particular purpose cannot constitute a trespass because Arkansas law requires a trespass to involve interference with a plaintiff's possession. *Int'l Paper Co.*, 442 F.3d at 636. The Eighth Circuit stated, "[w]e see no reason to believe that Arkansas would recognize a claim for damages from an intangible trespass of light signals." *Id.*

As this Court has already stated in its Order denying Sho-Me's Motion to Dismiss and its Order granting partial summary judgment in favor of Plaintiffs on the issue of liability, case law such as *Ogg v. Mediacom, LLC*, 142 S.W.3d 801(Mo. Ct. App. 2004), and *St. Louis, Iron Mountain & S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 114 S.W. 586, 588 (Mo. Ct. App. 1908), combined with § 523.283.1 RSMo., show that Missouri law is different from Arkansas law and that Missouri courts recognize claims based on violations of the manner and extent of usage rights provided by an easement regardless of whether or not those violations include actual physical injury. *See* [Doc. 81, p. 19][5]; [Doc. 396, p. 14]. Sho-Me insists that *Ogg* is inapposite because it addresses prescriptive easements and the easements in this case are express easements. However, the same "exceeding in manner or extent" trespass standard used in *Ogg* was also applied in *Branson West, Inc. v. City of Branson*, 980 S.W.2d 604, 606 (Mo. Ct. App. 1998), a case involving express easements. As such, Sho-Me's argument as to the applicability of *Ogg* is not persuasive. The significant differences between Missouri and Arkansas trespass case law make *International Paper* inapplicable to this case, and judgment as a matter of law is not appropriate on this ground.

### 2. The "home state" or "local controversy" exceptions to CAFA require dismissal.

___

[5] For the Court's analysis of *Ogg*, *Cape Girardeau*, *International Paper*, and § 523.283.1 RSMo., see the Court's previous order denying Defendants' Motion to Dismiss, [Doc. 81, pp. 15-20].

Next, Sho-Me argues the case should have been dismissed pursuant to the "home state" or "local controversy" exceptions to the Class Action Fairness Act (CAFA) because, according to a survey Sho-Me conducted using excluded class members, more than two-thirds of the class are Missouri citizens. Sho-Me filed their Motion to Dismiss pursuant to the "home state" or "local controversy" exceptions to CAFA in February 2014 – more than twenty-six months after the case was filed in federal court. This Court denied that Motion because it was not made within a reasonable time and was therefore waived. [Doc. 402, p. 4].

Sho-Me argues that the Court's finding of waiver "failed to consider the dilemma faced by the Sho-Me Defendants" and describes a series of decisions by this Court which they believe precluded them from filing their Motion sooner. This argument is not new. *See* [Doc. 377, p. 10]. Contrary to Sho-Me's contention, the Court did consider the effect of its decisions on the timeliness of Sho-Me's Motion and expressly rejected the argument:

> Sho-Me argues that . . . "a multi-year series of decisions by this Court . . . delayed or prevented the Sho-Me Defendants from starting the expert study needed for this jurisdictional motion." [Doc. 377, at p. 10]. However, other than the order denying Sho-Me's motion to conduct a jurisdictional survey, which was filed almost twenty-one months after the lawsuit commenced, none of these decisions prevented Sho-Me from conducting discovery into the citizenship of the class members. Sho-Me has had access to the easements relevant to this case since the commencement of the lawsuit and has used mapping technology to determine the exact location of its fiber-optic cables. With these tools, Sho-Me could have conducted research and filed a motion to dismiss early in the litigation, but instead, waited until August 2013 to ask for permission to conduct a survey and until February 2014 to file the motion to dismiss. Indeed, Sho-Me's early decision to not join in KAMO's Motion to Dismiss and to not pursue the issue until shortly after the putative class was certified, strongly suggests a litigation strategy to wait until the class certification issue was resolved before challenging jurisdiction. Had the class certification issue been resolved in Sho-Me's favor, the Court has no doubt that Sho-Me would not now be challenging CAFA jurisdiction.

[Doc. 402, pp. 6-7].

Sho-Me's argument that they realized they had a valid basis for pursuing dismissal only after the Third Circuit's decision in *Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497 (3d Cir. 2013), was also previously addressed by the Court. Sho-Me's reliance on this new case law for their delay was pretextual because Sho-Me sought permission to conduct a jurisdictional survey before *Halcon* was decided. [Doc. 402, pp. 5-6].

Sho-Me also argues that *vis-à-vis* Plaintiffs' class notice plan, filed two months before Sho-Me's Motion to Dismiss, Plaintiffs "dropped the pretense that less than two-thirds of the class are Missouri citizens, as required by the CAFA exceptions" thereby giving them reason to believe dismissal under CAFA was appropriate. [Doc. 639, p. 25]. First, the document Sho-Me cites to in support of this argument does not support that contention. The document states that 75% of the class could be reached using a Missouri-only notification campaign, [Doc. 315-1, ¶ 9], but that does not necessarily mean that those receiving notice are Missouri citizens. Second, this argument also appears pretextual. According to Sho-Me, Plaintiffs "dropped the pretense" in December 2013, two months before Sho-Me filed its Motion to Dismiss in February 2014. However, Sho-Me filed a notice of intent to conduct a jurisdictional survey in July 2013, [Doc. 253], and a motion seeking permission to do so in August 2013, [Doc. 265], suggesting Sho-Me thought it had a basis for a jurisdictional challenge long before Plaintiffs' purported concession.

Sho-Me also disagrees with this Court's citation of *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 2011 WL 5826687 (D. Minn. 2011), as rejecting the possibility that a district court can raise a challenge under the CAFA exceptions *sua sponte*. Upon review of that case, Sho-Me is correct that the district court did not reject the possibility that a district court can raise a CAFA challenge *sua sponte* and that instead, the district court in

Case 2:11-cv-04321-NKL   Document 730   Filed 08/21/15   Page 8 of 58

that case was merely summarizing arguments made by the parties. Nonetheless, while Sho-Me argues this Court should have raised the CAFA issue *sua sponte* – and case law suggests a court *may* do so – Sho-Me has cited no law suggesting that a district court *must* do so. *See Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1139 n. 1 (9th Cir. 2013) ("Although CAFA carves out exceptions to the district court's exercise of jurisdiction, the obligation to raise and prove that those exceptions apply – even the mandatory "local controversy" and "home-state controversy" ones – rests on the party seeking remand. As a result, we have no charge to consider those possibilities sua sponte."). Requiring a district judge to challenge CAFA jurisdiction *sua sponte* based on the "home state" or "local controversy" exception is inconsistent with the adversarial process and wholly impractical. Further, a district court "may not draw conclusions about the citizenship of class members based on things like their phone numbers and mailing addresses." *Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263, 266 (8th Cir. 2015) (internal quotations and citation omitted). In addition, the party seeking remand (or in this case, dismissal), has the burden of proof for a CAFA exception. *Id.* at 265. These rulings by the Eighth Circuit clearly place the burden of proof on the party seeking to invoke an exception and not on the district court. Dismissal under CAFA was not and is not appropriate.

### 3. Sho-Me Tech's sales of excess fiber optic capacity fit within Missouri's doctrine of "unlimited reasonable use."

Sho-Me next argues that all of the easements at issue authorize the use of fiber optic cable for commercial telecommunications pursuant to Missouri's doctrine of "unlimited reasonable use." The Court addressed this argument in its summary judgment Order. [Doc. 396, pp. 12-24]. In particular, the Court examined all categories of easements at issue and determined that easements in Categories 1A-1C do not expressly authorize use and lease of fiber optic cable for commercial telecommunications purposes. *Id.* at 18. The doctrine of "unlimited reasonable

9

use" or phrases in the easements such as "anything necessary or useful to the enjoyment of the easement" did not give the easement holder *carte blanche* use of the easement. *Id.* at 19. Rather, use is limited to what is reasonable and necessary for operation of the electric transmission lines. The installation and use of fiber optic cables for internal communications purposes is necessary in connection with the continued and evolving needs of Sho-Me Power's electric transmission systems, but external sale of the excess capacity for unrelated, third-party communications was never necessary for the continued operation of the electric transmission systems. *See id.* at 22. Otherwise, any easement holder could claim a right to install telephone lines or other utility lines across an easement – because all businesses have a need for utilities – and then sell excess capacity on those lines without regard for the limiting language in the easement.

Sho-Me disagrees with this Court's application of a "reasonable and necessary" test to the doctrine of "unlimited reasonable use." This Court's summary judgment Order states:

> "An easement granted in general terms without any limitations as to its use, is one of unlimited *reasonable* use." *Branson West*, 980 S.W.2d at 606 (emphasis in original). The appropriate standard then is whether the operation of a commercial telecommunications network is reasonable and necessary to Sho-Me Power's . . . authorized use of their easements. *See id.* at 607 (citing *Pogue v. KAMO Electric Cooperative, Inc.*, 795 S.W.2d 566 (Mo. App. S.D. 1990)).

[Doc. 396, p. 13]. Emphasizing that it is the doctrine of "*unlimited* reasonable use," Sho-Me argues that the Court misconstrued the doctrine and applied a "reasonable and necessary" test. Sho-Me argues they have found no Missouri authority holding that the doctrine of "unlimited reasonable use" prescribes a "reasonable and necessary" test. The authority relied upon and cited by this Court in prescribing a "reasonable and necessary" test was *Branson West, Inc. v. City of Branson*, 980 S.W.2d 604 (Mo. Ct. App. 1998). In *Branson West*, the plaintiff granted the City of Branson a sanitary sewer easement across the plaintiff's land. The plaintiff alleged

that the defendants exceeded the scope of the easement by clear cutting the entire width and

length of the easement without any attempt to preserve such trees as it was not necessary to

remove. *Id.* at 604. The parties disputed whether the defendants destroyed more trees than

necessary to construct the sewer line. *Id.* at 605. The Missouri Court of Appeals discussed at

length the rights and duties of an easement holder citing to both treatises and Missouri law. The

court acknowledged that "an easement granted in general terms without any limitations as to its

use, is one of unlimited *reasonable* use" but stated that "a dominant tenant may not make a more

burdensome use than his right permits." *Id.* at 606. The court concluded that "[c]onsistent with

those principles, . . . the [easement] in the instant case gave City the right to destroy all trees

whose destruction was *reasonably necessary* in constructing and maintaining the sewer . . . ." *Id.*

(emphasis added). In support of its conclusion, the Missouri court in *Branson West* cited to

*Pogue v. KAMO Elec. Coop., Inc.*, 795 S.W.2d 566 (Mo. Ct. App. 1990). In *Pogue*, the Missouri

Court of Appeals concluded that a contractor who was hired to perform a pre-condemnation

survey by a utility company with the power to condemn and who cut trees to perform the survey

"had the right to do what is reasonable under the circumstances to make a pre-condemnation

survey." The court in *Pogue* stated that

> clearing a line of sight through a heavily-wooded and brushy
> acreage may or may not be reasonably necessary. It is neither
> feasible nor necessary to attempt to list or categorize acts that are
> unreasonable in making a pre-condemnation survey. It is sufficient
> to observe that such a survey must be necessary to a condemnation
> that is planned and anticipated in good faith. *It must be made in a*
> *manner that is both necessary and reasonable.*

*Pogue*, 794 S.W.2d at 569 (quoted by *Branson West*, 980 S.W.2d at 607) (emphasis added).

*Branson West* and *Pogue*, both Missouri cases, support this Court's determination that Sho-Me's

additional use of the easement must be "necessary and reasonable" to the use for which the easement was granted.

Sho-Me further argues that it was error to rely on *Branson West* because it did not prescribe a "reasonable and necessary" test for an additional use of an express easement and is a case about clear cutting trees. While *Branson West* is a case about clear cutting trees, the issue in that case, like this one, was whether the easement holder exceeded its rights under the easement. *Branson West*, 980 S.W.2d at 604. The easement at issue was an express easement granted to the defendant by the plaintiff. *Id.* at 604-5. The sources cited by the Missouri Court of Appeals related to the "common law regarding the rights and duties of an easement holder" and the court specifically focused on the fact that an easement granted in general terms was one of "unlimited *reasonable* use." *Id.* at 606 (emphasis in original). The fact that the manner in which the defendant in that case was alleged to have exceeded the scope of the easement is different than the manner alleged in this case is a distinction without a difference.

