UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| CHASE BARFIELD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-cv-04321-NKL |
| | ) | |
| SHO-ME POWER ELECTRIC COOPERATIVE, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

# ORDER

On March 31, 2014, the Court ruled that Defendants, Sho-Me Power Electric Cooperative ("Sho-Me Power") and Sho-Me Technologies ("Sho-Me Tech"), were both liable for crossing the class members' land to operate their commercial telephone business without first obtaining commercial telecommunications easements from the landowners. Doc. 396. It found liability based on both trespass and unjust enrichment. Plaintiffs elected at trial to proceed on their unjust enrichment claim, and a jury awarded Plaintiffs $79,014,140 in actual damages. Doc. 619.

The Sho-Me Defendants appealed. On appeal, the Eighth Circuit reversed this Court's grant of summary judgment on the unjust enrichment claim but affirmed the grant of summary judgment on the trespass claim. *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 799–804 (8th Cir. 2017). The Eighth Circuit ordered the matter remanded, giving the landowners a right to pursue damages on their trespass claim if they elected to do so.

At the second trial, a jury found Plaintiffs' damages for the trespass to be $129,211,337 and awarded Plaintiffs punitive damages in the amount of $1,300,000. Doc. 859. Before the matter was submitted to the jury, however, Defendants filed a Rule 50(a) motion. For the reasons set forth below, Sho-Me's Rule 50(a) motion is denied.

## I. Background

Sho-Me Power placed fiber optic cable on its electric transmission easement across the class members' land for telecommunications purposes. Neither Sho-Me Power nor Sho-Me Tech had an easement to cross the class member's land for the purpose of commercial telecommunications. Nonetheless, the fiber optic system was intentionally developed to have far more capacity than Sho-Me Power needed to meet its own internal telecommunication needs, because Sho-Me Power planned to lease its excess capacity to Sho-Me Tech for a commercial telecommunications business. P29; Doc. 867, Tr. 221:10-21, 225:2-14; 219:15-220:1. Sho-Me Tech then entered into multiple contracts, with various entities, for telecommunications services on Sho-Me Power's fiber optic network. Doc. 867, Tr. at 228:5-10; P47; Doc. 868, Tr. at 300:2-302:21. At the time of trial, Sho-Me Tech's revenues were approaching $320 million annually. Doc. 868, Tr. at 288:12-17-22; P56.

While Sho-Me Power had the right to condemn property for electric transmission and even telecommunications purposes related to its electric services, it had no right to condemn property for commercial telecommunications. Indeed, Missouri law prohibited it from operating a commercial telecommunications business at all. Nevertheless, Sho-Me Power created Sho-Me Tech to operate a commercial telecommunications business. P31; Doc. 868, Tr. at 292:2-11. Sho-Me Tech had no employees and was for all intents and purposes operated by Sho-Me Power. Doc. 868, Tr. at 351:10-23. Much of the revenue generated by Sho-Me Tech's extensive telecommunications business was transferred to Sho-Me Power, permitting Sho-Me Power to reduce its customers' electric rates. Doc. 868, Tr. 294:10-13. Sho-Me Power provides the lowest-priced wholesale electric service in Missouri and the third lowest-priced wholesale electric service in the United States. Doc. 870, Tr. 672:14-23. Sho-Me Tech has been described as the best investment Sho-Me Power ever made. Doc. 868, Tr. 355:2-4.

## II. Motion for Judgment as a Matter of Law Standard

Federal Rule of Civil Procedure 50 provides that a court may enter judgment as a matter of law against a party after the party has been fully heard if there is no legally sufficient evidentiary basis for that party's claims. Fed. R. Civ. P. 50(a)(1). "[T]he law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (quotation marks and citation omitted). "Judgment as a matter of law is proper only when the evidence is such that, without weighing the credibility of the witnesses, there is a complete absence of probative facts to support the verdict." *Browning v. President Riverboat Casino–Mo., Inc.,* 139 F.3d 631, 634 (8th Cir. 1998).