Further, this Court did not rely solely on the "necessary and reasonable" test. The Court also considered "whether the additional use represents only a change in the degree of use, or whether it represents a change in the quality of the use." [Doc. 396, pp. 13-14] (citing *Maasen v. Shaw*, 133 S.W.3d 514, 519 (Mo. Ct. App. 2004)). Sho-Me concedes this was a proper consideration, but argues that the Court failed to apply the test. [Doc. 639, p. 14]. To the contrary, the Court did consider and apply this test. For instance, in its summary judgment Order, the Court stated

> Use of the Category 1B easements for commercial telecommunication purposes is a change in the quality of use and not merely in the quantity of use. Use of the easement for internal communication purposes in connection with supplying electric energy is entirely different than using the easements for a commercial telecommunications business that, if ceased tomorrow,

12

> would not affect Sho-Me Power's . . . ability to provide electric
> energy.

[Doc. 396, p. 21].

Sho-Me further argues that case law permits an additional use as long as the use is "consistent" with the original use and imposes no new burden. Sho-Me cites to *Eureka Real Estate & Inv. Co. v. S. Real Estate & Fin. Co.*, 200 S.W.2d 328, 332 (Mo. 1947). In that case, the defendant had a right-of-way easement for a street railroad. "[A]s a necessary part of operating streetcars, the company also maintained a power line over the right of way" which was used to "furnish power to streetcars." *Id.* at 330. The defendant also permitted an electric company to install poles and lines on right of way. *Id.* at 329. As Sho-Me states, the Supreme Court of Missouri stated that, "[i]t is true that the owner of an easement may, in some circumstances, license or authorize third persons to use its right of way for purposes *not inconsistent with the principal use granted* . . . ." *Id.* at 332 (emphasis added). But the Supreme Court of Missouri continued that

> [t]he licensed use was not for some purpose incidental to and connected with the business of the street railway. On the contrary, the uncontradicted evidence is that [the electric company's] lines over the right of way have no connection whatever with the electric lines or purposes of the street railway except that some of its poles are used as guys for the streetcar company's poles. And while the . . . the owner of the easement may permit some use of its right of way, perhaps even the construction of a power line over it, it may not create a right in excess of the title held by it, nor her[e] a right which as against the owner of the servient estate is an additional burden or servitude upon the fee simple title. Nevertheless, in so far as the telegraph or telephone company thus rightfully occupying the right of way serves the general public as a commercial enterprise, distinct from the avocation of the railroad, it constitutes a use of the right of way easement other than for railroad purposes, and it is therefore a servitude not contemplated in the original grant and a burden upon the fee of which the adjacent owner may rightfully complain.

13

*Id. Eureka Real Estate*'s use of the "not inconsistent with the principal use granted" standard, as advocated by Sho-Me yields the same result in this case. Use of the fiber optic cable for Sho-Me's internal communications is necessary and reasonable to or consistent with the operation of its electric transmission business. Use of those cables for a commercial telecommunications enterprise "constitutes a use of the . . . easement other than for [electric transmission] purposes, and it is therefore a servitude not contemplated in the original grant and burden upon the fee of which the adjacent owner may rightfully complain." *Id.*

Sho-Me also argues that *Kondrick v. Union Elec. Co.*, 2001 WL 36036438 (Mo. 22nd Cir. 2001), *aff'd* 88 S.W.3d 113 (Mo. Ct. App. 2002), requires reversal of the jury's verdict. In *Kondrick*, the easement at issue granted the right to

> construct, erect, keep, operate and maintain thereon a line or lines of towers, poles, crossarms, wires, transformers, anchors, guy wires and appurtenances, for the purpose of transmitting electric energy or other power, and a telegraph and telephone line or lines in, on, along, over, through, across or under [plaintiff's land].

2011 WL 36036438. The grantee, an electric company, built a large tower for the purpose of transmitting power and permitted Sprint to add antennas to the existing tower and to place its communications equipment at the base of the tower. The landowner sued the electric company for exceeding the scope of the easement and for unjust enrichment and Sprint for exceeding the scope of the easement and trespass. The Missouri circuit court concluded that the antenna and the communications equipment installed by Sprint were within the scope of the electric company's easement because,

> [t]he plain language of the easement allowed [the electric company] to lease the easement, and allowed for telephone and telegraph lines to be run on the easement. The Court finds that running telegraph and telephone lines on the property is substantially similar to placing a cellular antenna and

14

> communications equipment on the property and does not unduly
> burden the servient estate.

*Id.*

Contrary to Sho-Me's assertion, *Kondrick* actually supports this Court's summary judgment Order. This Court analyzed each category of easement and the representative language of the easements within each category before determining that Category 1A-C easements do not permit use for commercial telecommunications purposes. *See* [Doc. 396, pp. 17-24, 29-33]. For example Category 1A easements, unlike the easement at issue in *Kondrick*, do not even mention telephones, and the Court concluded that inclusion of "appurtenance" in the language of Category 1A easements does not permit the easement holder to construct and use fiber optic cables for any purpose. *Id.* at 19. Rather, the cables may only be used as an "accessory" or "appendage" to the electric transmission lines the easement holders are authorized to construct and operate. *Id.* Likewise, while Category 1B easements grant the right to install and use some communications equipment, equipment such as signal lines, wires, etc., in the easements are limited by the preceding word "appurtenant," and by the phrase "necessary in connection therewith" that follows the list. *Id.* at 20. Inclusion of "communication and other wires" is limited by the preceding "necessary" and by the phrase "in connection therewith" that follows the list. *Id.* Some Category 1C easements included communications-related language, but like Category 1A easements, the permission was qualified by phrases such as "as may be necessary, convenient or proper for the purpose of supplying electric energy . . . ." The easement in *Kondrick* is materially different than the Category 1A-C easements because the portion allowing the construction of a telegraph or telephone line is distinct from the portion of the easement related only to electric energy and is unqualified by phrases such as "necessary" or "in connection therewith." In fact, this Court concluded, similarly to *Kondrick*, that Category 1D,

15

2A-B and 3 easements *did* authorize use for commercial telecommunications purposes because they were not qualified by the phrases discussed above. For example, Category 2A easements permitted the grantee to use land for both power and communications purposes and unlike the language in Category 1B and 1C easements, did not restrict the holder to use "necessary," "appurtenant," or "related" to electric transmissions. *Id.* at 31. Therefore, *Kondrick* does not require reversal of the jury's verdict.

Sho-Me also cites to *Henley v. Continental Cablevision of St. Louis Cnty, Inc.*, 692 S.W.2d 825 (Mo. Ct. App. 1985), *Kelly v. Schmelz*, 439 S.W.2d 211 (Mo. Ct. App. 1969), and *Missouri Pub. Serv. Co. v. Argenbright*, 457 S.W.2d 777 (Mo. 1970), as cases requiring judgment as a matter of law. As this Court has already stated, *Henley* does not support Sho-Me's argument that the Category 1A-C easements permit use for commercial telecommunications purposes. [Doc. 396, pp. 22-24]. Where the easements in Categories 1A-C differ from the easements in *Henley* is that the Category 1A-C easements do not permit use for communications purposes outside of what is necessary for the transmission of electric energy. The Court in *Henley* found that cable television was the transmission of visual and audio *communication*, which is consistent with the grantors' original intention of permitting use of the easements for telephone purposes – another form of communication. But unlike in *Henley*, the Category 1A-C easements do not convey the right to use the property for the purpose of transmitting communications, and using the easements for commercial telecommunications purposes is not merely a more technologically advanced method of delivering electricity.

In *Kelly*, the plaintiffs sought to enjoin the defendants from interfering with the installation of electric poles and wires on an easement held by plaintiffs over defendants' land. *Kelly*, 439 S.W.2d at 212. The deed by which the plaintiffs acquired the land stated, "Also, an

Case 2:11-cv-04321-NKL   Document 730   Filed 08/21/15   Page 16 of 58

easement 18 feet wide from the Northwest corner of above described tract Northwardly to the county road." *Id.* Before seeking to construct electric lines on the easements, the plaintiffs used the easement for ingress and egress. The St. Louis Court of Appeals interpreted the easement to allow construction of the lines:

> The easement herein while used as a roadway by plaintiffs *contains no limitations as to its use*. It is in the nature of a general easement. . . . [W]here the grant is specifically for a 'way or roadway,' but without limitation, Missouri follows the rule as set out in 28 C.J.S. Easements s 87, pages 766—767: 'where a way is granted or reserved without limitation as to its use, it will not necessarily be confined to the purpose for which the land was used at the time the way was created, but may be used for any purpose to which the land accommodated by the way may naturally and reasonably be devoted. The grantee is entitled to vary his mode of enjoying the same, and from time to time avail himself of modern inventions if by so doing he can more fully exercise and enjoy or carry out the object for which the way was granted.

*Id.* at 213 (emphasis added). *Kelly* is consistent with this Court's summary judgment Order. The easement in *Kelly* contained "no limitations as to its use." *Id.* But the Category 1A-C easements did contain limitations, discussed above. Where the Court could reasonably construe the easements to permit commercial telecommunication purposes, it did so. For instance, the Category 1D, 2A-B and 3 easements could reasonably be construed to permit Sho-Me to vary its mode of enjoying its easement for unqualified communications purposes and to avail itself of modern inventions.

Sho-Me also cites to *Argenbright* as "relying on *Kelly* to hold the doctrine of unlimited reasonable use applicable to an electric transmission easement." [Doc. 639, p. 17]. Putting aside that *Argenbright* addressed the scope of access rights to an easement and not the scope of use of the land itself, *Argenbright* nonetheless recognizes that the doctrine of "unlimited reasonable use" is not one of "unlimited use." In *Argenbright*, the plaintiff sought to condemn property in order to build an electric transmission line. The easement also granted the plaintiff the "right of

17

ingress and egress to and from the right-of-way." *Argenbright*, 457 S.W.2d at 780. The landowners whose land was being condemned sought to maximize their award and argued that the easement plaintiff sought permitted the plaintiff rights of ingress and egress to and from the right-of-way over their entire 160-acre farm, which would limit the salability of their farm for residential development since any land sold would be subject to the plaintiff's right of ingress and egress. *Id.* The Supreme Court of Missouri concluded that the right to ingress and egress did give the plaintiff the right to access from any point on the landowners' property, but that its finding did not lead to the conclusion that the plaintiff "in the exercise of its general easement can unreasonably burden the servient tenement in its use and enjoyment thereof." *Id.* at 783. The Supreme Court of Missouri also stated that *Kelly* was relevant to the case but that "it also contains comments which contradict [the landowners'] view that [plaintiff] has acquired an absolute right to destroy buildings on the farm property." *Id.* at 784. The court pointed out that nowhere in the easement did the plaintiff specify a right to destroy improvements made on the farm and that "[t]o the contrary, the right to ingress and egress was subject to the limitation that the [landowners] retain 'the right to use and enjoy (their land) provided, however, such use shall not interfere with the uses sought to be made of such land by [the defendant].'" *Id.* at 783. The Supreme Court of Missouri concluded that while the easement did permit the plaintiff to access its right-of-way over the entire property and the landowners were permitted to show the effect, if any, of such an easement on the salability of their property, "it [was] altogether unwarranted to permit the jury to speculate that the right to get to the right-of-way is a license for unlimited destructive intrusion on the entire . . . farm." *Id.* Thus, *Argenbright* merely stands for the proposition that a general easement is one of "unlimited *reasonable* use" and not a license for "unlimited" intrusion – a principle consistent with this Court's summary judgment Order.