## III. Discussion

Defendants argue for judgment as a matter of law as to both compensatory damages and punitive damages.[1]

### A. Actual Damages

#### 1. The Nature of the Trespass

Defendants first ask the Court to reconsider its earlier ruling that the trespass is temporary, not permanent. Doc. 847, at 11-17. If the trespass is permanent, the measure of damages would be the difference in fair market value before and after the trespass, rather than the fair market rental value. According to Defendants, the Plaintiffs did not present evidence of

---

[1] In the Rule 50 motion as originally filed, Defendants also asked this Court to decertify the class. However, on September 1, 2017, Defendants withdrew the request. Accordingly, the request to decertify is denied as moot.

the before-and-after fair market value, and Defendants therefore argue that only nominal damages were permissible.[2]

Under Missouri law, an appropriation that is "[]capable of actual, physical repair," "readily removable," and "only slight and amenable to restoration" is temporary, not permanent. *Sterbenz v. Kansas City Power & Light Co.*, 333 S.W.3d 1, 8-9 (Mo. Ct. App. 2010) (citation omitted). In such a case, "recovery for permanent damage is not permissible." *Id.* Thus, in *Beetschen v. Shell Pipe Line Corp.*, the Missouri appellate court found that a fence impermissibly erected above a properly authorized pipeline constituted a temporary and continuing trespass because it "may be removed and the land restored to its former condition without in any wise interfering with the crude oil flowing through the pipe line." 248 S.W.2d 66, 73 (Mo. Ct. App. 1952) ("*Beetschen I*"). In affirming the finding that the trespass was temporary, the Missouri Supreme Court noted that "all trespasses to land incidental to the maintenance of" the authorized purpose of the easement—in other words, all uses that are "not an integral part of the . . . purpose for which private property may be condemned," are temporary. *Beetschen v. Shell Pipe Line Corp.*, 363 Mo. 751, 759 (Mo. 1952) ("*Beetschen II*").

---

[2] In fact, Plaintiffs did present evidence of the before-and-after fair market value. Dr. Kilpatrick explained how the damages for fair market rental value could be mathematically converted to a before-and-after fair market valuation. Sho-Me, however, has argued that Dr. Kilpatrick should not have been permitted to provide "an undisclosed 'before-and-after' fair market value opinion." As a preliminary matter, Defendants failed to object at trial to Dr. Kilpatrick's testimony. *See* Doc. 867, Tr. at 108:6-109:7; 113:20-114:5. Indeed, Defendants elicited additional testimony from Dr. Kilpatrick on this subject. *See id.*, Tr. at 187:7-189:17.209:23-211:12. Defendants thus waived any right they might have had to object to Dr. Kilpatrick's testimony on the subject. More importantly, Defendants have failed to show how they were surprised by the evidence. Indeed, the before-and-after calculation used by Dr. Kilpatrick was patently obvious from the mathematical calculation used by Dr. Kilpatrick to find the fair market rental value. Further, this is a tangential issue because the Court is not reconsidering its finding that this was a temporary trespass.

In contrast, a permanent trespass is one in which "injury to real property is extensive or permanent, not easily [or fully] remedied by repair . . . ." *Sterbenz*, 333 S.W.3d at 9 (citation omitted). A trespass is also considered permanent where "the appropriation was in fact necessary for the very public purpose for which the easement could have been acquired in a condemnation proceeding." *Beetschen I*, 253 S.W.2d at 788.

Here, the Defendants' trespass involved no physical structure that would have to be removed to terminate the trespass.[3] In fact, the trespass is readily abatable: to halt the trespass, Defendants would need only to cease commercializing the fiber optic cable on the class members' land. The trespass can stop without interfering with the communications for electric transmission—the only authorized use of the easement.

Defendants argue, however, that because Sho-Me Tech had the authority to condemn land for commercial telecommunications purposes, its use of Sho-Me Power's cables for telecommunications is "necessary for the very public purpose for which the easement could have been acquired in a condemnation proceeding," and therefore, as a matter of law, cannot be abated. But the evidence showed that the cable at issue is merely one part of an information superhighway, a "mesh" of cables that is not necessarily or predictably used by Sho-Me Tech at any given time. Doc. 867, Tr. at 226:7-228:23 ("We have multiple routes that we can