18

Missouri's doctrine of "unlimited reasonable use" is consistent with this Court's prior Order on liability. Judgment as a matter of law on this ground is not appropriate.

### 4. Sho-Me Tech's sales of excess fiber optic capacity help Sho-Me Power provide affordable electricity.

Sho-Me next argues that even if the "reasonable and necessary" standard applies, the use of Sho-Me Power's fiber optic cables for commercial telecommunications purposes is necessary because the revenue generated by Sho-Me Tech from the sale of this excess capacity is used to reduce the price of electricity for Sho-Me Power's members. This argument is not new,[6] and the Court's answer is the same. Applying Sho-Me's logic, Sho-Me Power could do anything on Plaintiffs' land so long as it made a profit doing so. Such an interpretation is not reasonable, is inconsistent with the fundamental rule that the easement holder's rights are limited, and is contrary to statutes like Missouri Revised Statute §§ 394.030 and 394.080 which limit an electric cooperative's powers. If merely making a profit from the land use was enough, then the easement holder's rights would be virtually limitless, even if totally contrary to the purpose for which the easement was given and totally contrary to the limited purpose for which rural electric cooperatives were formed. *See* [Doc. 396, p. 19].

### 5. Sho-Me's additional use of Plaintiffs' land is of the "same general character" as the use for which the easements were acquired.

Sho-Me argues that Sho-Me Tech's power of eminent domain permits it to condemn property for commercial telecommunications purposes and that this power triggers an alternative test that must be used to determine if trespass occurred. Because, Sho-Me contends, the Missouri Public Service Commission found "years ago" that Sho-Me Tech's business advances a public purpose and Sho-Me Power's easements are public easements being used by Sho-Me

---

[6] *See* Sho-Me's Combined Opposition to Plaintiffs' Motion for Summary Judgment and Reply in Support of its Restated Motion for Summary Judgment, [Doc. 295, pp. 16-18].

Tech for a public purpose, Plaintiffs must prove that the new use they complain of is not of the "same general character" as the original use of the easement. [Doc. 639, p. 20]. Sho-Me argued this point in their Motion for Partial Summary Judgment, [Doc. 438, p. 14; Doc. 503, pp. 4-8], which was denied by this Court, [Doc. 529]. However, because the Court did not specifically address this argument in its oral order, the Court will do so now.

In support of this argument, Sho-Me cites to *Riggs v. City of Springfield*, where the Supreme Court of Missouri stated:

> The extent of the power of condemnation of private property for public use is left to the discretion of the legislature. The right so to take property is in the exercise of sovereign power and its exercise or extent is not governed as in prescription by acquiescence of those whose property is taken in the limited and particular use exercised. It is the general rule that the owner of land subject to a public easement has no right to insist that the public use remain precisely the same, and if the original use is changed to another of the same general character and no new or other burdens are imposed, there is no reversion and the owner is not entitled to additional compensation.

*Riggs*, 126 S.W.2d 1144, 1149 (Mo. 1939). The Court first notes that of the three categories of easements where the Court concluded use for commercial telecommunications purposes was not permitted – Categories 1A-C – only Category 1C easements were obtained through condemnation, compared to Category 1A and 1B easements which were granted by the landowners for a limited and particular use. The "same general character" test, then, if applicable at all, would have only applied to the Court's analysis of the Category 1C easements. Sho-Me argues that they *could have* condemned Plaintiffs' land for commercial telecommunications purposes, but the fact remains that they did not. Instead, Sho-Me obtained Category 1A and 1B easements from landowners who granted use of their land to Sho-Me, and Sho-Me used the land for a purpose to which the landowners did not acquiesce. But even if the

Case 2:11-cv-04321-NKL   Document 730   Filed 08/21/15   Page 20 of 58

"same general character" test applied to all easements at issue in this case, and the sale of excess capacity to private businesses (among others) could be considered "public use," the answer would be the same. As this Court has previously stated in response to a similar argument by Sho-Me, "[u]se of the easement for internal communication purposes in connection with supplying electric energy is entirely different than using the easements for a commercial telecommunications business that, if ceased tomorrow, would not affect Sho-Me Power's . . . ability to provide electric energy." [Doc. 396, p. 21]. Similarly, Sho-Me's use of the easements for a commercial telecommunications business is not of the "same general character" as use for internal communications in connection with supplying electric energy.

**6. Plaintiffs' unjust enrichment claim is not recognized by Missouri Law.**

Next, Sho-Me argues that Missouri law does not recognize an unjust enrichment claim under these circumstances because unjust enrichment is not one of the four remedies available to landowners asserting claims against entities with the power of eminent domain described in *Sterbenz v. Kansas City Power & Light Co.*, 333 S.W.3d 1 (Mo. Ct. App. 2010). First, the Court has already concluded that *Sterbenz* does not stand for the proposition that a landowner may not pursue restitution against a party with the power of eminent domain or that the only common law cause of action available to a landowner against a party with the power of eminent domain is trespass. Sho-Me cites to no case law prohibiting an unjust enrichment claim against a party with the power of eminent domain.

Second, and more importantly, by pointing to *Sterbenz*, Sho-Me Power seeks to shield itself from liability for the unauthorized use of Plaintiffs' land for commercial telecommunications purposes by pointing to its power to condemn, but Sho Me Power's authority to condemn is not so broad that it encompasses the power to condemn for commercial

21

telecommunications purposes. *See* Mo. Rev. Stat. § 394.080(1)(11) ("A cooperative shall have power [ ] [t]o exercise the power of eminent domain in the manner provided by the laws of this state for the exercise of that power by corporations constructing or operating electric transmission and distribution lines or systems[.]"). In other words, Sho-Me Power seeks the protection of its power to condemn, but Sho-Me Power does not have the authority to condemn for the purposes in which it has used the land. Rather, Sho-Me Power's authority is limited to actions "necessary, convenient or appropriate to accomplish" its purpose of supplying electric energy and promoting and extending the use thereof in rural areas. Mo. Rev. Stat. §§ 394.030, 394.080(14). And while Sho-Me Tech does have the power to condemn for commercial telecommunications purposes, Sho-Me Tech did not condemn the properties at issue in this lawsuit. Rather than going through the process and cost to condemn Plaintiffs' property for commercial telecommunications purposes (implemented to ensure appropriate compensation to a landowner), Sho-Me Tech bypassed the process by receiving the rights from Sho-Me Power. This means that while Sho-Me Tech could have obtained an interest in Plaintiffs' land through condemnation proceedings, instead, Sho-Me Tech's interest in Plaintiff's land is derivative of Sho-Me Power's rights. Under the terms of the Category 1A-C easements, Sho-Me Power did not and does not have the right to use Plaintiffs' land for commercial telecommunications purposes. Nor does Sho-Me Power have the authority to condemn Plaintiffs' property for that purpose. It follows, then, that Sho-Me Tech does not have the right to use Plaintiffs' land for commercial telecommunications purposes because the rights it received from Sho-Me Power are rights Sho-Me Power did not own and therefore, could not transfer. Neither Sho-Me Power nor Sho-Me Tech may invoke their respective "shields" under the circumstances of this case.

Further, the Court is aware that during this litigation, Sho-Me Power and Sho-Me Technologies collectively filed two condemnation proceedings in the Circuit Court of Webster County, Missouri: *Sho-Me Technologies v. Leonard*, No. 14WE-CC00066, and *Sho-Me Technologies v. Palmer*, No. 14WE-CC00067. In both Condemnation Orders, which condemned the land for, among others, commercial telecommunications purposes, the Circuit Court of Webster County stated that Sho-Me Power and Sho-Me Tech "are authorized by law to condemn and appropriate the lands, property and rights for such use as set forth in the Petition." [Docs. 726-1, 726-2, ¶ 3]. However, this Court is not convinced that these Condemnation Orders are an accurate or authoritative statement of Missouri law. First, it is clear from the docket in these cases that the Condemnation Orders were submitted as proposed orders by Sho-Me and were uncontested by the landowners. For example, in the Palmer condemnation proceedings, the minute entry for August 26, 2014, the day the Order of Condemnation was entered by the court, states that the Palmers' attorney withdrew his representation before the proceeding began, that the Palmers subsequently stipulated to the Order of Condemnation, and that with "no objection to proposed order, it is filed herein." Likewise, the Leonards consented to the Order of Condemnation and the order was filed. There is simply no indication from either proceeding that Sho-Me Power's power to condemn for commercial telecommunications purposes was even an issue before the Court, and it is likely the conclusion within the Condemnation Order was made without the benefit of an adversarial process. Second, and more importantly, it is unclear what authority the Circuit Court of Webster County, Missouri relied upon, if any, when it reached its conclusion that Sho-Me Power and Sho-Me Tech "are authorized to condemn and appropriate the lands, property and rights for such use as set forth in the Petition." This Court has scoured the statutes cited by the Parties and found no inclination that Sho-Me Power can condemn

23

property for commercial telecommunications purposes or any other purpose that is not "reasonable and necessary" to providing electricity.

Neither *Sterbenz* nor Sho-Me Power's or Sho-Me Tech's power to condemn for the limited purposes for which they were formed shield them from liability in this case or from paying the value of the benefit they received under Plaintiffs' claim for unjust enrichment.[7] Entities formed under the laws of the State of Missouri to execute a specific, limited purpose and granted rights to execute that specific, limited purpose are restricted to the powers granted to them by those laws. To hold otherwise would grant a limited purpose entity, clothed with the benefits and rights not otherwise afforded to private businesses, *carte blanch* authority to do anything so long as it indirectly benefits the public or can be attributed, no matter how remotely, to their limited purpose. The rules being sought by Sho-Me cannot be limited to just them or their actions.

### 7. The measure of damages submitted to the jury is inconsistent with *Young v. Southwestern Bell Telephone Co.*, 201 S.W. 635 (Mo. Ct. App. 1918).

Sho-Me argues the measure of damages adopted in this case is precluded by *Young v. Southwestern Bell Telephone Co.*, 201 S.W. 635 (Mo. 1918), and the Court's summary judgment order on liability. In *Young*, telephone company installed poles on the plaintiffs' land without obtaining the right to do so through eminent domain or by agreement. *Id.* at 636. The plaintiffs sent the telephone company a letter indicating the company did not have permission to have its poles on their land and stated the company would be charged a fee per pole per month going forward if the company kept its poles on their land. Plaintiffs brought an action for recovery of

---

[7] The Court also points out that despite extensive briefing on the Parties' cross-motions for summary judgment on the issue of liability, Sho-Me did not raise the issue of eminent domain at that time. Sho-Me's arguments related to *Sterbenz* and their power to condemn were raised only after the Court ruled on the cross-motions for summary judgment. Sho-Me's attempt to use *Sterbenz* and its power to condemn to preclude recovery under an unjust enrichment theory was no doubt an attempt to relitigate liability, and Sho-Me should have raised the argument in their briefs requesting summary judgment on the issue of liability.

24

damages under the theory of trespass and implied contract. The landowners argued that since the defendant did not reply to its letter and did not remove its poles, the defendant was impliedly contractually obligated to pay for the poles on a monthly basis. The landowners argued that the implied contract "created the relation of landlord and tenant" and that the defendants were liable for rent under their claim for "use and occupation." *Id.* at 637. The Missouri Court of Appeals determined based on technical pleading rules that plaintiffs had not sufficiently pleaded trespass. *Id.* The court further determined plaintiffs could not recover under an implied contract theory for use and occupation of land because "no agreement, express or implied, to pay rent" existed between the parties and plaintiffs could not create a contract by the defendants' silence. *Id.* The Missouri court remarked that

> it is clear where one takes and occupies the land of another as a trespass, the law does not imply an agreement on the part of such trespasser to pay for such use and occupation. . . . [S]uch a suit cannot be maintained unless the relation of landlord and tenant, express or implied, exists between the parties. In other words, there must have been a prior mutual agreement existing between the parties or their privies to pay for such use and occupation, else a suit therefore cannot be maintained.