---

[3] Defendants cite a few cases finding a permanent trespass where physical structures were not located on a plaintiff's land. *See* Doc. 847, at 8. But in each case, there was a physical structure located off of the plaintiff's land that caused the trespass at issue by permitting water or contaminants to flow onto the plaintiff's land. *See Smith v. City of Sedalia*, 149 S.W. 597 (Mo. 1912) (concerning sewer operations offsite); *Riggs v. City of Springfield*, 126 S.W.2d 1144 (Mo. 1939) (same); *King v. City of Rolla*, 130 S.W.2d 697 (Mo. Ct. App. 1939) (concerning septic tank operations offsite); *Olson v. U.S.*, 67 F.2d 24 (8th Cir. 1933), *aff'd*, 292 U.S. 246 (1934) (concerning dam operations offsite). In each case cited, the physical structure that was the source of the trespass would have needed to be altered or removed to stop the trespass. Thus, those cases do not stand for the proposition that a physical structure is not a necessary component of a permanent trespass.

choose . . . ."). The use of the cable across Plaintiffs' land for commercial telecommunications purposes therefore cannot be deemed "necessary" to the "public purpose" that Tech may serve. Moreover, Defendants fail to direct the Court to any actual evidence supporting their claims that they cannot cost-effectively run Sho-Me Tech's commercial telephone business without trespassing, particularly given Sho-Me Tech's regular transfer of proceeds to Sho-Me Power. *See* Doc. 847, at 7 (citing only Doc. 311-1, a redline of a class notice, in support of this argument).

Further, the agreement governing Sho-Me Tech's usage of Sho-Me Power's fiber optic cable can be terminated on six months' written notice, and Sho-Me Power totally controls Sho-Me Tech. Therefore, it is up to Sho-Me Power, an entity without the power of condemnation, to determine how long Sho-Me Tech will conduct its telecommunications business. As such, it cannot be said that Sho-Me Tech's trespass will be indefinite.

Finally, Defendants have failed to show that they have been prejudiced by Plaintiffs' claim for temporary trespass as opposed to a claim for permanent trespass. By definition, the damages for permanent trespass would be higher. This is confirmed by every case concerning a permanent trespass reviewed by the Court. In each, it was the landowner who wanted the trespass to be permanent and the trespasser who wanted it to be temporary. It also is confirmed by Dr. Kilpatrick's testimony, which showed the before-and-after fair market value damages to be substantially higher than the damages for temporary trespass.

For these reasons, the Court will not alter its ruling that the trespass was temporary and not permanent.

### 2. The Measure of Damages

Defendants argue that the appropriate measure of damages for their trespass is "the cost of restoration and the value of lost use." Doc. 847, at 10-11 (quoting *Sterbenz*, 333 S.W.3d at 1, n.20). But the law is clear that the loss of use resulting from a temporary trespass may be properly measured by depreciation in the fair market rental value of the property. *Beetschen I,* 248 S.W.2d at 72 ("The proper measure of actual damages in this case is the damage, if any, to the sod, vegetation and soil resulting from the physical trespass and the *resulting depreciation in the fair and reasonable rental value* of the property.") (emphasis added); *see also Labrayere v. Bohr Farms, LLC,* 458 S.W.3d 319, 330 (Mo. banc. 2015) ("The loss of 'use of occupancy' is generally measured as the rental value of the property for the period of the taking.").

Nonetheless, Defendants argue that, because the Eighth Circuit concluded that Plaintiffs may not recover for unjust enrichment, Plaintiffs' damages for trespass may not be measured by fair market rental value—the measure of damages for unjust enrichment. However, the Eighth Circuit did not hold that Plaintiffs' damages may not be measured using fair market rental value. The Eighth Circuit stated only that Missouri does not appear to "recognize an unjust-enrichment action for fair market rental value against a trespassing entity with eminent domain power, at least in the absence of a prior agreement." *Barfield*, 852 F.3d at 805 (citation omitted).

The Missouri appellate cases that the Eighth Circuit cites in discussing "available remed[ies]" for trespass do not proscribe the use of fair market rental value in measuring damages for trespass claims against an entity with eminent domain power. To the contrary, one of those cases noted with approval that "the damage instruction upon which the case was submitted to the jury clearly confined the jury to the depreciation in the reasonable rental value in the use of plaintiffs' property." *Beetschen I,* 248 S.W.2d at 72-73.