*Id.* at 637.

In its summary judgment Order, this Court distinguished *Young* from this case:

> Plaintiffs in *Young* sought compensation for use of the land itself under a theory of implied contract for use and occupancy. The plaintiffs did not seek damages for benefits conferred to the defendants by their allegedly unlawful use of plaintiffs land in conjunction with their telephone company. Plaintiffs in this case are not requesting that the Court find a new, implied agreement to pay for the expanded right under the easements to operate a commercial telecommunications network; rather, Plaintiffs request that Defendants disgorge the benefits they received to date. *Young* would be more analogous to this case if Plaintiffs were requesting that the Court find that Defendants use of Plaintiffs' land for telecommunications purposes created an implied agreement by the

Defendants to pay for the easement rights to conduct such business.

[Doc. 396, pp. 47-48]. Sho-Me argues that Plaintiffs expressly disavowed their claims for disgorgement and that the Court then allowed Plaintiffs to pursue an implied contract claim for back rent despite its analysis of *Young*.

As this Court stated previously, *Young* stands for the principle that under Missouri law, a party cannot be made a tenant without his consent, even if he occupies land without authorization. *Young*, 201 S.W. at 637. In other words, *Young* held that a party cannot claim a right to the benefits of a contractual relationship (with all the rights and ongoing obligations of a contracting party), by arguing that a contract was impliedly created when the other party did not answer a letter indicating that failure to respond would create an agreement.[8] But Plaintiffs in

---

[8] This interpretation of *Young* is confirmed by looking at *Young v. Southwestern Bell Telephone Co.*, 3 S.W.2d 381, 383-84 (Mo. 1928), where the Supreme Court of Missouri, in a subsequent action filed by the same plaintiffs against the same defendants explained:

> This is the third action growing out of the same alleged trespass which plaintiffs have brought against defendants . . . . In February, 1917, they filed suit against said defendants . . . alleging an unauthorized entry upon their lands and the erection of a telephone line thereon without condemning the lands or compensating plaintiffs therefor. In the petition in that case, plaintiffs set out a notice to said telephone companies, requiring them to remove their poles and wires from plaintiffs' premises and advising them that, upon failure to comply, plaintiffs would charge them as rental $5 per month for each of the seven poles until removal thereof, and further advising that continuance of such occupancy would be regarded as an acceptance of the charge of $5 per pole each month and as an agreement on the part of the telephone companies to pay said charge.

> Treating the silence of the telephone companies as consent, plaintiffs claimed in the first suit that the sum of $1,575 was due them from the telephone companies. Upon demurrer to their petition being sustained, plaintiffs stood upon their petition and declined to plead over, suffered judgment, and appealed to the Kansas City Court of Appeals. The judgment of the trial court was affirmed. *Young v. Home Telephone Co.*, 201 S. W. 635 [(Mo. Ct. App. 635)].

> The Kansas City Court of Appeals held that no facts were alleged tending to show the existence of the relation of landlord and tenant between plaintiffs and the defendant telephone companies because no agreement to pay rent was alleged. It was ruled that an action for use and occupation would not lie upon the facts alleged in said petition.

> . . .

> The questions involved in the present case are the same as those determined in that case." The petition in this case is an unusual pleading. After alleging the entry upon their lands by the Home Company and the

26

this case did not seek to make Sho-Me a "tenant without their consent" and do not argue a contract or implied contract exists based on Sho-Me's unauthorized use. Instead Plaintiffs sued under the equitable theory of unjust enrichment for Sho-Me's unauthorized use of their land, and among the multiple measures of damages available under the equitable theory of unjust enrichment, elected to pursue the fair market rental value of Sho-Me's use as a measure of the benefit conferred upon Sho-Me. Just because the measure of damages under the equitable theory of unjust enrichment was gauged by the fair market rental value of the use does not mean that Sho-Me has been made a tenant without its consent. Nothing in this Court's prior Order or in *Young* stands for the proposition that rental value cannot be used to calculate the benefit Sho-Me has unjustly retained.

Sho-Me also cites to Missouri Revised Statute § 441.200, which is quoted in *Young*. Section 441.200 states, "A landlord may recover a reasonable satisfaction for the use and occupation of any lands or tenements held by any person under an agreement not made by deed." But again, this is not a "use and occupation" claim and Plaintiffs do not allege that Sho-Me's use created an implied landlord/tenant relationship. The measure of damages submitted to the jury is not inconsistent with *Young* or this Court's prior summary judgment Order on liability.

**8. Plaintiffs' only cause of action is for permanent trespass.**

---

Missouri & Kansas Company and the great profit derived by said companies and their successors (respondents here) from the use of plaintiffs' land, the petition alleges in effect that plaintiffs' rights to sue at law for compensation and to recover possession in ejectment are barred by limitation. It is alleged that the [defendants] "agreed with [plaintiffs] and by their several acts and acquiescence promised as a matter of law full and adequate compensation to complainants," but it is evident from the pleading as a whole that plaintiffs are relying on an implied agreement to pay rent from the mere occupancy of their land. The pleader is manifestly counting upon the same sort of alleged agreement counted on in the first case, which the Kansas City Court of Appeals held did not amount to an agreement to pay rent. *Young v. Home Telephone Co.*, [201 S.W. 635 (Mo. Ct. App. 1918)]. As there, the petition here fails to plead an enforceable agreement on the part of the defendants to pay any sort of compensation to plaintiffs. This was ruled in the first appeal and the correctness of that ruling is well supported by the authorities there cited.

Next, Sho-Me argues that the only available cause of action to Plaintiffs, if one exists at all, is one for permanent trespass. However, as discussed above, and in the Court's prior rulings, Missouri law does not preclude an unjust enrichment claim where a party exceeds the scope of an easement. Plaintiffs ultimately elected to pursue their unjust enrichment claim rather than their trespass claim, so whether the trespass was permanent or temporary is not an issue relevant to the judgment Sho-Me seeks to have overturned.

Sho-Me contends that a mid-trial jury instruction given by the Court "effectively converted this case into a garden-variety 'permanent' trespass case just like *Ogg v. Mediacom*" and that therefore, the "before and after" fair market value test under Missouri Approved Instruction 9.02 applies. [Doc. 639, p. 22]. The Court's Instruction 10, Sho-Me claims, "deemed the cable's installation and presence to be illegal." *Id.* To the contrary, the Court's instruction did not "effectively convert" the case into a permanent trespass claim and did not deem the cable's installation and presence to be illegal. Instruction 10 stated:

> The electric-transmission line easements on Plaintiffs' properties permit Sho-Me to install, maintain, and use electric-transmission lines on Plaintiffs' properties and to install, maintain, and use fiber optic cable but only to the extent the cable is used for the electric transmission business.
>
> The electric-transmission line easements on Plaintiffs' properties do not permit Sho-Me Power or Sho-Me Technologies to install, maintain, or use fiber optic cable on Plaintiffs' properties to the extent it is for commercial-telecommunications purposes.

[Doc. 617, p. 13]; [Doc. 648, p. 355:14-18]. This instruction clearly informed the jury that the easements held by Sho-Me permitted the installation of fiber optic cable for an electric transmission business, but that the easements did not permit installation, maintenance, or use for a commercial-telecommunications business. The Court gave both Parties an opportunity to provide input on the instruction, and Sho-Me did not submit an alternative instruction. Further,

to the extent that Sho-Me argues that the instruction was confusing or misled the jury into believing the Plaintiffs were challenging installation of the cables and not just use that exceeded the scope of what was permitted under the easements, any such confusion was remedied by other instructions. For instance, in voir dire, the Court read an instruction approved by both Plaintiffs and Sho-Me which stated, in part, that

> Mr. Robertson and Mr. and Mrs. Biffle brought this class action suit on behalf of themselves and several thousand present and former Missouri landowners to challenge the Sho-Me Defendants' use of the fiber optic cable for commercial-telecommunications purposes. They have not challenged the installation of the fiber optic cable or its use for electric-transmission purposes.

[Doc. 617, p. 2]. The instruction also states, "There has been no determination of the amount Defendants owe the landowners for the unauthorized use. It will be the jury's duty to make that determination." Instruction 17, the verdict director, mentions nothing about installation. It states that the jury must award "such sum as you may find from the evidence to be the fair market rental value of Defendants' use of the fiber optic cable on Plaintiffs' land for commercial-telecommunications purposes . . . ." *Id.* at p. 20. Instruction 10 did not convert Plaintiffs' claim into a permanent trespass claim.

**9. Alternatively, Plaintiffs' only cause of action is for temporary trespass.**

Sho-Me argues that even if the trespass was "temporary," as Plaintiffs contend, the jury was not instructed on the correct measure of damages for a temporary trespass, which is the "cost of restoration and the value of lost use." [Doc. 639, pp. 23-24]. Again, the Court has already concluded that under Missouri law trespass – whether permanent or temporary – is not the only available cause of action. Plaintiffs and Sho-Me repeatedly argued their positions as to the appropriate measure of damages under an unjust enrichment claim, and the measure of damages ultimately adopted by the Court and read to the jury was based on § 51(2) and is consistent with

§ 40 of the Restatement (Third) of Restitution and Unjust Enrichment.[9]  Further, while Sho-Me

did argue in its Rule 50(a) Motion for Judgment as a Matter of Law that the appropriate measure

of damages for a temporary trespass was "the cost of restoration and the value of lost use," [Doc.

608, p. 25], Sho-Me did not propose a jury instruction which measured damages by the "cost of

restoration and the value of lost use."  Instead, Sho-Me advocated for an instruction similar to

MAI 4.02, which measured damages as "the difference between the fair market value of their

entire property, immediately before the fiber optic cable on their property was first used to make

a sale of commercial telecommunication services, and the fair market value of their property

immediately after the use began, which difference in value is the direct result of the use." [Doc.

569, p. 20]; [Doc. 613-1, p. 1].  Sho-Me cannot now claim this Court erred by not using the "cost

---

[9] Section 51(2) of the Restatement (Third) of Restitution and Unjust Enrichment states that "[t]he value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value. Market value may be identified, where appropriate, with the reasonable cost of a license." Section 40 states that "[a] person who obtains a benefit by an act of trespass or conversion, by comparable interference with other protected interests in tangible property, or in consequence of such an act by another, is liable in restitution to the victim of the wrong."  Comment (c) to § 40 states that "[u]njust enrichment from interference with real property may involve a removal of physical assets . . . . [but] [m]ore commonly, what the defendant has 'taken' from the claimant is an unauthorized use of property from which the claimant had a right to exclude him."

Comment (c) is followed by an illustration based on *Raven Red Ash Coal Co. v. Ball*, 39 S.E.2d 231 (1946), which is analogous to this case in that the trespass did not cause damage to the plaintiff's land.  In *Raven Red Ash*, the defendant owned an easement over the plaintiff's land to construct a railway or tramway in order to transport coal from designated areas. *Id.* at 232-33.  In addition to transporting coal from the designated areas permitted by the easement, the defendant also transported more coal from other areas. *Id.* at 233.  The plaintiff could not prove damage done to his land by transporting the extra coal, so he brought an action to recover for the defendant's "use and occupation" of the land.  The Virginia court declined to follow the then majority rule, which would have limited the plaintiff to nominal damages and an injunction from further unlawful use of the easement. *Id.* at 236.  Instead, the Virginia court reasoned:

> To hold that a trespasser who benefits himself by cutting and removing trees from another's land is liable on an implied contract, and that another trespasser who benefits himself by the illegal use of another's land is not liable on an implied contract is illogical.  The only distinction is that in one case the benefit he received is the diminution of another's property.  In the other case, he still receives the benefit but does not thereby diminish the value of the owner's property.  In both cases, he has received substantial benefit by his own wrong.  As the gist of the action is to prevent the unjust enrichment of a wrongdoer from the illegal use of another's property, such wrongdoer should be held on an implied promise in both cases.