Secondary authority also shows that depreciation in rental value is the proper measure of damages for a temporary trespass. *See* D. Dobbs, Handbook on the Law of Remedies, § 5.8(2) (1973) ("When the trespasser's presence is substantial enough to count as a possession, or even as a temporary use, damages for the invasion can be measured by the rental value of the land during the period of the trespass. . . . Rental value is also an appropriate measure for temporary takings under eminent domain powers, that is, for taking the land for a limited period of time."); *see also* Doc. 867, Tr. 113:20-114:5 (Plaintiff's expert, Dr. Kilpatrick, testifying, "In short, in the before state, these plaintiffs, Biffles and Robertsons, and their neighbors, the other people in the class, owned a slice of this corridor. In the aggregate, they own a big chunk of it, and it has been taken from them. It is the thing that they had which has been depreciated. And so from an appraisal perspective, from the before to the after, the thing which is removed, the thing which is -- you would use the word depreciated, is that value of that corridor."). Thus, the fair market rental value of the commercial telecommunications easement across Plaintiffs' land is the proper measure of damages.

### 3. Evidence of Fair Market Rental Value

Defendants argue that Plaintiffs failed to demonstrate the fair market rental value of the rights that Defendants took.

#### a. The Corridor Theory

Plaintiffs' expert, Dr. John Kilpatrick, testified that a corridor for appraisal purposes is a corridor of land measured not by its width but rather its length and use. Doc. 867, Tr. 75:4-9, 75:21-76:7. Once the corridor is created, the commercialization of the corridor becomes the highest and best use of the land on which the corridor is located. *Id.*, Tr. 77:20-79:6, 89:21-90:15, 107:21-108:5, 163:14-18. Sho-Me Power created a fiber optic corridor when it installed

fiber optic cable on its electric easement. Doc. 867, Tr. 151:1-152:1, 208:3-14. The commercialization of that fiber optic cable corridor was thereafter its highest and best use. Doc. 867, Tr. 75:21-76:4 (explaining what constitutes a corridor); 77:20-79:6 (explaining that Sho-Me Power's fiber optic cable corridor has a higher and better use than the surrounding agricultural land); 89:21-90:15 ("Sho-Me did not acquire pastureland, Sho-Me did not acquire forestland, Sho-Me did not acquire grazing land. Sho-Me acquired a commercialized telecommunications corridor, and so we'd use other kinds of commercialized uses in order to arrive at a value."); 107:21-108:5 ("We're valuing a fiber-optic cable corridor. I'm valuing the right to use that corridor for commercial purposes, for commercialization of a fiber-optic cable easement. So the absolute appraisal rule would be to use comparables, and pastureland would not be comparable to that."); 163:14-18 ("[I]n this case what makes it a corridor is the commercialization of this fiber-optic cable easement."); 211:8-12 ("It's the commercialization of the corridor, not the installation of the cable, that is the -- at the heart of my valuation here.").[4]

Defendants argue that Dr. Kilpatrick should not have been permitted to testify that the highest and best use of the land at issue was as a corridor for commercial telecommunications services, because commercial telecommunications was the public purpose for which Sho-Me Tech could have condemned the class members' land. *See Greystone Heights Redev. Corp. v. Nicholas Investment Co., Inc.*, 500 S.W.2d 292 (Mo. App. 1973), *Olson v. United States*, 67 F.2d 24 (8th Cir. 1933), *aff'd,* 292 U.S. 246 (1934).

---

[4] It is notable that a Missouri trial court permitted Dr. Kilpatrick to testify about his "corridor theory . . . ." *Ogg v. Mediacom*, 383 S.W.3d 108, 118 (Mo. App. 2012) ("*Ogg II*"), and based on that testimony, the jury assessed damages at $9.50 per linear foot in a factually similar case. While the trespasser in *Ogg II* did not have the power of condemnation, the Court tacitly approved Dr. Kilpatrick's corridor theory testimony.