*Id.* at 237-38.  The Virginia court held that while the plaintiff could not prove damage to his land, he was entitled to the value of the illegal use of the easement.  *Id.* at 239.

30

of restoration and the value of lost use" standard when it offered no such instruction. *See* Fed. R. Civ. Pro. 51(d)(1)(B) ("A party may assign as error a failure to give an instruction, if that party properly request it and – unless the court rejected the request in a definitive ruling on the record – also properly objected.").

Sho-Me also argues a nominal damages instruction should have been given. However, other than citing to *Sterbenz*, 333 S.W.3d at 14, n. 20, Sho-Me does not explain why. *Sterbenz* states that "in any trespass case, the ability to enter an award of nominal damages should be instructed." *Sterbenz*, 333 S.W.3d at 14, n. 20. However, Plaintiffs did not pursue damages under their trespass claim, and Sho-Me has not explained why a nominal damages instruction is necessary under an unjust enrichment claim seeking restitution of the benefit conferred.

### 10. The Restatement (Third) of Restitution and Unjust Enrichment does not apply to entities with eminent domain power or not-for-profits.

Sho-Me contends that the "fair market rental value" measure of damages ultimately adopted by this Court in the jury instructions, which was based on the Restatement (Third) of Restitution and Unjust Enrichment, does not apply because that Restatement does not apply to entities with the power of eminent domain or to not-for-profits. Sho-Me also argues that Missouri has not adopted the Restatement (Third) of Restitution and Unjust Enrichment and that no Missouri court has ever applied this "novel" measure of damages to entities like Sho-Me Power and Sho-Me Tech. [Doc. 639, p. 24]. As discussed above, Sho-Me Power did not have the authority to condemn land for commercial telecommunication purposes. Likewise, Sho-Me Tech did not exercise its authority to condemn for commercial telecommunications purposes, and its rights are completely derivative of Sho-Me Power's rights, which, under the easements at issue and Sho-Me Power's authority to condemn, do not include using Plaintiffs' land for commercial telecommunications purposes. Moreover, the Restatement clearly allows restitution

31

as an appropriate remedy when trespass occurs and does not limit the type of defendant against whom the remedy is available. [Doc. 529]; [Doc. 532, pp. 31-32]. While no Missouri court has expressly adopted the Restatement (Third), Sho-Me has cited to no Missouri court that has rejected it, and Missouri courts have often viewed earlier versions of the Restatement as reflective of Missouri law. Sho-Me cites to § 3, Comment c and § 40, Reporter's Note c for their argument that the Restatement assumes that a trespasser does not have the power of eminent domain. Section 3, Comment c states, in part:

> If a conscious wrongdoer were able to make profitable, unauthorized use of the claimant's property, then pay only the objective value of the assets taken or the harm inflicted, the anomalous result would be to legitimate a kind of private eminent domain (in favor of a wrongdoer) and to subject the claimant to a forced exchange.

Restatement (Third) of Restitution and Unjust Enrichment § 3, cmt. c (2011). Section 40, Reporter's Note c states, in part, "[i]f liability for conscious interference with another's property is restricted to compensation for resulting injury, the wrongdoer is given, in effect, a private right of condemnation." But because the Restatement seeks to prevent a wrongdoer from exercising a "kind of private eminent domain" does not mean that the Restatement precludes a landowner from seeking restitution from a party with eminent domain power but who chooses not to exercise it. The Restatement (Third) of Restitution and Unjust Enrichment is not limited to for-profit corporations or entities without the power of eminent domain.

### 11. The claims are not certifiable under Rule 23.

Sho-Me renews the argument that a Rule 23 class should not have been certified because the identities of certain class members cannot be ascertained "until after factually-intensive mini-trials are held on a parcel-by-parcel, title search-by-title search basis" and because there is no valid way to assess damages without considering the specifics of each parcel. [Doc. 639, p. 25].

Sho-Me also renews "all of the other reasons . . . asserted in opposition to [P]laintiffs' Motion to Certify" and argues that the trial should have been limited to the damages of the named Plaintiffs. *Id.* The Court rejected the same arguments by Sho-Me when it certified the class:

> "the potential class consists of readily identifiable private landowners located in a defined geographic area," and Plaintiffs have articulated a variety of methods to effect notice. *Moore*, 41 Fed. Cl. at 398. Although the class is large, Plaintiffs have set forth a process for managing the case. Class members who own land burdened by the winning easements during the relevant time period will file a claim form with a sworn statement identifying the period of their ownership and attaching a deed. If the parcel at issue is owned by multiple individuals, the compensation check will be issued in all the owners' names. In the event that individual issues involving damages or disputes between competing owners arise, this will be addressed in claims administration proceedings as between the competing owners.

[Doc. 254, p. 33]; *see also id.* at 27-34 (the Court's complete analysis); [Doc. 211, pp. 4-11] (Plaintiffs' description of the claims process). The Parties do not dispute the location of the parcels or the number of linear miles at issue, and damages were determined on a uniform, per-foot, per-year amount. The relevant easements were also divided into manageable categories. Plaintiffs have submitted a detailed list of class action settlements involving similar right-of-way claims where a claims process was used to distribute compensation. [Doc. 147-3, pp. 154, 162-69] (claims administrator's description of previous experience with class action administration which includes 87 right-of-way cases, class definitions including past and current owners, right-of-ways ranging from 2 to 2,522 miles, and class members ranging from 21 to 58,066). Sho-Me argues that while a claims process may be appropriate for an award under a class action settlement, a claims process is not suitable for allocating a massive class action jury verdict, and there is no precedent for it. However, Sho-Me fails to explain why a claims process in the settlement context is appropriate but not in the jury verdict context.

33

Sho-Me also argues they "have the fundamental right to challenge each claimant's membership in the Class" and that class members must be able to be identified without extensive and individualized fact-finding or mini-trials. [Doc. 686, p. 14]. In support of this argument, Sho-Me cites to *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). In *Carrera*, the class was defined as all persons who purchased One-A-Day WeightSmart (a dietary supplement) in Florida. *Id.* at 304. The plaintiffs argued the class was ascertainable because they could use records from retailers who track online and loyalty card purchases and they could use affidavits from class members attesting to their purchase of the product. *Id.* 308. The Third Circuit Court of Appeals concluded that neither method satisfied the plaintiffs' burden of showing that the class was ascertainable and that the plaintiffs' proposed screening process was insufficient. There was no evidence that a single purchaser could be identified using records of customer membership cards or records of online sales, and there was a risk of fraudulent or inaccurate claims associated with the affidavit claims process. *Id.* at 309. The Third Circuit was concerned that defendants would not be able to challenge class membership and was also concerned that fraudulent or inaccurate claims would materially reduce true class members' relief. *Id.* at 310. True class members could then argue that they were not adequately represented and if successful, would not be bound by the judgment. *Id.* at 310. The Third Circuit stated that "[a] defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues." *Id.* at 307.

This case is factually distinguishable from *Carerra*. Class members are ascertainable because they are current and prior owners of property where the illegal use occurred. The Parties do not dispute the location of the parcels or the number of linear miles at issue. Unlike in

*Carerra*, where no reliable verification method occurred, claimants in this case must submit a deed in addition to a sworn statement of ownership. And while it is possible that different individuals might make competing claims of ownership, only those competing claims would be subjected to a more in-depth analysis of the title to the property. This is not the type of "extensive and individualized fact-finding" the *Carerra* court sought to avoid, and therefore, *Carerra* is not persuasive.

Sho-Me also cites to *Ogg v. Mediacom, LLC*, 382 S.W.3d 108 (Mo. Ct. App. 2012), where the Missouri Court of Appeals affirmed decertification of a right-of-way class. But in *Ogg*, the Missouri Court of Appeals concluded that evidence necessary to determine whether the defendant had the authority to place its cable on each class member's property would vary from class member to class member. *Id.* at 115. There were individual issues related to prescriptive and express easements, punitive damages, and whether the class members' land had been damaged during installation of the cables. *Id.*; *Ogg v. Mediacom, LLC*, No. 7CV101002809, at p. 22 (7th Mo. Jud. Cir. 2011). Here, there are no claims for punitive damages or for property damage that would require individualized inquiry. The easements at issue were categorized into manageable categories, and the Court was able to determine whether Sho-Me exceeded the scope of the easements by looking at these categories. The problematic individualized inquiries in *Ogg* are not present in this case.

**12. The Court violated the "one-way intervention" rule.**

Sho-Me's last ground for judgment as a matter of law is that Court should have waited until after the opt-out period expired before ruling on the merits of the class claim, and because it did not, it violated the one-way intervention rule. Sho-Me argues that because of this

35

"violation," decertification is necessary. Sho-Me previously made this argument, but as this Court has already stated,

> numerous courts have found that nothing in Rule 23 precludes a district court from exercising its discretion to address the merits of the putative class' claims before addressing certification. *See* McLaughlin on Class Actions § 3:3 (10th ed.) (collecting cases). It follows, then, that nothing precludes a court from addressing the merits of the claims before putative class members have had the opportunity to opt out.

[Doc. 419, p. 4]. Further, the notice did not unduly prejudice Sho-Me. The notice did not give specifics of the liability determination, made it clear in multiple places that class members may not be entitled to any money at all, stated that no damages determination has been made, and stated that Plaintiffs' damage calculation method was disputed by Sho-Me. *See* [Doc. 419, pp. 5-6]. The Court's decision to rule on the merits of the class claim before the opt-out period was over does not require decertification or a new trial. Further still, there is no evidence that the limited number of people who requested exclusion from the class – comprised of approximately 14 parcels of land out of the 3,560 parcels of land owned by the Plaintiffs – did so based on the Court's ruling.

### C. New Trial

In the alternative to judgment as a matter of law, Sho-Me moves for a new trial. "[T]he authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court." *White v. Pence*, 961 F.2d 776, 781 (8th Cir. 1992) (internal citations omitted). "When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not." *Id.* at 781.

### 1. The Court submitted Dr. John Kilpatrick's testimony to the jury.[10]

---

[10] In their original Motion for Judgment as a Matter of Law and Suggestions in Support thereof, [Docs. 607, 608], Sho-Me argued that judgment as a matter of law was appropriate because Dr. Kilpatrick's testimony and report

Sho-Me argues a new trial is necessary because the Court admitted the "*Daubert-*deficient" testimony and report of Plaintiffs' damage expert, Dr. John Kilpatrick. The standard for admission of expert testimony is a liberal one, and a district court should not weigh or assess the correctness of competing expert opinions. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's . . . testimony rests upon good grounds based on what is known it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.*

Sho-Me gives several reasons why Dr. Kilpatrick's testimony was deficient and should not have been admitted despite the liberal standard of admission. First, Sho-Me asserts that Dr. Kilpatrick's theory of damages was based on a "value to the taker" theory rather than on the "loss to the owner," and that Sho-Me's use of the property for a commercial telecommunication corridor cannot be considered the property's "highest and best use" in determining just compensation. Sho-Me argues that "in the eminent domain context, the taker's use of the property for a public purpose . . . cannot be considered the property's 'highest and best use' in determining just compensation." [Doc. 639, p. 30]. In support of this contention, Sho-Me repeats its citation to *Greystone Heights Redev. Corp. v. Nicholas Investment Co., Inc.*, 500 S.W.2d 292, 296 (Mo. Ct. App. 1973), and *Olson v. United States*, 67 F.2d 24 (8th Cir. 1933), *aff'd* 292 U.S. 246 (1934). However, both *Greystone* and *Olson* dealt with a damages determinations in the context of condemnation proceedings in contrast to *Ogg v. Mediacom*, 383 S.W.3d 108 (Mo. Ct. App. 2012), where, in a trespass case alleging that a utility company exceeded the scope of its easement by giving a cable company permission to install cables on the landowner's property, the Missouri Court of Appeals affirmed the trial court's decision to allow

---

should have been excluded. Since those arguments are nearly identical to the arguments made in Sho-Me's request for a new trial, the Court will address them together. Neither a new trial nor judgment as a matter of law is necessary based on the admission of Dr. Kilpatrick's testimony and report.