Even putting aside the question of whether Sho-Me Tech's eminent domain power with respect to commercial telecommunications affords any protection to Sho-Me Power, which did not have eminent domain power with respect to commercial telecommunications, the Court finds no merit in this argument because commercial telecommunications are not the only use for the corridor described by Dr. Kilpatrick. For example, Dr. Kilpatrick discussed comparable data relating to cable television companies' use of fiber optic cable. Doc. 867, Tr. at 104:7-12 (describing, *inter alia*, figures for "Mediacom rentals"); 111:1-14 (noting that Dr. Kilpatrick's data included "Mediacom rentals at 6.16 per foot per year" to provide television services through fiber optic cable). Indeed, Dr. Kilpatrick's testimony concerning valuation revolved not around commercial telecommunications per se, but around *commercial uses of fiber optic cable. Id.*, Tr. at 108:2-4 ("I'm valuing the right to use that corridor for commercial purposes, for commercialization of a fiber-optic cable easement"). The commercial use of fiber optic cable is available to entities that do not have eminent domain power. *See Ogg v. Mediacom*, 42 S.W.3d 801, 814 (2004) ("*Ogg I*") (noting, in case concerning cable company's installation of fiber optic cable, that "cable companies have not received a legislative grant of authority from the General Assembly to exercise the power of eminent domain").

Because evidence showed that even entities without the power of eminent domain (*i.e.*, cable television companies) could use fiber optic cable corridors for commercial purposes, the admission of Dr. Kilpatrick's testimony concerning the value of commercialized fiber optic cable was proper. *See Greystone*, 500 S.W.2d at 297 ("[I]n ascertaining the market value of property taken in a condemnation proceeding the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose. *If, however, the property has a special utility or availability, not only to the taker,*

*but to the other parties who could use the property for the particular purpose intended by the taker, then this utility or availability may be shown.*") (emphasis added, quotation marks and citation omitted); *see also Olson*, 67 F.2d at 32 ("[W]here the use is possible *only* through the exercise of [eminent domain] power, it must be left out in estimating the probability of such a use as affecting sales value and compensation.") (emphasis added, quotation marks and citation omitted).

There is nothing in the law that says that a party with the power of eminent domain should pay less than the going rate for the property being taken, regardless of the use for which it is being taken. Instead, the law protects that party only from paying more based on the specific public purpose for which the land is taken.

### b. Plaintiffs' Right to Rent

Defendants also argue that Plaintiffs failed to demonstrate diminution in fair market rental value because they offered no evidence that they had the right to rent space over Sho-Me's equipment. This argument is misplaced. First, in the cases that Defendants cite for the proposition that a claim for rental value depreciation requires proof of a right to rent in the first place, the plaintiffs were tenants, and the defendants' tortious conduct "did not interfere with the [the plaintiff's] rights in the property . . . ." *Carter v. Wabash R. Co.*, 128 Mo. App. 57, 106 S.W. 611, 613 (1907); *see also McKee v. St. Louis, K. & N.W.R. Co.*, 49 Mo. App. 174, 182–83 (1892) (finding that plaintiff had no right under verbal lease to sublet). Here, in contrast, both this Court and the Eighth Circuit already have ruled that Defendants interfered with a property right belonging to the Plaintiffs, who own the land at issue. The fact that Sho-Me Power may also have had a legal right to exclude third parties from using the fiber optic cable is not relevant

11

to the question of what compensation is due to the plaintiff class members for the Defendants' unauthorized use of their property.

Had Defendants followed the proper course at the outset and condemned the class members' land for commercial telecommunications purposes, the class members would have been entitled to compensation for the taking, notwithstanding Sho-Me Power's control of its own cable. There is no reason why a different result should follow from the Defendants' failure to properly condemn the easement.

### c. Interference with Ability to Rent Land to Others

Defendants argue that Plaintiffs failed to demonstrate depreciation in fair market rental value because they did not show that the Defendants' use of the class members' properties for commercial telecommunications purposes interfered with the landowners' ability to rent their land to others. But the evidence showed that:

- Sho-Me Power's fiber optic cable on the class members' land had enough capacity to form a commercial superhighway. Doc. 867, Tr. at 220:8-15, 222:7-21, 225:2-14, 228:11-23.

- There was substantial competition in Sho-Me Power's geographic area to offer the types of telecommunications services Sho-Me Tech provides. *See id.* at 230:1-232:12 ("Q. Did you have the opinion that if Sho-Me Technologies didn't do that that somebody else would come in and step in the void?" A. Yes."); *see also* P98 (listing "Sho-Me Technologies' stiffest competition").