Dr. Kilpatrick to testify as to the "corridor theory." As the Missouri Court of Appeals explained, "[t]he fact that one of the Oggs' experts [(Dr. Kilpatrick)] testified as to a 'corridor theory' for determining the *amount* of damages does not change the proper *measure* of damages." *Ogg*, 383 S.W.3d at 118 (emphasis in original). Here, Dr. Kilpatrick's testimony related to the amount of damages and not the proper methodology of determining damages. Dr. Kilpatrick was permitted to base his opinion of the *amount* of damages on the "corridor theory" as he did in *Ogg*.

Next, Sho-Me argues Dr. Kilpatrick's testimony and report should have been excluded because the telecommunications easements Dr. Kilpatrick relied upon for his "comparable transactions" approach involved "full-spectrum" fiber optic easements rather than "fractional use" easements. The Court previously rejected this argument. The similarity of the comparables used by Dr. Kilpatrick goes to the "weight" of his testimony and not to the admissibility. Sho-Me was given ample opportunity to cross-examine Dr. Kilpatrick on the difference between the easements he used in his damages calculation and the easements at issue in this case. The jury was free to weigh or reject Dr. Kilpatrick's testimony that there was no difference in value between a "full spectrum" easement and a "fractional use" easement, and Sho-Me's expert was also permitted to testify as to why the difference was material. And aside from Dr. Kilpatrick's testimony that the distinction was a red herring, Sho-Me's own expert admitted that the term "full spectrum easement" was "not an official definition" and that he did not "know if [he had] ever seen it in the appraisal literature." [Doc. 649, p. 525:3-25]. Sho-Me argues that the only easements Dr. Kilpatrick should have used were "fractional use" easements, but Sho-Me has failed to provide a single data point which reflects any difference between a "full spectrum" easement and a "fractional use" easement. These data points likely do not exist because an entity

seeking to purchase rights would never seek an easement for usage rights but not access and maintenance rights.

Next, Sho-Me argues the Court wrongly denied Sho-Me the right to cross-examine Dr. Kilpatrick on the Maryland Supreme Court's recent reversal of a jury verdict "based on the unreliability and inadmissibility of his damages analysis in a mass tort case." [Doc. 639, p. 34]. The Court did not permit Sho-Me to cross-examine Sho-Me regarding the Maryland Supreme Court's opinion of Dr. Kilpatrick's testimony because the line of questioning would have created ancillary issues such as why that court made the determination and what the differences were between that case and this case. [Doc. 647, p. 140:12-20; 143:7-10; 148:8-11]. A review of the Maryland Supreme Court case confirms this Court's concerns. In *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 99 (Md. 2013), the Maryland Supreme Court concluded that Dr. Kilpatrick's method was "faulty, for failing to consider comparable sales data . . . ." *Id.* at 101. The *Exxon Mobil* case involved property valuation after a gas leak. The Maryland Supreme Court took issue with the fact that Dr. Kilpatrick did not rely on comparable sales data despite numerous sales of residential properties in the relevant area after the gas leak. Dr. Kilpatrick argued this data was not reliable because the market was unreliable and because buyers were perhaps uninformed about the possible contamination, but the Maryland Supreme Court disagreed. *Id.* at 101. Given the difference between the issues in *Exxon Mobile* and the issues in this case, the likelihood of confusion to the jury substantially outweighed the probative value of the evidence. *See* Fed. R. Evid. 403.

Finally, Sho-Me contends the Court wrongly denied them the right to cross-examine Dr. Kilpatrick on a declaration he made stating that all of the data he relied upon for his opinions were produced to Sho-Me when, in fact, not all data had been transmitted to Sho-Me. Sho-Me's

counsel conceded that evidence of the false declaration was evidence of a prior bad act. *See* [Doc. 647, p. 146:18-148:8]. Counsel for Sho-Me could not give an exception to Federal Rule of Evidence 404, and the Court is not aware of one.

Sho-Me also contends that the Court should have precluded Dr. Kilpatrick from relying on the unproduced evidence at trial. Dr. Kilpatrick's late production of data points was the subject of several teleconferences before trial. [Docs. 589, 592, 593, 594, 604]. The Court did not strike Dr. Kilpatrick's testimony or continue the trial because it concluded, in part, that Sho-Me had multiple opportunities prior to the eve of trial to bring the matter to the Court's attention in a meaningful way but never requested a teleconference regarding the unproduced data and never filed a motion to compel. *See* [Doc. 644, pp. 28:8-32:21]. It was clear that Sho-Me was sitting on its objection to prevent use of the evidence rather than to actually get the evidence. The Court also granted Sho-Me the opportunity to depose Dr. Kilpatrick regarding the data on two occasions on the eve of trial and at Plaintiffs' expense. It was not error to allow Dr. Kilpatrick to testify despite the late production of the data points.

A miscarriage of justice did not occur as a result of this Court's decision to allow Dr. Kilpatrick to testify and its decisions limiting the scope of cross-examination. A new trial is not necessary based on the admission of Dr. Kilpatrick's testimony and report.

**2. The Court gave a mid-trial instruction purporting to eliminate Sho-Me's rights to install and maintain cable.**

In the alternative to their argument that the Court's reading of Instruction 10 to the jury warrants the entry of judgment as a matter of law in favor of Sho-Me (Part II.B.8, *supra*), Sho-Me argues that, for different reasons, the reading of Instruction 10 necessitates a new trial. "When a particular jury instruction is assigned as error, . . . the . . . court must determine whether the instructions, taken as a whole and viewed in light of the evidence and the applicable law,

40

fairly and adequately submitted the issues in the case to the jury. *Jones v. Bd. of Police Comm'rs*, 844 F.2d 500, 504 (8th Cir. 1988). "The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case." *White v. Honeywell, Inc.*, 141 F.3d 1270, 1278 (8th Cir. 1998). Reversal on the basis of instructional error is only necessary when the error "affected the substantial rights of the parties." *Id.*

After determining that events occurring during the first day of trial had the potential of confusing the jury as to the Court's previous liability determination and as to what the easements permitted, the Court invited the Parties to submit a proposed instruction that would clarify the issues before the jury. Plaintiffs proposed an instruction which was ultimately edited by the Court after discussion with the Parties and read as Instruction 10:

> The electric-transmission line easements on Plaintiffs' properties permit Sho-Me to install, maintain, and use electric-transmission lines on Plaintiffs' properties and to install, maintain, and use fiber optic cable but only to the extent the cable is used for the electric transmission business.
>
> The electric-transmission line easements on Plaintiffs' properties do not permit Sho-Me Power or Sho-Me Technologies to install, maintain, or use fiber optic cable on Plaintiffs' properties to the extent it is for commercial-telecommunications purposes.

[Doc. 617, p. 13]; [Doc. 648, p. 355:14-18].

When Plaintiffs proposed the instruction, Sho-Me objected on the grounds that the proposed instruction was an attempt to amend the Court's summary judgment order on liability, that it was not physically possible for there to be an occasion where Sho-Me would enter a landowner's land to fix a cable only for commercial telecommunications, and that the Court had already granted a motion in limine in favor of Sho-Me which prohibited Plaintiffs from "portraying the installation of fiber optic cable as being part of the Court's finding against the

41

company." [Doc. 648, p. 250:2-251:21].  Sho-Me also objected at a later time on the grounds that the proposed instruction was inconsistent with the stipulated jury statement and other instructions previously read to the jury.  Although Sho-Me requested and was granted an opportunity to confer with Plaintiffs regarding the proposed instruction, Sho-Me ultimately argued that the proposed instruction was not appropriate and did not submit an alternative.  Sho-Me now repeats the same arguments it previously made.

Based on these arguments, a new trial is not necessary.  First, Instruction 10 did not "amend" the Court's summary judgment order nor did it "effectively expand[] the scope of the trespass to include cable installation and maintenance."  [Doc. 639, p. 36].  Sho-Me argues that by stating in Instruction 10 that the easements did not permit Sho-Me to "install" and "maintain" cable for commercial-telecommunications purposes, the Court expanded its previous ruling that Sho-Me's "use" of the cables for commercial-telecommunications purposes was not permitted.  However, during the discussions surrounding this instruction, Sho-Me's counsel agreed that given the Court's previous liability ruling, Sho-Me could not enter the property for telecommunications purposes and that it "would be consistent with [the Court's] ruling that if there was a malfunction that was exclusively commercial telecommunications, that would raise an issue." [Doc. 648, p. 353:3-22].

Next, Sho-Me argues that the instruction "drew a meaningless distinction that undoubtedly confused the jury" because when "Sho-Me enters property to install or maintain cable, it necessarily does so for 'electric transmission purposes.'" [Doc. 639, p. 38].  But even assuming that the distinction was "meaningless," Sho-Me's witnesses were permitted to testify that the company never came on the land to fix a fiber optic cable for the sole purpose of

commercial telecommunications, and so the jury was fully informed of circumstances surrounding when Sho-Me came onto the land. [Doc. 648, p. 357:8-21].

Further, contrary to Sho-Me's assertion, Instruction 10 does not contradict the Stipulation of Facts read to the jury. Sho-Me focuses on the last sentence of Paragraph 8 of the Stipulated Facts, which states, "Plaintiffs do not claim that Sho-Me's installation or maintenance of the fiber optic cable on Plaintiffs' properties is improper." [Doc. 647, p. 208:19-21]. But the preceding sentence in the same stipulated paragraph states, "Easements that Sho-Me has on [Plaintiffs'] property permit Sho-Me to use their properties for transmitting electricity and to install and use fiber optic cable on the structures supporting its electric transmission lines for its internal communications needs." *Id.* at p. 208:14-18. Instruction 10, which states that the easements do not permit installation, maintenance, or use of cables for commercial telecommunications purposes, is not inconsistent with the stipulated fact that Sho-Me is permitted to install and use the cable "for its internal communications needs."

Likewise, Instruction 10 does not contradict this Court's pre-trial ruling that Plaintiffs could not argue that Sho-Me lacked the right to install fiber optic cable. And, as discussed above, Sho-Me was permitted to elicit testimony from its witnesses that none of the cable was installed or maintained for commercial telecommunications purposes only. So even if the jury interpreted Instruction 10 to mean that Plaintiffs were challenging the installation and maintenance of the cable, viewing Instruction 10 in light of the evidence presented, Instruction 10 does not represent an unfair or inadequate representation of the issues. Further, as this Court stated in the pre-trial conference, rulings on motions in limine are subject to change as the trial progresses and witnesses testify, [Doc. 571, p. 2], and the reason Instruction 10 was necessary in

the first place is because considerable time was spent eliciting confusing testimony as to what the easements at issue legally permitted when that determination had already been made.

Sho-Me contends that the effect of Instruction 10 was that it "unexpectedly threw into question the legality of the presence of every foot of the 796 miles of cable installed and maintained by Sho-Me over the past 10 years" and transformed Sho-Me's "fractional use" into "something that appeared physically comparable to Kilpatrick's full-spectrum transactions." [Doc. 639, p. 39]. But Instruction 10, taken as a whole and viewed in light of the evidence and the applicable law, does not do that. As Sho-Me pointed out in their own brief, the jury was presented with testimony from multiple witnesses and argument from both parties – both before and after Instruction 10 was read – that made it clear that the issue for the jury to decide related to the value of Sho-Me's use of Plaintiffs' land for commercial telecommunications purposes. *See e.g.*, [Doc. 647, p. 61:22-24, 208:13-21; Doc. 648, p. 357:8-21]. And most importantly, Instruction 17, the verdict director, mentions nothing about an award for installation or maintenance. It states that the jury must award "such sum as you may find from the evidence to be the fair market rental value of Defendants' use of the fiber optic cable on Plaintiffs' land for commercial-telecommunications purposes . . . ." [Doc. 617, p. 20]. The jury was correctly instructed on the substantive issues in the case, and a new trial is not necessary based on Instruction 10.