- Other providers, including Sho-Me Tech's competitors, installed their own fiber-optic cable to serve rural, small town, and metropolitan areas similar to those belonging to the plaintiffs. Doc. 867, Tr. at 218:19-25, 230:1-14.

- Mediacom actively bought rural cable television companies in Missouri for a number of years and connected them with fiber-optic cable, getting a huge cost savings. *Id.* at 111:1-14.

- Sho-Me Power leased excess fiber optic capacity to Sho-Me Tech and other providers, and other providers leased fiber to Sho-Me Tech. *Id.* at 218:19-25, 236:4-237:5; Doc. 868, Tr. at 305:13-306:19. The market for fiber optic capacity was active.

12

- The first party in the space would enjoy an advantage. P98 (Sho-Me Technologies, *A Business Plan*, Spring 1997) at 1 ("A well-conceived and well-executed company could secure a leading position in this field and own the information super highway. The window of opportunity will not stay open forever. In a new industry, the company that secures the lead can establish a position of strength that lasts for years.") and 11 ("If there are substantial barriers to entry the first company in can reap tremendous benefits.").

Thus, contrary to Defendants' argument, the evidence supported the jury's conclusion that there was a market for renting the commercial fiber optic cable corridor to third parties, and that Defendants' trespass, as a practical matter, interfered with Plaintiffs' ability to rent the land to others for telecommunications purposes.

### d. The Data Underlying the Testimony

Defendants insists that Dr. Kilpatrick's comparable transactions were not actually comparable in a number of ways, and that his opinion was otherwise unreliable, citing portions of Dr. Kilpatrick's report, which was attached to suggestions in support of a motion to strike that Defendants filed on April 4, 2014, Doc. 401, to argue that he did not consider enough transactions. Doc. 847, at 30-33. However, Defendants do not discuss testimony or exhibits from the second trial, which canvassed more than the 19 transactions to which Defendants refer in their motion.[5]

Dr. Kilpatrick's determination of the property's rental value was based in part on a report of the National Oceanic and Atmospheric Administration ("NOAA"), which valued several fiber-optic corridors around the country, including those crossing railroad rights-of-way and Indian lands, running along highways, and passing through subterranean waters. Doc. 867, at

---

[5] Defendants similarly argue that Dr. Kilpatrick's opinion contains an unauthenticated compilation of easement transactions that should be stricken. However, Defendants fail to identify testimony by Dr. Kilpatrick that was affected by the purportedly unreliable data. In any event, Defendants were at liberty to challenge the basis for Dr. Kilpatrick's testimony at trial, and it was up to the jury to determine how much weight to give to Dr. Kilpatrick's testimony.

13

81:10-82:4, 84:24-86:22; P3.[6] Dr. Kilpatrick also considered the value of net ground lease rates for commercial telecommunications corridors as well as fiber-optic cable easement data that he collected from transactions around the country and in Missouri. Doc. 867, at 87:4-89:3, 95:7-96:17, 97:10-99:13; P4, P83, P85, P86. Dr. Kilpatrick explained that: (i) railroad crossing easements offer a good point of comparison for Sho-Me Tech's easements because the parties in the transactions are "knowledgeable" and "well informed"; (ii) data from corridors crossing Indian lands offers a good point of comparison because those lands tend to be very rural; and (iii) data from a corridor along the Massachusetts Turnpike was a good comparable because the transactions were negotiated by various parties, and the lands in Massachusetts are largely wooded and agrarian. Doc. 867, Tr. at 99:2-101:10; 102:8-104:12. He opined that the data concerning the value of commercial fiber-optic cable easements was consistent across the nation, and that the Missouri figure he arrived at was consistent with national data. *Id.*, at 110:6-25. There also was evidence that Defendants paid the Kansas Southern Railway Company approximately $125 per foot in 2009 to put a fiber-optic cable across a track—a much higher rate than the $2.44 figure Dr. Kilpatrick reached. P37. Thus, there was sufficient evidence of comparable transactions to support a jury verdict in Plaintiffs' favor.