### 3. The Court precluded Sho-Me from eliciting testimony to prove the mid-trial instruction "makes no sense."

Sho-Me next asserts that the Court "ma[d]e matters worse" regarding the effect of Instruction 10 when, while Sho-Me was eliciting testimony from their witness to prove "that it makes no sense to say . . . that Sho-Me installs and maintains cable for 'commercial

telecommunications' purposes, the Court *sua sponte* instructed the jury to disregard the witness's answer . . . ." [Doc. 639, p. 39].  The interaction Sho-Me points to was as follows:

> Sho-Me's Counsel: Of all of the miles of fiber optic cable on Sho-Me's network, what percentage of the miles does Sho-Me use for its electric business on any given day?
> Witness: One hundred percent.
> Sho-Me's Counsel: Of all of the miles of fiber optic cable on Sho-Me's network, what percentage of the miles are used for commercial telecommunications alone on any given day?
> Witness: Zero percent.
> Plaintiffs' Counsel: Excuse me.
> The Court: Please disregard the last statement.

[Doc. 648, pp. 356:22-357:6].  Sho-Me presumably takes issue with the Court's instruction to the jury to disregard "zero percent."  Despite the instruction to disregard "zero percent," Sho-Me was still able to communicate their point to the jury through other questions and answers.  For example, the question and answer at issue was merely the inverse of the first question stated above.  The jury was told that one hundred percent of the miles on Sho-Me's network were used for its electric business on any given day.  Two questions after the question at issue, the following occurred:

> Sho-Me's Counsel: When, if ever, has the company needed to come on the electric right-of-way to fix a fiber optic cable for the sole purpose of commercial telecommunications?
> Witness: None.
> Sho-Me's Counsel: And why is that?
> Witness: Because we don't have any sole commercial users on the property.  We need to come on the property to fix the power.

*Id.* at p. 357:15-21.  Sho-Me was not precluded from eliciting testimony regarding Sho-Me's use and maintenance of all the fiber optic cable miles for its electric transmissions business.  A new trial is not necessary based on the Court's instruction to disregard "zero percent."

### 4.  The Court admitted evidence of Sho-Me Tech's revenues.

Case 2:11-cv-04321-NKL   Document 730   Filed 08/21/15   Page 45 of 58

Sho-Me argues a new trial is necessary because the Court admitted evidence of Sho-Me Tech's revenues despite the fact that Plaintiffs were not seeking disgorgement of profits nor did Dr. Kilpatrick's comparable sales valuation rely on gross revenues. However, the Court did not admit evidence of Sho-Me Tech's revenue because it was relevant to profit disgorgement; rather, the evidence was relevant to what a willing buyer would pay and what a willing seller would take for those easement rights. Recognizing that the jury could confuse the purpose of the evidence, the Court gave a mid-trial limiting instruction, discussed below in Part II.C.5. Evidence of the revenues Sho-Me Tech gained from the unauthorized use of Plaintiffs' land for its commercial telecommunications business was relevant to fair market rental value, particularly in light of Sho-Me's strategy to convince the jury that the trespass that occurred in this case was *de minimis*.

Sho-Me argues that "the Court admitted all of this evidence based upon its 'common sense' notion that a willing seller will hold out for a price that correlates with the buyer's expected profits" and that this "'common sense' valuation method" was not supported by legal authorities, expert methodology, expert testimony, or objective market evidence. [Doc. 639, p. 42]. Sho-Me contends that by allowing this evidence, the Court "*sua sponte* added a previously undisclosed, independent appraisal method . . . ." *Id.* However, the Court merely was conducting a relevancy analysis in response to an objection and gave both Parties the opportunity to explain why the evidence was or was not relevant to Plaintiffs' theory of damages. Further, contrary to Sho-Me's argument that the admission of the evidence was not supported by expert testimony, Dr. Kilpatrick testified that one of the reports he relied on in making his conclusions noted that the telecommunications industry had exploded in the last 20-30 years, which made demand for fiber optic corridors very significant. [Doc. 647, p. 97:20-98:15, 98:24-99:1].

46

Lastly, Sho-Me also argues that the Court's "common sense" approach incorporates the "project influence" doctrine. However, the Court has previously denied Sho-Me's arguments based on the "project influence" doctrine. This is not a condemnation case. The Court's admission of revenue evidence for a limited purpose was not "so prejudicial that a new trial would likely produce a new outcome" and therefore, a new trial on these grounds is not necessary. *See Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 349 (8th Cir. 2004).

### 5. The Court gave a mid-trial "limiting" instruction on the purported relevance of revenue evidence.

Recognizing that the revenue evidence could improperly suggest to the jury that Plaintiffs were seeking disgorgement of profits, the Court invited both parties to submit a proposed instruction limiting how the jury could use the revenue evidence in their deliberations. After discussions with both Parties, the Court read Instruction 9 to the jury:

> Evidence has been and will be presented regarding the revenues the Defendants have received in connection with Sho-Me Technologies' commercial-telecommunications business. You may consider this evidence of that revenue only with respect to the willingness of one desiring to purchase or sell the right to use the property at issue in this case for commercial-telecommunications purposes. You may not consider such evidence for any other purposes. So for the fair market only.

[Doc. 648, p. 255:22-256:9]; [Doc. 617, p. 12].

Sho-Me argues the instruction "not only failed to cure the problem inherent with the admission of revenue evidence, it exacerbated the problem." [Doc. 639, p. 44]. The problem Sho-Me refers to is its belief that revenue evidence should have been excluded altogether. However, as discussed in Part II.C.5, revenue evidence was relevant to the jury's determination of fair market value, and it was not error to admit the evidence or give Instruction 9 regarding the limited relevance of the evidence. Sho-Me does not explain how Instruction 9 "exacerbated the

problem" other than it informed the jury of how they could consider the evidence. Further, prior to the reading of Instruction 9, the Court asked both Parties if they objected to the wording or reading of the instruction. Sho-Me's counsel stated that other than believing no evidence of revenues should be admitted, Sho-Me did not object to the wording or the reading of Instruction 9 to the jury. [Doc. 648, p. 247:23-248:18]. Therefore, Sho-Me cannot now argue that Instruction 9 itself "exacerbated" the effect of the revenue evidence on the jury's verdict.

Sho-Me argues that instead of reading Instruction 9, the Court should have read a proposed limiting instruction it submitted. However, this proposed instruction instructed the jury to disregard arguments regarding revenue altogether. The Court rejected that proposal because, as discussed above, admission of revenues was relevant to determining the fair market value of a commercial telecommunications easement. The reading of Instruction 9 "fairly and adequately submitted the issues in the case to the jury," and therefore, a new trial based on Instruction 9 is not necessary. *See Jones v. Bd. of Police Comm'rs*, 844 F.2d 500, 504 (8th Cir. 1988).

### 6. Sho-Me was prohibited from introducing basic, relevant facts about themselves.

Next, Sho-Me asserts the Court skewed the case in Plaintiffs' favor by not only permitting evidence of revenue for a limited purpose, but also by prohibiting Sho-Me from introducing "basic facts about themselves." [Doc. 639, p. 45]. Sho-Me has long taken the position that because they are a rural electric cooperative, they did not benefit from their commercial telecommunications business because all benefit was for their customers and the work they did was for the public good. In particular, Sho-Me argues a new trial is necessary because the Court prohibited evidence that:

> (i) Sho-Me is a not-for-profit company that is required to pass along to its wholesale customers, owned by rural Missourians, including plaintiffs and virtually all Class Members, Tech's revenues in the form of lower electric rates and/or patronage

48

> refunds; and (ii) Tech is a certified "public interest" company that
> provides high-quality, affordable broadband services to schools,
> clinics, businesses, public institutions and cell phone users along
> Sho-Me's electric right-of-ways in sparsely-populated South
> Central rural Missouri.

*Id.* Sho-Me argues this evidence was necessary to show that unlike the for-profit corporations referenced in Dr. Kilpatrick's report, Sho-Me did not have the financial incentive or resources to pay the same for easements as did those companies. Sho-Me also states that Sho-Me Power does not profit from any revenue enhancements from Sho-Me Tech and lacks financial incentive to pay much for easements. *Id.* at 45-46. However, in none of the instances that Sho-Me advocated for the admission of this evidence did it argue that the evidence was relevant to Sho-Me's willingness or ability to "pay much" for the easements. Rather, Sho-Me argued the evidence was relevant to showing the "good" that came out of Sho-Me's trespass and how profits benefitted customers and not the company.

For instance, in response to Plaintiffs' Motions in Limine ##1-5,[11] Sho-Me did argue that evidence related to Sho-Me's not-for-profit status and the services it provided to the community were necessary so that the jury could compare Sho-Me to Dr. Kilpatrick's comparables, but Sho-Me did not argue that the purpose of the evidence was so the jury could compare Sho-Me's ability and willingness to pay to those for-profit companies. Rather, the argument Sho-Me made was that the jury needed to see that Sho-Me provided services to "underserved, economically challenged rural areas," provided "benefits to servient landowners" by generating and transferring cost savings in the form of lower electric rates, made "available an array of

---

[11] Plaintiffs' sought to preclude (1) Evidence or argument concerning the benefits of broadband for rural Missouri or benefits of rural broadband to Plaintiffs or the class; (2) Evidence or argument concerning lawful uses of the fiber optic cable for Defendants' electric transmission business; (3) Evidence or argument implying that awarding restitution will increase electric rates and/or decrease availability or affordability of cellular telephone services, internet access, cable television, education, health care, government, and banding in rural Missouri; (4) Evidence or argument that rural Missourians are the beneficial owners of Defendants; and (5) Evidence or argument concerning the "justness" or lack of blameworthiness of Defendants' conduct or requesting a weighing of equities between Plaintiffs and Defendants.

telecommunication services to the servient landowners, including their local schools, employers, clinics and private and public institutions," and "operat[ed] in the 'public interest.'" [Doc. 551, p. 15]. Sho-Me further argued that "any and all evidence of how Sho-Me and Tech enhance the lives of plaintiffs and Class Members by charging lower electric rates and by making high-speed broadband available in rural Missouri is eminently admissible." *Id.* at 17. Based on those arguments, the Court granted Plaintiffs' Motions in Limine ##1-5. The "good" that came from Sho-Me's unauthorized use of Plaintiffs' land is not relevant to the fair market value of the use of land for commercial telecommunications purposes.

On the first day of trial, Sho-Me requested to refer to itself as a not-for-profit because it was "relevant to the whole issue of balancing the benefits and benefits received . . . ." [Doc. 647, p. 20:2-20]. On the second day of trial, Sho-Me's counsel asked the Court to review its rulings on Plaintiffs Motions in Limine #1-5 after Plaintiffs' mentioned revenues in their opening statement. When asked to explain why the evidence was relevant after Plaintiffs mentioned revenues, Sho-Me again argued that they wanted to show that the money obtained from the commercial telecommunications business goes back to the cooperative members, some of which were class members, through lower electricity rates and through access to broadband services. *Id.* at p. 47:1-48:4. Sho-Me wanted to present the evidence to show that "[i]t was not only a good use" of the revenue but that "the benefit [Plaintiffs' counsel] suggested that we received has been mitigated because a good portion of it has been returned." *Id.* at p. 48:2-4. Based on those arguments, the Court denied Sho-Me's request to present the evidence. There is no principle of property law that permits easement violations so long as the defendant forwards the money it makes from those violations on to others or does good work with the revenue it receives. *See id.* at p. 51:7-11. On the third day of trial, Sho-Me's counsel attempted to elicit

testimony from Sho-Me's chief financial officer in order to show that "[t]he financial benefit flowed directly to the customers." [Doc. 648, p. 266:18-23]. The Court sustained Plaintiffs' objections to that questioning. Later, Sho-Me's counsel reiterated the purpose of the evidence: "This evidence is that the financial benefit flowed directly to the retail users of the providers." *Id.* at p. 276:18-19. The evidence was excluded because it was irrelevant to the issue the jury was tasked with deciding. The Court did not commit error by excluding it. Any probative value was outweighed by the prejudicial impact of confusion. While the Court understands that it is Sho-Me's deeply held belief that they can take some of their customers' property (and in some instances, property of people who are not Sho-Me's customers) without compensation because they are doing public good for many customers, the Court is confidant this is not a concept recognized in American property law.