### e. Full-Spectrum vs. Fractional Use Easement

Defendants also criticize Dr. Kilpatrick's opinion for failing to distinguish between "full-spectrum" and "fractional use" easements. However, Dr. Kilpatrick testified that appraisal literature does not recognize such a distinction. Doc. 867, Tr. at 107:10-17. Defendants had the opportunity to cross-examine Dr. Kilpatrick regarding the scope of the easements he analyzed.

---

[6] The NOAA report also provides a methodology for valuing telecommunications corridors and a starting point for identifying comparable properties to perform valuations. *Id.* at 84.

Defendants also had the opportunity to present competing evidence concerning the value of a commercial telecommunications easement. Defendants' failure to do so does not justify a verdict in their favor. The jury was entitled to weigh Dr. Kilpatrick's testimony concerning the scope of the easement as it deemed appropriate in reaching its verdict.

### f. The "Value to the Taker" Approach

Defendants' complaints that, during "opening statement in the first trial, Plaintiff's counsel expressly acknowledged that Dr. Kilpatrick calculates damages based on the 'value to the taker' rather than 'loss to the owner,'" and that "Dr. Kilpatrick's focus [is] on the value and the benefit to the buyer, to the person who acquires it" (Doc. 847, at 28 of 43 (citing Doc. 647 at 37:17-20)), are baseless. First, statements made at the prior trial cannot supply a basis for judgment in Defendants' favor now. Second, to the extent that Defendants believed that Dr. Kilpatrick made misleading statements concerning the proper measure of damages, they had the opportunity both to object and to challenge Dr. Kilpatrick's testimony on cross-examination. The jury was entitled to weigh the admissible evidence adduced to determine how much credence Dr. Kilpatrick's testimony warranted. *See Browning,* 139 F.3d at 634 (holding that courts may not "weigh[] the credibility of the witnesses" in deciding a Rule 50 motion).

*     *     *

In sum, Defendants have not shown that there was insufficient evidence for the jury to find in Plaintiffs' favor as to the fair market rental value of a commercial fiber optic cable corridor.

### 4. Nominal damages instruction

Defendants' argument that the jury "must be instructed on nominal damages" (Doc. 847, at 26-27) is moot, as the Court gave a nominal damages instruction at trial. *See* Doc. 858, at 18 (Instruction No. 15).

### B.     Punitive damages

Defendants' argument that there was not sufficient evidence to support an award of punitive damages, Doc. 847, at 34-40, is unpersuasive.

As a preliminary matter, the Rule 50 motion was filed before the punitive damages phase of the trial began, so it references issues that were not raised in the punitive damages phase and fails to take account of evidence that was raised therein.

Furthermore, even if Defendants are correct that "no legal authority provide[d] a basis for the Sho-Me Defendants to believe they were obliged to pay any money (or at least anything more than a nominal payment of $1.00 per owner)" (Doc. 847, at 28), that would not mean that punitive damages were not warranted. Punitive damages are no less appropriate where damages are merely nominal than where actual damages are high.[7] The question is whether Defendants demonstrated reckless indifference to the rights of others. Doc. 858, at 23 (Jury Instruction No. 18). The fact that Defendants knew that they could have owed some money to property owners but failed to make any payment supports an award of punitive damages.

Further, the evidence before the jury included testimony that Defendants knew that Sho-Me Power was empowered to sell electricity and related products, but not telecommunications services (Doc. 870, Tr. 661:1-9, 670:15-23), and that the Defendants might have had to pay more money to operate a commercial telecommunications business across Plaintiffs' land (*id.*,

---

[7] Of course, the amount of punitive damages may be different depending on the amount of actual damages awarded.

at 661:14-24), and they concealed that intended use from the plaintiff class members (*id.*, at 669:1-23, 681:17-683:12). These facts supported the jury's conclusion that Defendants acted with "reckless indifference" to the Plaintiffs' rights. *See Beetschen II*, 253 S.W.2d at 787 ("The erection of the fence was certainly intentional, it was a wrongful act and was done without just cause or excuse and was therefore wilful, and warranted the submission of punitive damages."). Neither Sho-Me Power's status as a not-for-profit rural electric cooperative nor its purported belief that the ends justified the means immunizes either Defendant from punitive damages.

## IV. Conclusion

For the reasons stated above, Defendants' Rule 50 motion for judgment as a matter of law is denied in full.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: April 10, 2018  
Jefferson City, Missouri