### 7. The Court permitted Plaintiffs to present evidence of and argue conscious wrongdoing.

Sho-Me's next argument is that a new trial is necessary because the Court permitted Plaintiffs to present evidence of and argue conscious wrongdoing despite Plaintiffs' repeated representation that they would not assert a conscious wrongdoing/net profit disgorgement claim. Sho-Me cites to instances throughout the trial where Plaintiffs' counsel challenged the accuracy of Sho-Me Tech's revenue reports, insinuated that Sho-Me Power purposefully installed excess capacity, and insinuated that Sho-Me Power disregarded its obligation to purchase easements. [Doc. 639, p. 48]. Sho-Me also focuses on Plaintiffs' rebuttal argument where Plaintiffs' counsel argued that Sho-Me Technologies had a choice when it started its business and chose not to be forthright to landowners. Sho-Me argues that the Court prevented Sho-Me from rebutting these arguments by (1) precluding Sho-Me from introducing any of the basic information about

themselves; (2) precluding Sho-Me from introducing their advice-of-counsel evidence; and (3) refusing to sustain Sho-Me's objections to Plaintiff's rebuttal argument.

First, none of the instances cited by Sho-Me are as egregious as Sho-Me portrays. For example, Plaintiffs challenged the accuracy of the revenue reports to show that Sho-Me Tech received more money than they said they did. The Court permitted this questioning not to allow Plaintiffs to prove that Sho-Me Tech was untruthful, but to show that Sho-Me Tech made significant sums of money from their commercial telecommunications business, which, as discussed above, was relevant to fair market value. Instruction 9 instructed the jury to only consider revenue evidence for the purpose of determining fair market value and not "for any other purposes." The jury is presumed to follow the Court's instructions and so there is no evidence the jury relied on this questioning as evidence of conscious wrongdoing. And while Plaintiffs' counsel began questioning Sho-Me's witness about excess capacity, Sho-Me's counsel objected to the questioning, and the Court sustained the objection. [Doc. 648, p. 308:16-309:22]. The same thing happened when Plaintiffs' counsel began a line of questioning that could have insinuated conscious wrongdoing; the Court ordered Plaintiffs to "move on to another topic." [Doc. 649, p. 590:21-591:11].

Second, as discussed in Part II.C.7, the "basic information" Sho-Me sought to present was properly excluded on the grounds Sho-Me argued. Sho-Me was precluded from asserting their "advice-of-counsel" evidence because Sho-Me did not timely assert the defense. *See* [Doc. 529]; [Doc. 532, p. 38:7-12]. The Court did not sustain Sho-Me's objections to Plaintiffs' counsel's rebuttal argument, but did ask Plaintiffs' counsel to move to another topic. [Doc. 650, p. 668:5]. Significantly, Sho-Me themselves injected conscious wrongdoing into their own closing argument: "Plaintiffs have introduced and there's been no evidence here of conscious

wrongdoing on the part of the defendants . . . ." *Id.* at p. 643:12-14. This occurred before Plaintiffs' comment in rebuttal. The Court's decision to overrule Sho-Me's objections to Plaintiffs' rebuttal arguments, even if in error, was not "so prejudicial that a new trial would likely produce a different outcome." *See Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 349 (8th Cir. 2004).

Sho-Me also claims Plaintiffs' rebuttal argument interjected an "uncertified class claim at the very end of a certified class action trial." [Doc. 639, p. 50]. In particular, Sho-Me argues that Plaintiffs' statements that Sho-Me was not forthcoming with landowners and chose to "sneak the business through the electric transmission structures and keep the landowners in the dark" broadened the scope of the court's class certification order by accusing Sho-Me of class-wide fraud. *Id.*; [Doc. 686, p. 24]. Sho-Me exaggerates the effect of Plaintiffs' arguments, and no such "uncertified class claim" was injected into the trial. Further, the Court reminded the jury at the end of closing arguments that their decision must be made based on the evidence and the instructions and not on closing arguments. [Doc. 650, p. 675:20-676:2]. They were also told this at the beginning of trial. Jurors are competent to understand that attorneys in the heat of the moment are prone to hyperbole.

### 8. The Court precluded evidence of Sho-Me's "pilot project."

Prior to trial, Sho-Me conducted what it termed as a "pilot project" in an attempt to produce evidence in support of their argument that the fair market value of the rights at issue was *de minimis*. In order to obtain such evidence, Sho-Me sent a letter to landowners who were excluded from the class and requested commercial telecommunications easements for "nominal consideration." [Doc. 405, pp. 5-7]; [Doc. 547, pp. 10-12]. The letter described the Plaintiffs'

theories as "audacious" and "far-fetched" and included Sho-Me's own interpretation of the easements.  The letter concludes:

> For reasons described above, Sho-Me strongly believes it has the right under its existing easements to allow Sho-Me's excess capacity to be sold by Tech as telecommunication services enhance the lives of rural Missouri residents.  For these reasons, Sho-Me and Tech will be asking you for a nominal consideration to execute an amended and restated easement confirming their right to make commercial sales of fiber optic telecommunication services.  This will help you and your Rural Electric Cooperative in two ways.  First, it will demonstrate that cooperative members who are similarly situated as the class of plaintiffs, but have been excluded from the class by a technicality, agree with their cooperative instead of the Washington D.C. plaintiffs' lawyers about Sho-Me's and Tech's right to make such sales.   Second, the nominal consideration we will be asking you to accept will help us prove that the damages the plaintiffs' lawyers are claiming have no basis in reality.

*Id.*  In response to this letter, twenty landowners sold a commercial telecommunications easement to Sho-Me for $10, and Sho-Me sought to present evidence of this fact, along with testimony from one of those landowners, at trial.  Plaintiffs sought to preclude this evidence through a Motion in Limine, and the Court granted that request pursuant to Federal Rule of Evidence 403.  Evidence from the "pilot project" would confuse the jury and require the Parties to address a number of collateral issues related to how the contents of the letter may have affected the agreements that were reached.  *See* [Doc. 597, p. 36:10-23].

Sho-Me also sought to present evidence of two condemnation awards they received after landowners refused to sell easement rights to them and to present the testimony of a circuit court-appointed condemnation commissioner.  The Court granted Plaintiffs' motion in limine with respect to this evidence and concluded that the evidence should be excluded under Federal Rule of Evidence 403.  The evidence would raise too many collateral issues. [Doc. 597, p. 37:7-11].  Further, evidence of a forced sale is not evidence of the amount a willing buyer and a willing

seller would agree upon. The Court did not err by precluding this evidence. Further, Sho-Me's expert identified what he thought the value of any damages was, which was consistent with the value identified by the post-filing "sales."

**9. The Court permitted Plaintiffs to cross-examine a Sho-Me witness about an insurance application.**

During the cross-examination of one of Sho-Me's witnesses, Plaintiffs' counsel used an excerpt from an insurance application to elicit testimony regarding the revenue obtained from certain contracts Sho-Me Tech acquired. Plaintiffs' counsel described the document as an "application," and asked the witness if he recognized it as an application he submitted. Before the witness answered, the Court instructed the witness not to describe the document. [Doc. 647, p. 223:3-4]. Despite this instruction, Sho-Me's witness stated it was an insurance application. Sho-Me argues a new trial is necessary because Federal Rule of Evidence 411 prohibits evidence of insurance, and "the Court unrealistically assumed that the Sho-Me witness under cross-examination at the time would avoid referring to the document as such." [Doc. 639, p. 51].

Federal Rule of Evidence 411 only prohibits evidence that a company was or was not insured when it is being used "to prove whether the person acted negligently or otherwise wrongfully." The application was not used for this purpose. Regardless, the Court immediately instructed the jury to disregard the witness' identification of the document as an insurance application and directed Sho-Me's counsel to instruct their witness regarding the issue. A new trial is not necessary on these grounds. Further, this was a sophisticated witness who one would expect to follow the Court's instructions.

**10. The Court refused to declare a mistrial after speaking about the relevancy of evidence in front of the jury.**

On the third day of trial, the Court returned from a recess and, not realizing the jury was present, overruled Sho-Me's objection to a contested piece of evidence. The Court stated,

> I will permit the executive summary. And the reason for that is, you know, I've reviewed it. And it clearly talks about, you know, what a value this is. What a value to the company this is. And I think that is - - Oh, my God. All right. I'd like to excuse the jury, please.

[Doc. 648, p. 404:12-18]. Sho-Me argues this statement by the Court in front of the jury required the Court to declare a mistrial.

First, the Court acknowledges its error, and regrets it. It resulted from a miscommunication about the presence of the jury. However, no mistrial was necessary and no new trial is required. While a "judge should take care not to give the impression that he or she prefers one litigant over another . . . a few improper comments are not necessarily enough to require reversal." *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1330 (8th Cir. 1985). The "comment was a minor incident in a lengthy trial and is not the type of egregious conduct that alone would require reversal." *Id.* Further, when the jury was escorted back to the courtroom, the Court read a curative instruction to the jury which stated, in part:

> Because I find something can be heard by the jury, it does not reflect what I think of that evidence or how you should weigh the evidence. It is merely a legal ruling that the evidence can be considered by you. Nothing that I have said during this -- nothing that I have said during any ruling or remark or action during the trial have I intended to suggest what I think your verdict should be or how you should weigh the evidence. That is entirely for you to decide.

*Id.* at p. 409:5-12; [Doc. 617, p. 14]. A district court is afforded "broad discretion to grant or deny a motion for mistrial because it is in a far better position to weigh the effect of any possible prejudice." *U.S. v. Urqhart*, 469 F.3d 745, 749 (8th Cir. 2006) (concluding that judge's accidental statements about the criminal defendant did not require a mistrial in light of the

<div align="center">56</div>

court's curative instruction immediately after the issue was brought to the court's attention). The district court "is in the best position to craft a remedy, given that less drastic measures than mistrial such as a cautionary instruction are generally sufficient to alleviate prejudice stemming from accidental comments." *Id.* A mistrial was not necessary based on this Court's statement in the presence of the jury, and no new trial is necessary as a result of the Court's refusal to declare one. While the Court regrets its mistake, it is confident that it had no impact on the ultimate verdict.

### D. Amendment of the Clerk's Judgment

In addition to requesting judgment as a matter of law or a new trial, Sho-Me also argues the Clerk's Judgment in this case is "facially defective" because it does not identify the payors or the payees and does not explain how the award shall be allocated. [Doc. 639, p. 52]. The Clerk's Judgment has since been amended nunc pro tunc to include the payors and identifies the payees as "Plaintiffs Dwight Robertson, Mike and Gina Biffle and others similarly situated." [Doc. 690]. Sho-Me argues the Judgment must include the class members' names and the amounts they are owed before the judgment will have any force or effect. Plaintiffs have since requested to amend the judgment a third time, and the Parties continue to argue what specificity is required when identifying the payees of a class action judgment. The Court will defer ruling on Sho-Me's arguments in the present motion regarding specificity in the judgment and will take those arguments into consideration when ruling on Plaintiffs' Motion to Add Federal Rule of Civil Procedure 23(c)(3) Information to Judgment, [Doc. 695].

### III. Conclusion

For the reasons set forth above, Sho-Me's Rule 50(a) Motion for Judgment as a Matter of Law is denied as moot. Sho-Me's Rule 50(b) Motion for Judgment as a Matter of Law and Motion for New Trial are denied.

<div align="center" style="text-align:right; margin-left:40%;">

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

</div>

Dated: August 21, 2015
Jefferson City, Missouri